QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Jonathan Tse (Bar. No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Deepa Acharya (Bar No. 267654)
deepaacharya@quinnemanuel.com
1300 I Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

Attorneys for Defendant

*(ADDITIONAL COUNSEL IN
SIGNATURE BLOCKS)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNILOC 2017 LLC, | Case Nos.: 4:20-cv-04355-YGR; 4:20-cv-05330-YGR; 4:20-cv-05333-YGR; 4:20-cv-05334-YGR; 4:20-cv-05339-YGR; 4:20-cv-05340-YGR; 4:20-cv-05341-YGR; 4:20-cv-05342-YGR; 4:20-cv-05343-YGR; 4:20-cv-05344-YGR; 4:20-cv-05345-YGR; 4:20-cv-05346-YGR |
| Plaintiff, | |
| v. | |
| GOOGLE LLC, | |
| Defendant. | **DEFENDANT GOOGLE LLC'S RENEWED MOTION TO DISMISS FOR LACK OF STANDING** |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION..........................................................................................1

II.     STATEMENT OF ISSUES TO BE DECIDED (L.R. CV-7(A)(1))......................................2

III.    FACTUAL BACKGROUND ............................................................................2

        A.      The Parties .........................................................................................2

        B.      Google's Motion to Dismiss ..........................................................2

IV.     UNILOC LACKS STANDING TO SUE ..........................................................2

        A.      Uniloc 2017 Lacks the Exclusionary Rights Required for Standing ........................2

                1.      Uniloc 2017's Predecessor-In-Interest Granted Fortress an
                        Irrevocable Right to Sublicense the Patents-in-Suit......................................3

                2.      Fortress's Irrevocable Sublicensing Right Survived the Termination
                        of the Fortress License Agreement................................................5

                3.      Fortress's Irrevocable Sublicensing Right Was Not Restricted ....................6

                4.      Fortress Never Waived Any Rights Under the RSA, and Uniloc
                        Never Cured Any Defaults .............................................................7

        B.      Uniloc 2017 Does Not Hold All Substantial Rights in the Patents-in-Suit...............9

                1.      Uniloc 2017 Relinquished All Rights to Sue and Recover Damages ...........9

                2.      CF Uniloc Controls Enforcement and Disposition of the Patents-in-
                        Suit ...............................................................................11

V.      CONCLUSION ............................................................................................11

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
    No. CV 16-453-RGA, 2017 WL 3668597 (D. Del. Aug. 24, 2017) ................................ 6

*Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010) ...................................................................................... 10

*Bakalis v. Bakalis*,
    88 N.Y.S.3d 899 (N.Y. App. Div. 2018) ......................................................................... 8

*Bank of New York Mellon Trust Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*,
    910 F. Supp. 2d 629 (S.D.N.Y. 2012) ......................................................................... 7, 8

*Cafferty v. Scotti Bros. Records, Inc.*,
    969 F. Supp. 193 (S.D.N.Y. 1997) ................................................................................. 6

*Enviro Noise Control Corp. v. Stealth Acoustical & Emission Control Corp.*,
    No. 07-CV-02555-EWN-KLM, 2008 WL 11363360 (D. Colo. July 9, 2008) ................ 10

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
    630 F. Supp. 2d 365 (D. Del. 2007) .............................................................................. 10

*In re Provider Meds, L.L.C.*,
    907 F.3d 845 (5th Cir. 2018) ......................................................................................... 6

*In re Taddeo*,
    685 F.2d 24 (2d Cir. 1982) ............................................................................................ 7

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
    925 F.3d 1225 (Fed. Cir. 2019) ................................................................................. 9, 11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................................... 3

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
    814 F.3d 1343 (Fed. Cir. 2016) ...................................................................................... 6

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990) ........................................................................................... 8

*Morrow v. Microsoft Corp.*,
    499 F.3d 1332 (Fed. Cir. 2007) .............................................................................. 1, 3, 10

*Prima Tek II, LLC v. A-Roo Co.*,
    222 F.3d 1372 (Fed. Cir. 2000) ...................................................................................... 5

*Propat Int'l Corp. v. Rpost, Inc.*,
    473 F.3d 1187 (Fed. Cir. 2007) .......................................................... 11

*WiAV Solutions LLC v. Motorola, Inc.*,
    631 F.3d 1257 (Fed. Cir. 2010) .............................................. 3, 6, 7

*Wittman v. Personhuballah*,
    136 S. Ct. 1732 (2016) ........................................................... 3

**STATUTES**

35 U.S.C. § 281 .................................................................................... 1, 9

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(1) ............................................ 1, 2

Federal Rule of Civil Procedure 12(b)(3) ................................................ 1

Federal Rules of Civil Procedure 12(b)(6) ......................................... 1, 2

# I.  INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(3), and (b)(6), Defendant Google LLC ("Google") is moving to dismiss five pending complaints filed by Uniloc 2017 LLC ("Uniloc 2017") in December 2018 (the "December Complaints")[1] for lack of standing.

*First*, Uniloc 2017 lacks Article III standing because its predecessor-in-interest, Uniloc Luxembourg, S.A. ("Uniloc Lux"), granted a third party, Fortress Credit Co LLC ("Fortress"), an "irrevocable" license that is "transferrable" and "sub-licensable" at Fortress's "sole and absolute discretion"—including to Google.  *See Morrow v. Microsoft Corp.,* 499 F.3d 1332, 1338 (Fed. Cir. 2007) (holding that a plaintiff for patent infringement lacks standing if it does not have the right to exclude the defendant from practicing the patents).  Uniloc 2017 acquired the patents-in-suit subject to Fortress's irrevocable rights.  Further, Uniloc 2017 lacks standing under 35 U.S.C. § 281, because Uniloc 2017 does not have "all substantial rights" in order to sue.  Shortly after acquiring the patents-in-suit, Uniloc 2017 granted Uniloc Licensing LLC ("Uniloc Licensing") an "exclusive" right to sue for infringement.  Uniloc 2017 also ceded control over settlement and assignment decisions to a Fortress-controlled entity, CF Uniloc Holdings LLC ("CF Uniloc").

The division of patent rights here goes far beyond the typical case.  Standing often turns on the division of rights between two entities—the assignor/licensor and the assignee/licensee.  But here, the rights are divided among at least *four* different entities—a licensee with an irrevocable right to grant sublicenses (Fortress), a licensee with a right to sue but no standing to do so (Uniloc Licensing), a patent owner with exclusionary rights but no right or power to enforce them (Uniloc 2017), and a corporate parent with rights to control enforcement and assignment but no exclusionary rights or rights to sue (CF Uniloc).  This is exactly the kind of scheme that *Morrow* suggests could deprive all entities of standing.

---

[1]  The parties conducted discovery on standing after initially briefing the issues addressed in this motion. The facts relating to lack of standing are sufficiently similar that an identical motion is being filed across Uniloc's cases filed in late December 2018 (the 548-554 cases). Google is filing motions addressed to different factual circumstances in Uniloc's cases filed in November 2018 (the 491-504 cases), with the only substantive variation among the motions in the November 2018 cases being particular arguments as to Uniloc's failure to allege acts of infringement in this District in the 491, 492, 495, 497, 500, 503, and 504 cases.

## II. STATEMENT OF ISSUES TO BE DECIDED (L.R. CV-7(A)(1))

1. Should this case be dismissed under Federal Rule of Civil Procedure 12(b)(1) and/or 12(b)(6) because the plaintiffs lack standing to sue?

## III. FACTUAL BACKGROUND

### A. The Parties

Uniloc 2017 LLC is a Delaware limited liability company. 2:18-cv-00552 Compl. ¶ 1. Various permutations of Uniloc entities (including Uniloc 2017, Uniloc USA, and Uniloc Licensing USA LLC) have sued telecommunications and mobile device companies for patent infringement across the country, and have previously filed and dismissed several other complaints against Google in this District. Meanwhile, the ownership of the patents-in-suit has shifted alongside Uniloc's changing corporate and capital structure. *See infra* Part IV.

### B. Google's Motion to Dismiss

This Motion concerns five actions Uniloc 2017 filed against Google in December 2018. On December 30, 2018, Uniloc 2017 sued Google in 2:18-cv-548. The next day, it sued Google in cases ending -550, -551, -552, and -553. In these actions collectively, Uniloc alleges that Google's Cloud, Photos, Chromecast, and Featured Snippets products infringe six different patents. *See, e.g.*, 2:18-cv-00550 Compl. ¶ 19; 2:18-cv-00548 Compl. ¶ 17; 2:18-cv-00552 Compl. ¶ 17; 2:18-cv-00553 Compl. ¶ 17.

On June 19, 2019, Google filed a motion to dismiss for lack of standing. The Court subsequently entered a scheduling order to govern additional discovery and briefing on the issues raised in Google's motion. A modified scheduling order followed, setting forth deadlines by which Google would file a renewed motion to dismiss based on standing. This is the contemplated renewed motion.

## IV. UNILOC LACKS STANDING TO SUE

### A. Uniloc 2017 Lacks the Exclusionary Rights Required for Standing

The plaintiff bears the burden of establishing that it has Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "A party has standing only if he shows that he

-2

has suffered an 'injury in fact' . . . ." *Wittman v. Personhuballah,* 136 S. Ct. 1732, 1736 (2016) ("The need to satisfy [this] requirement[] persists throughout the life of the lawsuit.") (citations omitted). Article III standing requires that a plaintiff have suffered an injury-in-fact from a violation of its exclusionary rights in the patent. *Morrow,* 499 F.3d at 1340–41 (Fed. Cir. 2007).

Article III standing in a patent case requires that the plaintiff have the "exclusive" right to control the use of the patents-in-suit. If a third party has the right to license the defendant's allegedly infringing activities, the plaintiff lacks the requisite exclusionary rights. *See WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010). In such a case, the plaintiff suffers no injury-in-fact from the defendant's acts, because the plaintiff lacks the right to exclude the defendants from using the patents in the first place. Such is the situation here: Uniloc 2017 lacks exclusionary rights in the patents-in-suit because a third party—Fortress—has the right to license those patents to Google.

> ### 1. Uniloc 2017's Predecessor-In-Interest Granted Fortress an Irrevocable Right to Sublicense the Patents-in-Suit

In 2014, Fortress loaned money to Uniloc Lux and Uniloc USA. On December 30, 2014, Uniloc Lux, Uniloc USA, and Fortress entered into several agreements, including: (1) a Revenue Sharing and Note and Warrant Purchase Agreement ("RSA") (Ex. D); and (2) a Patent License Agreement ("Fortress License Agreement") (Ex. E).

The Fortress License Agreement granted Fortress extensive rights in *all* of Uniloc Lux's and Uniloc USA's intellectual property "following an Event of Default," as defined in the RSA. *Id.* § 2.1; Ex. D § 2.8; Ex. F, 66:22-25; Ex. G, 27:9-15. Once an Event of Default occurred, Fortress's right to use its license would become "irrevocable.":

> Subject to the terms and conditions herein and in the Purchase Agreement, Licensor hereby grants to Licensee a non-exclusive, *transferrable, sub-licensable, divisible irrevocable*, fully paid-up, royalty-free, and worldwide license to the Licensed Patents, including, but not limited to, the rights to make, have made, market, use, sell, offer for sale, import, export and distribute the inventions disclosed in the Licensed Patents and otherwise exploit the Licensed Patents in any lawful manner in *Licensee's sole and absolute discretion* solely for the benefit of the Secured Parties ("Patent License"), provided that Licensee shall only use the Patent License following an Event of Default.

Ex. E, § 2.1 (emphasis added). Accordingly, once an Event of Default occurred, Fortress could use its "irrevocable" license to grant sublicenses in its "sole and absolute discretion," "without restriction," and "without consent of [Uniloc Lux or Uniloc USA]." *Id.* §§ 2.2, 8.

The parties to the RSA defined "Event[] of Default" broadly. Ex. D, § 7.1. An Event of Default would occur, for instance, if Uniloc Lux or Uniloc USA failed to perform any of the covenants or agreements contained in the RSA. *Id.* § 7.1.2, Article VI. An Event of Default would also occur if Uniloc Lux or Uniloc USA made any representations that were materially false on the date on which the representation was made. *Id.* § 7.1.3.

By the time Uniloc 2017 acquired the patents-in-suit, at least three Events of Default had already occurred, each itself sufficient to remove the sole condition on Fortress's "irrevocable" license. One Event of Default occurred on March 31, 2017, when Uniloc Lux and Uniloc USA failed to realize at least $20 million in revenue for the four-quarter period ending on that date, as required by § 6.2.2 of the RSA. *Id.*, §§ 6.2.2, 7.1.2. Uniloc Lux and Uniloc USA managed to realize only approximately $14,608,000 in revenue during that period—a fact confirmed by Uniloc Lux's financial records and the deposition testimony of its Chief Financial Officer, Drake Turner. Ex. D, Schedule 4.5(a); Ex. G, 72:22-25. A second Event of Default occurred under the same provision of the RSA when Uniloc Lux and Uniloc USA received only $14,360,989 in revenue for the four-quarter period ending June 30, 2017—again short of the $20 million that the RSA required. Ex. H; Ex. G, 66:4-67:6, 68:15-18.[2]

A third Event of Default occurred when Uniloc Lux and Uniloc USA breached a covenant requiring certain representations to be true. *See* Ex. D, § 7.1.3. Article IV of the RSA contains representations that Uniloc Lux and Uniloc USA made "[i]n order to induce [Fortress]" to enter that agreement. (*Id.* Art. IV.) These representations were first made as of the original closing date of December 30, 2014, and they were reaffirmed upon the RSA's amendment on May 15, 2017. Ex. I, § 3.02 ("The representations and warranties of [Uniloc] contained in the Agreement being true and correct in all material respects . . . each on and as of [May 15, 2017.]"). Uniloc Lux and

---

[2] Notably, Uniloc 2017's 30(b)(6) witness testified he did not know these revenue figures, even though Google had listed them as a deposition topic. Ex. P, 139:15-141:1; Ex. V, 8-9.

Uniloc USA represented that "[a]ll of the Patents . . . have not been adjudged invalid or unenforceable, in whole or in part, and none of the Patents [is] at this time . . . subject to any challenge to their validity or enforceability. Ex. D, § 4.5. Uniloc Lux and Uniloc USA further represented that they had "no notice of any lawsuits, actions or opposition, cancellation, revocation, re-examination to reissue proceedings commenced or threatened with reference to any of the Patents." *Id.* These statements were false. By May 15, 2017, at least seven Uniloc patents had already "been adjudged invalid or unenforceable, in whole or in part", and at least nine more were subject to re-examination proceedings, challenging their validity or enforceability. *Id*. § 4.5.[3]

### 2. Fortress's Irrevocable Sublicensing Right Survived the Termination of the Fortress License Agreement

On March 28, 2018, Uniloc Lux agreed to assign the patents-in-suit to Uniloc 2017 and terminate both the Lux-to-USA License and the Fortress License Agreement. Ex. L, § 2.7(b)(iii), (vi), (xvi). On May 3, 2018, the agreements were terminated (Ex. M; Ex. N), and Uniloc Lux assigned all of its right, title, and interest to the patents-in-suit to Uniloc 2017. Ex. O, § 1(a). By this point, however, Fortress already possessed the irrevocable right to sublicense the patents-in-suit. So Uniloc Lux did not have an unfettered exclusionary right to assign to Uniloc 2017. *See Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1382 (Fed. Cir. 2000) (explaining that "an owner or licensee of a patent cannot convey that which it does not possess").

The Fortress License Agreement makes clear that Fortress's license, which included the right to sublicense, is "irrevocable." Its use of this word is unambiguous. Further, the agreement expressly provides for the survival of certain rights following termination. In the section titled "Survival," it provides that "[a]ny rights . . . which by their nature survive and continue after any . . . termination of this Agreement will survive and continue and will bind the Parties and their successors and assigns." Ex. E § 6. An "irrevocable" right is inherently among those that "by their nature survive." This is true not only as a matter of plain meaning, but also as a matter of

---

[3] *See* Doak Decl. Uniloc Lux and Uniloc USA's representations were also false when first made on December 30, 2014. By that date, at least one Uniloc patent had already been ruled invalid in part, and at least two other patents were subject to pending invalidity challenges. Ex. J; Ex. K.

law.  *See, e.g., In re Provider Meds, L.L.C.*, 907 F.3d 845, 856 (5th Cir. 2018) (explaining that the term "irrevocable . . . indicates that the license may not be revoked for any reason"); *Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193, 198–199 (S.D.N.Y. 1997) (holding under New York law that an "irrevocabl[e]" license survived the occurrence of events that a subsequent agreement stated would terminate the license).

Because Fortress retained the right to sublicense or transfer its license to Google, Uniloc 2017 lacks the absolute right to exclude Google from practicing the patents-in-suit.  Without that right, Uniloc 2017 lacks constitutional standing to sue.  *See Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1348 (Fed. Cir. 2016) ("If [the patentee] could . . . license any entity . . . [the licensee] would not have had exclusionary rights to the asserted patents."); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. CV 16-453-RGA, 2017 WL 3668597, at *3 (D. Del. Aug. 24, 2017) (third party's ability to license the accused infringers deprived plaintiff of standing to sue).

### 3. Fortress's Irrevocable Sublicensing Right Was Not Restricted

In analyzing whether a third party's licensing rights defeat standing, the dispositive issue is whether the right extends to licensing the accused infringer.  *Luminara*, 814 F.3d at 1348; *WiAV*, 631 F.3d at 1267.  Although the court found standing in *Luminara* and *WiAV*, it did so because the licenses at issue allowed the third party to sublicense only to "affiliate[s]," and the accused infringer did not so qualify.  *Luminara*, 814 F.3d at 1349; *WiAV*, 631 F.3d at 1262-63.  Fortress's right to sublicense has no similar restrictions.  Once an Event of Default occurred, Fortress obtained the right to grant any sublicenses in its "sole and absolute discretion."  Ex. E, § 2.1. Fortress also obtained the right to transfer its rights to any third party without restriction and consent from Uniloc Lux or Uniloc USA."  *Id.* § 8.  Uniloc Lux and Uniloc USA knew how to restrict a licensee's right to sublicense when they intended to do so, but they chose not to do so here.

Whether Fortress has taken any action based on these Events of Default is irrelevant. Fortress did not need to do anything to obtain its rights in the patents-in-suit—they vested automatically when the Events of Default occurred.  Ex. D, §§ 6.2.2, 7.1.2.  Nor does it matter that Fortress has not granted a sublicense to Google.  Google's *ability* to obtain a license from a party

other than Uniloc 2017 is what vitiates Uniloc 2017's exclusionary right. *See WiAV*, 631 F.3d at 1266 ("[A]n exclusive licensee lacks standing to sue a party who has the *ability* to obtain such a license from another party with the right to grant it." (emphasis added)).

### 4. Fortress Never Waived Any Rights Under the RSA, and Uniloc Never Cured Any Defaults

Fortress never waived these or any other Events of Default, even though the RSA allowed it to do so. Ex.D, § 7.3; Ex. F at 89:13-90:15; Ex. P, 142:6-143:10. The RSA requires all waivers to be in writing; it expressly forbids implied waivers. (Ex. D, §§ 7.3(x), 9.4.). Uniloc 2017 has not produced any evidence of an express, written waiver—evidence that presumably would have been produced long ago if it existed—and Uniloc 2017's corporate representative has testified that he is unaware of any such waiver. Ex. P, 142:6-143:10. Moreover, the May 2017 amendment to the RSA states affirmatively that it does not waive any of Fortress's rights. Ex. I, Section 4.

Nor is there any evidence that Uniloc Lux and Uniloc USA cured either Event of Default. The RSA does not define the term "cure." Under New York law, which governs, undefined terms are given their plain meaning. *Bank of New York Mellon Trust Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.,* 910 F. Supp. 2d 629, 648-49 (S.D.N.Y. 2012); *In re Taddeo,* 685 F.2d 24, 26-27 (2d Cir. 1982); *see also Bank of New York Mellon,* 910 F. Supp. 2d at 649 ("Curing a default commonly means taking care of the triggering event and returning to pre-default conditions.").

The RSA uses the term "cure" in accord with its plain meaning. Section 7.3(y) provides that an Event of Default shall continue until "[Uniloc Lux and Uniloc USA have] cured such Event of Default . . . or such Event of Default otherwise ceases to exist." Ex. D, § 7.3(y). Thus, to fall within Section 7.3(y), the Event of Default must no longer exist, whether by Uniloc Lux's and Uniloc USA's action ("cured") or by some other means ("otherwise"). The waiver provision of Section 7.3(x), in contrast, does not require that the Event of Default cease to exist. Instead, it requires action on the part of Fortress to waive an Event of Default in writing. *Id.* § 7.3(x). *Bank of New York Mellon,* 910 F. Supp. 2d at 649 ("waiver" and "cure" presumed to differ). A "cure" by Uniloc Lux and Uniloc USA is thus both separate and distinct from a waiver by Fortress.

To have cured their defaults, Uniloc Lux and Uniloc USA would have needed to remedy both of their revenue shortfalls, as well as their misrepresentations, such that those shortfalls and misrepresentations no longer existed. *Bakalis v. Bakalis,* 88 N.Y.S.3d 899, 900 (N.Y. App. Div. 2018) ("[T]he defendant . . . cured his default in payment . . . by making the required payment . . . on the cure date fixed by the plaintiff"). The RSA offers no guidance on how Uniloc Lux and Uniloc USA could have cured a default under Section 6.2.2 or by when they would have been required to do so. It provides for no cure period, and it gives Uniloc Lux and Uniloc USA no time to comply with Section 6.2.2 before a default is deemed to occur. A breach of that section is automatically a default, which suggests that Uniloc Lux and Uniloc USA had no opportunity to cure their defaults at all. *Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 890 (2d Cir. 1990) (court cannot modify the "right to cure that was bargained for"). Even assuming a cure were possible, there is no evidence that Uniloc Lux and Uniloc USA effected one. Curing a revenue shortfall presumably would have required, at a minimum, that they make up that shortfall. But Uniloc Lux and Uniloc USA missed their March 31, 2017 target by $6 million, and they did not make up that difference by the end of the next quarter, June 30, 2017, when they *again* fell far short of their revenue target, resulting in a second breach. Ex. G, 70:7-72:25; Ex. H.

Nor did Uniloc Lux and Uniloc USA identify any plan to cure their breach. Section 6.5.1.2 of the RSA required them, upon learning of an Event of Default, to notify Fortress of "what action [Uniloc] has taken, is taking or proposes to take" to rectify their default. Ex. D, § 6.5.1.2. But Uniloc Lux and Uniloc USA never provided such notice. Ex. F, 83:22-84:7. Indeed, they apparently did not even realize they had defaulted—whether an Event of Default had occurred did not "even cross[] the mind of anyone at Fortress or Uniloc Luxembourg." Ex. Q, 11. The fact that Uniloc admits that it did not realize the breach and never provided a plan to address it confirms that Uniloc Lux and Uniloc USA never took any affirmative steps to cure.

In response to Google's previous motion to dismiss, Uniloc submitted two declarations by Fortress employee James Palmer in response to Google's assertion that Uniloc defaulted under the RSA. Mr. Palmer opined that any default by Uniloc had been cured to Fortress's satisfaction. Ex.

R. Mr. Palmer's declarations ignore the legal meaning of a "cure," conflict with the RSA's use of the term, and contradict other, nontestimonial evidence.

### B. Uniloc 2017 Does Not Hold All Substantial Rights in the Patents-in-Suit

Uniloc 2017 also lacks standing under 35 U.S.C. § 281, which requires that a plaintiff hold "all substantial rights" to the patents-in-suit. *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019). After acquiring the patents-in-suit, Uniloc 2017 granted Uniloc Licensing the exclusive right to sue and recover damages for infringement. Uniloc 2017 also ceded to CF Uniloc the right to control enforcement and disposition of the patents-in-suit, effectively burning the candle at both ends. Although Uniloc 2017 might have retained the right to exclude, it has no mechanism to enforce that right and no control over the entity that does. This is another ground for dismissal.

#### 1. Uniloc 2017 Relinquished All Rights to Sue and Recover Damages

Upon acquiring the patents-in-suit, Uniloc 2017 immediately granted another Uniloc entity, Uniloc Licensing, the "exclusive" right to sue—but *only* the right to sue. Ex. S; Ex. T. Uniloc Licensing holds a "non-assignable exclusive license . . . solely to enforce [the patents] through litigation"; the license extends only to "licensing and enforcement" and "the planning and management of litigation," including the right to select counsel and consultants for use in these actions. Ex. S, §§ 1.5, 2.1, 2.2, 3.1(c). The agreement also grants Uniloc Licensing "the exclusive right to . . . manage and oversee any present suit for infringement . . . [and to] recover damages, profits and awards of whatever nature for past and present infringement." *Id.* § 3.1. Further, it requires Uniloc Licensing to remit "100% of any proceeds received from any litigation or settlement" to Uniloc 2017. *Id.* § 3.2. The agreement gives Uniloc Licensing no right, however, to practice the patents-in-suit or to exclude others from doing so. To the contrary, it states that, beyond the litigation rights above, "no license to, or right of Uniloc 2017 under, any patents . . . is either granted or implied to Uniloc Licensing and all rights not expressly granted in this Agreement are reserved by Uniloc 2017." *Id.* § 2.4.

This transfer of rights failed to confer standing on Uniloc Licensing, but it did negate any claim to standing by Uniloc 2017. The right to sue is "frequently" considered "the most important

-9

consideration" in the standing analysis. *Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1361 (Fed. Cir. 2010). As the Federal Circuit warned in *Morrow*, "[w]hile parties are free to assign some or all patent rights as they see fit based on their interests and objectives, this does not mean that the chosen method of division will satisfy standing requirements." 499 F.3d at 1341 n.8. Several district courts have applied *Morrow* in holding that when an entity with exclusionary rights in a patent relinquishes its right to sue, it lacks standing. In *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, for example, the patent owner (Intersil) had granted a licensee (Fairchild) "the sole and exclusive right" to sue the accused infringer (Power Integrations) on the patents-in-suit. 630 F. Supp. 2d 365, 371 (D. Del. 2007). The court held that the patent owner had contracted away its right to sue and lacked standing:

> As for Intersil, the Court likewise concludes that Intersil lacks standing to maintain this action against Power Integrations. Intersil contracted away its right to sue Power Integrations to Fairchild. That Fairchild lacks standing to take advantage of that right does not mean that Intersil regains it. Indeed, the Federal Circuit recognized in *Morrow* . . . that the contractual division of patent rights may have the effect of defeating standing as to all relevant parties.

*Id.* at 372–73. The court further concluded that, because the patent owner had no right to sue and the licensee had no Article III standing, the patent owner could not be added in order to cure the standing problem—and dismissed the action. *Id.* at 373. The reasoning in *Fairchild* applies here. Like the plaintiff in that case, Uniloc 2017 signed away its right to sue and recover damages for infringement. Ex. S, §§ 2.1, 3.1. *See Fairchild*, 630 F. Supp. 2d at 373. And Uniloc Licensing, like the licensee in *Fairchild*, is a bare licensee. Uniloc 2017 thus divided its rights such that neither it nor Uniloc Licensing has standing. *See id.* at 372–73.

The court in *Enviro Noise Control Corp. v. Stealth Acoustical & Emission Control Corp.* reached a similar conclusion on similar facts. No. 07-CV-02555-EWN-KLM, 2008 WL 11363360 (D. Colo. July 9, 2008). There, the licensee possessed exclusionary rights in the patents-in-suit, but the patent owner possessed the exclusive right to sue and recover damages. *Id.* at *7. The court concluded that the licensee had "no mechanism" to enforce its exclusionary rights and lacked standing. *Id.*. Similarly, although Uniloc 2017 might have theoretically retained its exclusionary right, it lacks any mechanism of enforcement.

### 2. CF Uniloc Controls Enforcement and Disposition of the Patents-in-Suit

Around the same time that Uniloc 2017 relinquished its right to sue, it entered a security agreement giving CF Uniloc control over the enforcement and disposition of the patents-in-suit. Ex. U, § 7.1. The agreement requires Uniloc 2017 to obtain the "prior written consent" of CF Uniloc before it can "sell, lease, transfer or otherwise dispose of . . . *any*" of its patents. *Id.* § 7.1(d). This gives CF Uniloc substantial control over settlement and licensing decisions by Uniloc 2017. Relatedly, the agreement requires Uniloc 2017 to pay the maintenance fees for its patents, which enables CF Uniloc to control whether patents lapse and inventions enter the public domain. *Id.* § 4.9(a). This right to control eliminates Uniloc 2017's standing. *See Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir. 2007) ("The right to dispose of an asset is an important incident of ownership, and . . . a restriction on that right is a strong indicator that the [patent holder] does not [have] all substantial rights under the patent.").

CF Uniloc's control over the "alienation" of Uniloc 2017's patents also "ensures that [CF Uniloc] will always control how the patents are asserted" because licensing objectives necessarily drive decisions about who, whether, and when to sue. *See Lone Star*, 925 F.3d at 1233. These controls are "fundamentally inconsistent" with the notion that Uniloc 2017 possesses "all substantial rights" in the patents-in-suit. *See id.* Uniloc 2017, therefore, does not have standing.[The sections addressing Google's motion to dismiss as to venue grounds are omitted]

## V. CONCLUSION

For these reasons, the Court should dismiss the actions for lack of standing.

Dated: October 18, 2019          Respectfully submitted:

*/s/ Michael E. Berta, with permission*
*by Michael E. Jones*
Michael A. Berta
(California Bar No. 194650
Michael.berta@arnoldporter.com
Arnold & Porter
10th Floor
Three Embarcadero Center
San Francisco, CA 94111-4024
Tel: 415-471-3100
Fax: 415-471-3400

David Caine (California Bar No. 218074)

-11

David.Caine@arnoldporter.com
Telephone: (650) 319-4710
Bonnie Phan (California Bar No. 305574)
Bonnie.Phan@arnoldporter.com
Telephone: (650) 319-4543
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807

Nicholas Lee (California Bar No. 259588)
Nicholas.Lee@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4156

Nicholas Nyemah (DC Bar No. 1005926)
Nicholas.Nyemah@arnoldporter.com
Telephone: (202) 942-6681
Paul Margulies (DC Bar No. 1000297)
Paul.Margulies@arnoldporter.com
Telephone: (202) 942-6990
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

Mark Samartino (Illinois No. 6313889)
Mark.Samartino@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602-4321
Telephone: (312) 583-2437

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Earl Glenn Thames, Jr.
State Bar No.00785097
glennthames@potterminton.com
Patrick C. Clutter
State Bar No. 24036374
patrickclutter@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

**Attorneys for Defendant Google LLC**
**2:18cv548**

*/s/ Michael C. Hendershot, with permission*

-12

*by Michael E. Jones*
Michael C. Hendershot
Tharan G. Lanier
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Tel: (650) 739-3940
Fax: (650) 739-3900
mhendershot@jonesday.com
tglanier@jonesday.com

Sanjiv P. Laud
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
Telephone: (612) 217-8879
slaud@jonesday.com

John D. Kinton (Calif. State Bar No. 203250)
JONES DAY
4655 Executive Drive
Suite 1500
San Diego, CA 92121
Telephone: 858.314.1190
Facsimile: 844.345.3178
Email: jkinton@jonesday.com

Tracy A. Stitt
tastitt@jonesday.com
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: (202) 879-3641

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Earl Glenn Thames, Jr.
State Bar No.00785097
glennthames@potterminton.com
Patrick C. Clutter
State Bar No. 24036374
patrickclutter@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

**Attorneys for Defendants Google LLC**
**2:18-cv-549**
**2:18-cv-552**

_/s/ Robert Unikel, with permission by_
_Michael E. Jones_
Robert Unikel
robertunikel@paulhastings.com
Michelle Marek Figueiredo (IL Bar #6297112)
michellemarek@paulhastings.com Matthew Richard
Lind (IL Bar #6327241) mattlind@paulhastings.com
John A. Cotiguala (IL Bar #6311056)
johncotiguala@paulhastings.com
PAUL HASTINGS LLP
71 South Wacker Dr., 45th Floor
Chicago, IL 60606
Main: 312-499-6000
Facsimile: (312) 499-6100

Elizabeth Louise Brann (CA Bar #222873)
elizabethbrann@paulhastings.com
Ariell Nicole Bratton (CA Bar #317587)
ariellbratton@paulhastings.com
PAUL HASTINGS LLP
4747 Executive Drive, 12th Floor
San Diego, CA 92121
Telephone: (858) 458-3000
Facsimile: (858) 458-3005

Robert Laurenzi (NY Bar #3024676)
robertlaurenzi@paulhastings.com
PAUL HASTINGS LLP
200 Park Avenue, 26th Floor
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 318-6100

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Earl Glenn Thames, Jr.
State Bar No.00785097
glennthames@potterminton.com
Patrick C. Clutter
State Bar No. 24036374
patrickclutter@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846
**Attorneys for Defendants Google LLC**
**2:18-cv-550**
**2:18-cv-551**

_/s/ David Perlson, with permission by_
_Michael E. Jones_
David Perlson
davidperlson@quinnemanuel.com

-14

Charles K. Verhoeven
charlesverhoeven@quinnemanuel.com
Jonathan Tse
jonathantse@quinnemanuel.com
David Doak
daviddoak@quinnemanuel.com
Antonio Sistos
antoniosistos@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
50 California St., 22nd Floor
San Francisco, CA 94111
Tel: 415-875-6344
Fax: 415-875-6700

Deepa Acharya
deepaacharya@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900 20005
Washington, D.C. 20005-4107
Tel: 202-538-8107
Fax: 202-538-8100

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Earl Glenn Thames, Jr.
State Bar No.00785097
glennthames@potterminton.com
Patrick C. Clutter
State Bar No. 24036374
patrickclutter@potterminton.com POTTER
MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

Joseph Drayton
NY Bar No. 2875318
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Tel: 212-479-6275
Fax: 212-479-6275
Email: jdrayton@cooley.com

**Attorneys for Defendants Google LLC
2:18-cv-553**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on October 18, 2019.

*/s/ Michael E. Jones*

## **CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I certify that the foregoing document is authorized to be filed under seal pursuant to the

Protective Order entered in this case.

*/s/ Michael E. Jones*

DEFENDANT GOOGLE LLC'S RENEWED
MOTION TO DISMISS FOR LACK OF STANDING

1  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
2  Charles K. Verhoeven (Bar No. 170151)
   charlesverhoeven@quinnemanuel.com
3  David Perlson (Bar No. 209502)
   davidperlson@quinnemanuel.com
4  Jonathan Tse (Bar. No. 305468)
   jonathantse@quinnemanuel.com
5  50 California Street, 22nd Floor
   San Francisco, CA 94111
6  Telephone: (415) 875-6600
   Facsimile: (415) 875-6700
7
   Deepa Acharya (Bar No. 267654)
8  deepaacharya@quinnemanuel.com
   1300 I Street, NW, Suite 900
9  Washington, DC 20005
   Telephone: (202) 538-8000
10 Facsimile: (202) 538-8100

11 Attorneys for Defendant

12 *(ADDITIONAL COUNSEL IN
   SIGNATURE BLOCKS)*

13

14

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17                          OAKLAND DIVISION

18
   UNILOC 2017 LLC,                    Case Nos.: 4:20-cv-04355-YGR
19                                      4:20-cv-05330-YGR; 4:20-cv-05333-YGR;
          Plaintiff,                    4:20-cv-05334-YGR; 4:20-cv-05339-YGR;
20                                      4:20-cv-05340-YGR; 4:20-cv-05341-YGR;
          v.                            4:20-cv-05342-YGR; 4:20-cv-05343-YGR;
21                                      4:20-cv-05344-YGR; 4:20-cv-05345-YGR;
   GOOGLE LLC,                          4:20-cv-05346-YGR
22
          Defendant.                    **DECLARATION OF DAVID DOAK IN**
23                                      **SUPPORT OF DEFENDANT GOOGLE**
                                        **LLC'S RENEWED MOTION TO**
24                                      **DISMISS FOR LACK OF STANDING**

25

26

27

28

                                    - 1 -

I, David Doak, declare as follows:

1. I am an attorney at Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Defendant Google LLC ("Google") in Case No. 2:18-cv-553. I have personal knowledge of the facts stated herein, and, if called to testify, I could and would competently testify thereto.

2. Attached as Appendix A is a list that I created of Uniloc patents that had been invalidated or challenged as of May 15, 2017.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed October 18, 2019 in San Francisco, California.

/s/ *David Doak*
David Doak

**<u>Appendix A</u>**

<u>Uniloc patents invalidated in whole or in part as of May 15, 2017:</u>

1. U.S. Patent No. 6,857,067: IPR2013-00391 (Paper No. 39) (Dec. 3, 2014)

2. U.S. Patent No. 5,490,216: IPR2014-01453 (Paper No. 27) (Mar. 10, 2016)

3. U.S. Patent No. 5,682,526:  No. 6:14-cv-625 (E.D. Tex.) (Dkt. 315) (Aug. 19, 2015)

4. U.S. Patent No. 5,715,451:  No. 6:14-cv-625 (E.D. Tex.) (Dkt. 315) (Aug. 19, 2015)

5. U.S. Patent No. 8,566,960:  No. 2:16-cv-570 (E.D. Tex.) (Dkt. 113) (Mar. 20, 2017)

6. U.S. Patent No. 6,510,466:  No. 2:16-cv-393 (E.D. Tex.) (Dkt. 129) (Mar. 28, 2017)

7. U.S. Patent No. 6,728,766:  No. 2:16-cv-393 (E.D. Tex.) (Dkt. 129) (Mar. 28, 2017)

<u>Uniloc patents challenged as invalid as of May 15, 2017:</u>

1. U.S. Patent No. 7,783,523:  CBM2016-00042 (filed Mar. 14, 2016)

2. U.S. Patent No. 8,515,820:  CBM2016-00043 (filed Mar. 15, 2016)

3. U.S. Patent No. 8,571,194:  IPR2016-01756 (filed Sept. 7, 2016)

4. U.S. Patent No. 7,804,948:  IPR2017-00058 (filed Oct. 11, 2016)

5. U.S. Patent No. 7,853,000: IPR2017-00198 (filed Nov. 2, 2016)

6. U.S. Patent No. 8,243,723:  IPR2017-00222 (filed Nov. 14, 2016)

7. U.S. Patent No. 8,995,433:  IPR2017-00225 (filed Nov. 14, 2016)

8. U.S. Patent No. 8,199,747: IPR2017-01257 (filed Apr. 7, 2017)

9. U.S. Patent No. 6,234,578: No. 2:16-cv-741 (Dkt. 267) (filed Sept. 28, 2017)

1 QUINN EMANUEL URQUHART &
SULLIVAN, LLP
2 Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
3 David Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
4 Jonathan Tse (Bar. No. 305468)
jonathantse@quinnemanuel.com
5 50 California Street, 22nd Floor
San Francisco, CA 94111
6 Telephone: (415) 875-6600
Facsimile: (415) 875-6700
7
Deepa Acharya (Bar No. 267654)
8 deepaacharya@quinnemanuel.com
1300 I Street, NW, Suite 900
9 Washington, DC 20005
Telephone: (202) 538-8000
10 Facsimile: (202) 538-8100

11 Attorneys for Defendant

12 *(ADDITIONAL COUNSEL IN
SIGNATURE BLOCKS)*

13

14

15                 UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                        OAKLAND DIVISION

| 18 | UNILOC 2017 LLC, | Case Nos.: 4:20-cv-04355-YGR; |
|---|---|---|
| 19 | Plaintiff, | 4:20-cv-05330-YGR; 4:20-cv-05333-YGR; 4:20-cv-05334-YGR; 4:20-cv-05339-YGR; |
| 20 | v. | 4:20-cv-05340-YGR; 4:20-cv-05341-YGR; 4:20-cv-05342-YGR; 4:20-cv-05343-YGR; 4:20-cv-05344-YGR; 4:20-cv-05345-YGR; |
| 21 | GOOGLE LLC, | 4:20-cv-05346-YGR |
| 22 | Defendant. | **DECLARATION OF DOUGLAS L. CLARK IN SUPPORT OF DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS RENEWED MOTION TO DISMISS FOR LACK OF STANDING** |
| 23 | | |
| 24 | | |

25

26

27

28

I, Douglas L. Clark, declare as follows:

1.     I am an attorney duly admitted to practice before all Courts of the State of California and before this Court, and I am an attorney with the law firm of Jones Day, counsel for Defendant Google LLC ("Google") in Case Nos. 2:18-cv-499 and 2:18-cv-552. I make this declaration in support of Google's Renewed Motions to Dismiss for Lack of Standing. I have personal knowledge of the facts stated herein and if called to testify could and would competently testify thereto.

5.     Attached hereto as Exhibit D is a true and correct copy of excerpts of the Conformed Revenue Sharing and Note and Warrant Purchase Agreement among Uniloc USA, Inc., Uniloc Luxembourg S.A., Uniloc Corporation PTY Limited, D/A Investment Holdings LLC, and Fortress Credit Co LLC, dated December 30, 2014, as amended February 24, 2015, May 27, 2016, and May 15, 2017. The complete document is Bates-stamped Uniloc Common Production to Google 0011267 to Uniloc Common Production to Google 0011332.

6.     Attached hereto as Exhibit E is a true and correct copy of the Patent License Agreement among Uniloc USA, Inc., Uniloc Luxembourg S.A., and Fortress Credit Co LLC, dated December 30, 2014, and Bates-stamped Uniloc Common Production to Google000065 to Uniloc Common Production to Google000070.

7.     Attached hereto as Exhibit F is a true and correct copy of excerpts of the transcript of the September 21, 2018 Deposition of Erez Levy. The complete document is Bates-stamped Uniloc Common Production to Google 0004864 to Uniloc Common Production to Google 0005079.

8.     Attached hereto as Exhibit G is a true and correct copy of excerpts of the transcript of the October 8, 2018 Deposition of Drake Turner. The complete document is Bates-stamped Uniloc Common Production to Google 0005080 to Uniloc Common Production to Google 0005245.

9.     Attached hereto as Exhibit H is a true and correct copy of excerpts of the Management Report of the Board of Directors For the year ended 30 June 2017. The complete

document is Bates-stamped Uniloc Common Production to Google 0009813 to Uniloc Common Production to Google 0009839.

10.    Attached hereto as Exhibit I is a true and correct copy of excerpts of the Third Amendment to Revenue Sharing and Note and Warrant Purchase Agreement among Uniloc USA, Inc., Uniloc Luxembourg S.A., Uniloc Corporation PTY Limited, D/A Investment Holdings LLC, Fortress Credit Co LLC, CF DB EZ LLC, and CF DB EZ 2017 LLC, dated May 15, 2017. The complete document is Bates-stamped Uniloc Common Production to Google 0011253 to Uniloc Common Production to Google 0011353.

11.    Attached hereto as Exhibit J is a true and correct copy of excerpts of the final written decision regarding U.S. Patent No. 6,857,067, issued by the Patent Trial and Appeal Board in Case No. IPR2013-00391 on December 3, 2014.

12.    Attached hereto as Exhibit K is a true and correct copy of excerpts of Defendants' Motion to Dismiss Plaintiffs' Complaint Under Rule 12(b)(6) for Failure to Allege Infringement of a Patentable Claim Under 35 U.S.C. § 101, filed on September 30, 2014, in *Uniloc USA, Inc. v. E-MDS, Inc.*, No. 6:14-cv-00625-RWS (E.D. Tex.).

13.    Attached hereto as Exhibit L is a true and correct copy of excerpts of the Asset Purchase Agreement between Uniloc 2017 LLC and Uniloc Luxembourg S.A., dated March 28, 2018. The complete document is Bates-stamped Uniloc Common Production to Google001269 to Uniloc Common Production to Google001569.

14.    Attached hereto as Exhibit M is a true and correct copy of excerpts of the Termination Agreement between Uniloc USA, Inc. and Uniloc Luxembourg S.A., dated May 3, 2018. The complete document is Bates-stamped Uniloc Common Production to Google002306 to Uniloc Common Production to Google002309.

15.    Attached hereto as Exhibit N is a true and correct copy of excerpts of the Payoff and Termination Agreement among Uniloc USA, Inc., Uniloc Luxembourg S.A., Uniloc Corporation PTY Limited, D/A Investment Holdings LLC, Uniloc USA Holdings LLC, Fortress Credit Co LLC, CF DB EZ LLC, and CF DB EZ 2017 LLC, dated May 3, 2018. The complete

document is Bates-stamped Uniloc Common Production to Google002271 to Uniloc Common Production to Google002285.

16.      Attached hereto as Exhibit O is a true and correct copy of the Patent Assignment between Uniloc Luxembourg S.A. and Uniloc 2017 LLC, dated May 3, 2018. The complete document is Bates-stamped Uniloc Common Production to Google 0010266 to Uniloc Common Production to Google 0010304.

17.      Attached hereto as Exhibit P is a true and correct copy of excerpts of the transcript of the October 4, 2019 Deposition of Craig Etchegoyen as a 30(b)(6) witness in this action.

18.      Attached hereto as Exhibit Q is a true and correct copy of excerpts of Plaintiffs' Opposition to Defendant's Motion to Dismiss, and Reply in Support of Rule 25 Motion to Add Uniloc 2017 as a Party, filed in Case Nos. 3:18-cv-00360, -363, -365, and -572. The complete document is Bates-stamped Uniloc Common Production to Google000803 to Uniloc Common Production to Google000837.

19.      Attached hereto as Exhibit R are true and correct copies of the Declarations of James Palmer, dated November 9, 2018 and March 13, 2019, previously filed in this action by Uniloc 2017 LLC.

20.      Attached hereto as Exhibit S is a true and correct copy of the License Agreement between Uniloc 2017 LLC and Uniloc Licensing USA LLC, dated May 3, 2018. The complete document is Bates-stamped Uniloc Common Production to Google002677 to Uniloc Common Production to Google002686.

21.      Attached hereto as Exhibit T is a true and correct copy of the Amendment No. 1 to License Agreement between Uniloc 2017 LLC and Uniloc Licensing USA LLC, dated August 28, 2018. The complete document is Bates-stamped Uniloc Common Production to Google 0009317 to Uniloc Common Production to Google 0009326.

22.      Attached hereto as Exhibit U is a true and correct copy of excerpts of the Amended and Restated Note Purchase and Security Agreement between Uniloc 2017 LLC and CF Uniloc Holdings LLC, dated November 16, 2018. The complete document is Bates-stamped Uniloc Common Production to Google 0011443 to Uniloc Common Production to Google 0011549.

23.     Attached hereto as Exhibit V is a true and correct copy of excerpts of the deposition notice served on Uniloc 2017 LLC in this action pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed October 18, 2019 in San Diego, California.

/s/  Douglas L. Clark
Douglas L. Clark

EXHIBIT D

CONFORMED REVENUE SHARING AND NOTE AND WARRANT PURCHASE
AGREEMENT

(UNILOC USA, INC.,
UNILOC LUXEMBOURG S.A.,
UNILOC CORPORATION PTY LIMITED, and
D/A INVESTMENT HOLDINGS LLC)

DATED AS OF DECEMBER 30, 2014

AS AMENDED BY:
FIRST AMENDMENT TO REVENUE SHARE AND NOTE AND WARRANT PURCHASE
AGREEMENT, DATED AS OF FEBRUARY 24, 2015
SECOND AMENDMENT TO REVENUE SHARE AND NOTE AND WARRANT
PURCHASE AGREEMENT, DATED AS OF MAY 27, 2016
THIRD AMENDMENT TO REVENUE SHARE AND NOTE AND WARRANT PURCHASE
AGREEMENT, DATED AS OF MAY 15, 2017

62250363_5

Uniloc Common Production to Google 0011267

# REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT

This REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT (this "<u>Agreement</u>") is dated as of December 30, 2014 by and among Uniloc USA, Inc. a Texas corporation ("<u>Issuer</u>"), Uniloc Luxembourg S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand Duchy of Luxembourg, with registered office at 14, rue Edward Steichen, L-2540 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 159.161 ("<u>Uniloc Lux</u>"), Uniloc Corporation PTY Limited ("<u>Uniloc Aus</u>") and D/A Investment Holdings LLC (together with Uniloc Lux and Uniloc Aus, the "<u>Guarantors</u>", and, collectively, with Issuer, the "<u>Company</u>" and each, a "<u>Company</u>"), Fortress Credit Co LLC as collateral agent (the "<u>Collateral Agent</u>"), and each Person listed on <u>Schedule 2.1</u> hereto (the "<u>Purchasers</u>").

## RECITALS

WHEREAS, the Purchasers wish to acquire, and Uniloc USA, Inc. has agreed to grant, issue and sell to the Purchasers, (i) an interest in certain of the Company's future revenues from its patent portfolio (the "<u>Revenue Stream</u>") and (ii) up to $26,000,000 in aggregate original principal amount of the Issuer's term notes (the "<u>Notes</u>") in the form of <u>Exhibit A</u> hereto, in each case, subject to the terms of this Agreement;

WHEREAS, the Purchasers have agreed to purchase from Uniloc Lux and Uniloc Lux has agreed to issue and sell to the Purchasers warrants for 1.5% of the fully diluted equity of Uniloc Lux (the "<u>Warrants</u>") in the form of <u>Exhibit H</u> hereto, subject to the terms of the Agreement;

NOW THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    <u>Certain Defined Terms</u>.  Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in <u>Appendix I</u>.

1.2.    <u>Other Interpretative Provisions</u>.  Unless otherwise specified, all references to "$", "cash", "dollars" or similar references shall mean U.S. dollars, paid in cash or other immediately available funds. The definitions set forth in this Agreement are equally applicable to both the singular and plural forms of the terms defined.  The words *"hereof"*, *"herein"*, and *"hereunder"* and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All references to time of day herein are references to New York, New York time (daylight or standard, as applicable) unless otherwise specifically provided.  Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the

specific provisions of this Agreement or otherwise required by applicable law. References in this Agreement to an Appendix, Exhibit, Schedule, Article, Section, clause or subclause refer (A) to the appropriate Appendix, Exhibit or Schedule to, or Article, Section, clause or subclause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Document in which such reference appears. The term "including" is by way of example and not limitation. The word "or" is not exclusive. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including." The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form. All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein). Unless otherwise expressly provided herein, references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

## ARTICLE II
## CLOSING AND TERMS OF THE REVENUE STREAM AND NOTES

2.1.    <u>The Revenue Stream.</u>

2.1.1.    <u>Purchase of the Revenue Stream</u>.  On the Closing Date, subject to the satisfaction of the conditions set forth in <u>Section 3.1</u>, the Issuer hereby grants, and the Purchasers hereby acquire, the Revenue Stream.  The purchase price of the Revenue Stream on the Closing Date will be $500,000 (such amount, as such may be adjusted from time to time in connection with subsequent purchases of additional rights to the Revenue Stream, the "<u>Revenue Stream Basis</u>").  The rights of the Purchasers to the Revenue Stream shall be secured pursuant to the Collateral Documents, junior in priority to the rights of the Purchasers with respect to the Notes.

2.1.2.    <u>Subsequent Increases to Revenue Stream</u>.  From time to time following the Closing Date, and subject to the conditions set forth in <u>Section 2.2.1.3</u> and <u>Section 3.2</u>, subsequent issuances of Notes shall be accompanied by additional rights to the Actual Monetization Revenues of the Company that shall increase the economics of the Revenue Stream.  Such subsequent acquisitions of rights to the Issuer's Actual Monetization Revenues shall be acquired for an issue price, and shall increase the Revenue Stream Basis, by an amount equal to 5% of the total amount funded with respect to the Notes and Revenue Stream on such subsequent issue date; <u>provided</u>, that the parties may agree in connection with any such subsequent funding to a different allocated issue price but such allocation shall not affect the incremental Revenue Stream Basis on account of such issuance, which shall equal 5% of the total amount funded; <u>provided, further</u>, that after the contemplated issuance of the Term Loan C Notes, the Revenue Stream Basis shall be increased to $1,300,00

2.1.3.    <u>Payments to Purchasers</u>. Following the payment in full of the Notes or as otherwise specified in <u>Section 2.4</u>, the Issuer shall pay to the Purchasers their proportionate share, in accordance with <u>Schedule 2.1</u>, of the Revenue Stream; <u>provided</u>,

62250363_5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY            Uniloc Common Production to Google 0011272

that the Company shall instruct any payors to deposit Actual Monetization Revenues, directly into the Cash Collateral Account. Except to the extent that the Collateral Agent is enjoined or stayed from distributing any such Actual Monetization Revenues, such direct deposit in the Cash Collateral Account by payors shall constitute timely payment by the Company. Payments by the Company to the Purchasers shall be made monthly on the last Business Day of each month with respect to any Actual Monetization Revenues received through such date. For the avoidance of doubt, prior to the payment in full of the Notes, except as provided in Section 2.4, all Actual Monetization Revenues shall be applied by the Issuer or the Collateral Agent, as the case may be, to the payment of principal, interest and any applicable premiums or fees on the Notes or payments owed pursuant to Sections 9.1(ii)-(iv) or 9.2, and shall not be applied to the satisfaction of the Purchasers' rights with respect to the Revenue Stream."

2.2.  The Notes.

2.2.1.  Purchase and Sale of the Notes.

2.2.1.1.  On the Closing Date and from time to time thereafter as provided herein and subject to satisfaction of the conditions set forth in Sections 3.1 and 3.2, the Issuer agrees to issue and sell, and each Purchaser agrees to purchase, for an amount equal to the original principal amount thereof and in accordance with the percentages set forth on Schedule 2.1, Notes in an aggregate original principal amount of up to $26,000,000. The purchase price of the Notes allocated in accordance with the percentages set forth Schedule 2.1 shall be payable in immediately available funds by wire transfer to the deposit account of the Issuer as identified in writing by the Issuer to the Purchasers prior to the Closing Date and each subsequent date of issuance of Notes thereafter. No Purchaser shall be responsible for any default by any other Purchaser in its obligation to acquire Notes hereunder.

2.2.1.2.  The Notes to be issued on the Closing Date shall be in an aggregate original principal amount of $10,000,000. The proceeds of the Notes issued on the Closing Date shall be used to (i) support the Company's current IP monetization campaign, and (ii) fund general corporate activities and working capital and to pay the Company's transaction expenses.

2.2.1.3.  From time to time following the Closing Date and through November 15, 2020, on not less than 10 Business Days prior written notice, the Issuer may request that the Purchasers acquire, and subject to the conditions set forth in Section 3.2, the Purchasers shall acquire, additional Notes in an aggregate original principal amount of up to $16,000,000. The proceeds of the Notes issued following the Closing Date shall be applied to the payment of Monetization Expenses (or to reimburse the Company for the payment of Monetization Expenses), and for general corporate purposes. The Issuer may not request additional Notes to be acquired more than one time in any calendar month, and any such requests shall be in a minimum amount of $100,000. Subsequent issuances of Notes shall be issued at a purchase price of 95% of principal amount.

-3-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011273

2.2.2.    Interest on the Notes. The unpaid principal amount of the Term A Notes (including any PIK Interest) shall bear cash interest at a rate equal to LIBOR plus 12% per annum, the unpaid principal amount of the Term B Notes (including any PIK Interest) shall bear cash interest at a rate equal to LIBOR plus 10% per annum and the Term C Notes (including any PIK Interest) shall bear cash interest at a rate equal to LIBOR plus 9% per annum; *provided* that upon and during the continuance of an Event of Default, the interest rate per annum on each of the Notes shall increase by an additional 2% per annum. Interest on the principal amount of any then outstanding Notes shall be paid on the last Business Day of each calendar month (the "Interest Payment Date"), starting with the calendar month ending January 31, 2015. Such interest shall be paid in cash except that 4% per annum (or, in the case of the Term B Notes and Term C Notes, 3% per annum) of the interest due on each Interest Payment Date shall be paid-in-kind, by increasing the principal amount of the Notes by the amount of such interest, effective as of the applicable Interest Payment Date ("PIK Interest"). PIK Interest shall be treated as principal of the Note for all purposes of interest accrual or the calculation of any prepayment premium."

2.2.3.    Fees.

2.2.3.1.    The Issuer shall pay to the applicable Purchaser acquiring the applicable Notes, a structuring fee equal to $150,000 at the issuance of the Term A Notes, $90,000 at the issuance of the Term B Notes and $200,000 at the issuance of the Term C Notes (each such payment, the "Structuring Fee" related to such issuance), which amount shall be netted out of the funding at each such issuance.

2.2.3.2.    The Issuer shall pay to the applicable Purchaser, the Termination Fees for its Notes in accordance with, and at the times specified in Section 2.4 or, if not paid prior to such date, upon the first to occur of (x) any acceleration of the Note Obligations or (y) November 11, 2020.

2.2.4.    Payment of the Notes.

2.2.4.1.    Payment at Maturity. The principal of the Notes and all unpaid interest thereon or other amounts owing with respect thereto (other than the applicable Termination Fee for such Notes, which shall be due at the times specified in Section 2.2.3.2) shall be paid in full in cash on the applicable Maturity Date for such Notes, but in any event not later than November 15, 2020.

2.2.4.2.    Optional Prepayments. The Issuer may prepay the Notes from time to time in whole or in part, without penalty or premium, except that:

i) with respect to the Term A Notes, any optional prepayments of such Notes in the first 6 months after the issuance thereof Closing Date shall be accompanied by a prepayment premium equal to 5.00% of the principal amount prepaid; any optional prepayments of such Notes after the first 6 months from the Closing Date and prior to the second anniversary of the

-4-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011274

Closing Date shall be accompanied by a prepayment premium equal to 3.00% of the principal amount prepaid; any optional prepayments of such Notes after the second anniversary of the Closing Date and prior to the 30 month anniversary of the Closing Date, shall be accompanied by a prepayment premium equal to 1.00% of the principal amount prepaid; and optional prepayments following the 30 month anniversary of the Closing Date shall be at par;

ii) with respect to the Term B Notes, any optional prepayments of such Notes in the first 6 months after the issuance thereof shall be accompanied by a prepayment premium equal to 5.00% of the principal amount prepaid; any optional prepayments of such Notes after the first 6 months from the issuance thereof and prior to the second anniversary of such issuance shall be accompanied by a prepayment premium equal to 3.00% of the principal amount prepaid; any optional prepayments of such Notes after the second anniversary of the issuance thereof and prior to the 30 month anniversary of such issuance shall be accompanied by a prepayment premium equal to 1.00% of the principal amount prepaid, and optional prepayments following the 30 month anniversary of issuance shall be at par; and

(iii) with respect to the Term C Notes, any optional prepayments of such notes in the first 6 months after the issuance thereof shall be accompanied by a prepayment premium equal to 5.00% of the principal amount prepaid; any optional prepayments of such Notes after the first 6 months from the issuance thereof and prior to the second anniversary of such issuance shall be accompanied by a prepayment premium equal to 3.00% of the principal amount prepaid; any optional prepayments of such Notes after the second anniversary of the issuance thereof and prior to the 30 month anniversary of such issuance shall be accompanied by a prepayment premium equal to 1.00% of the principal prepaid, and optional prepayments following the 30 month anniversary of issuance shall be at par.

Any such prepayment of Notes shall include accrued and unpaid interest on the amount prepaid.

2.2.4.3.  <u>Amortization</u>.  With respect to the Term A Notes, commencing on the last Business Day of January, 2016, the Issuer shall make monthly amortization payments each in a principal amount equal to the amount which, calculated based on the principal amount outstanding as of such payment date (and re-calculated monthly to the extent necessary), would result in the Issuer's making equal monthly payments of principal on the Notes from such date through the Term A Maturity Date.  With respect to Term B Notes, commencing on the last Business Day of June, 2017, the Issuer shall make monthly amortization payments each in a principal amount equal to the amount which, calculated based on the principal amount outstanding as of such payment date (and re-calculated monthly to the extent necessary), would result in the Issuer's making equal monthly payments of principal on such Notes from such date through the Term B

-5-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0011275

Maturity Date. With respect to the Term C Notes, commencing on the last Business Day of May, 2018, the Issuer shall make monthly amortization payments each in a principal amount equal to the amount which, calculated based on the principal amount outstanding as of such payment date (and re-calculated monthly to the extent necessary), would result in the Issuer's making equal monthly payments of principal on such Notes from such date through the Term C Maturity Date.

2.2.4.4.  Mandatory Prepayments.  Subject to Section 2.4, upon receipt of any Actual Monetization Revenues, the Issuer or the Collateral Agent, as the case may be, shall apply 50% of the related Actual Monetization Revenues to the payment of accrued and unpaid interest on, and then to repay outstanding principal of, and any fees with respect to, the Notes until all Note Obligations have been paid in full.  Payments by the Issuer on the Notes shall be made monthly on the last  Business Day of each month with respect to Actual Monetization Revenues received through the last Business Day of the prior month.  For the avoidance of doubt, mandatory prepayments are not subject to any prepayment premium.

2.2.4.5.  Application of Payments.  Payments on the Notes shall be applied in the following order: first to any then outstanding expenses or other amounts owing pursuant to Article 9; second, to accrued and unpaid interest (excluding PIK Interest); third to principal (including PIK Interest); fourth to any prepayment premium owing on the principal so repaid; and finally, after all principal of the Notes and any prepayment premium has been paid in full, to the Termination Fee.  Prepayments of the Notes (whether mandatory or optional) shall reduce amortization payments, pro rata.

2.3.  The Warrants

2.3.1.  Purchase of the Warrants.  On the Closing Date, subject to the satisfaction of the conditions set forth in Section 3.1, and against the payment of an aggregate purchase price of $324,254 Uniloc Lux hereby issues and sells, and the Purchasers hereby purchase the Warrants.

2.4.  Monetization Revenues.  From and after the Third Amendment Effective Date, 33% of Actual Monetization Revenues received by the Company or deposited in the Cash Collateral Account shall be paid to the Purchasers, and applied to the Note Obligations and the Revenue Stream, as set forth in Section 23.4.1 and 2.4.2 below; provided that, notwithstanding the foregoing, and for the avoidance of doubt in the event of acceleration of the Notes and/or of the Revenue Stream, 100% of the Actual Monetization Revenues received since the last Business day of the preceding month shall be so applied.

2.4.1.  Term A/B Notes and Revenue Stream. To the Term A/B Purchaser (x) any Actual Monetization Revenues which arise from, or relate to, the Term A/B Priority Collateral and (y) following payment in full of all Obligations related to the Term C

62250363_5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    Uniloc Common Production to Google 0011276

the Company shall remit 200% of the amount described in the foregoing clause (y) to the relevant taxation authority or other authority in accordance with applicable law. Within 30 days after the date of any payment of such, the Company shall furnish to the Purchasers the original or certified copy of a receipt evidencing payment thereof. For the avoidance of doubt, the intent of the foregoing provision is to limit the Company's obligation to gross up any withholding required on distributions on the Warrants or Warrant Shares to 50% of the amount of any such required withholding. In the event that it appears that any withholding will be required on payments on the Warrants or Warrant Shares, the parties agree to use commercially reasonable efforts to work together in good faith to arrive at an alternative structure that eliminates or reduces any such withholding requirement, with the overall goal of minimizing the cost to the Purchasers and the Company associated with any such withholding and the Company's obligations with respect thereto.

The Company shall timely indemnify any Purchaser against any cost, loss or liability that such Purchaser incurs in relation to the payment of stamp, registrations or similar taxes arising from the execution, delivery or enforcement of, or otherwise with respect to, the Documents.

2.7.    <u>Manner and Time of Payment</u>.  All payments to the Purchasers shall be made by wire transfer or other same day funds, without set off, not later than 2:00 p.m. on the day such payment is due, in accordance with the payment instructions set forth on <u>Schedule 2.7</u>.

2.8.    <u>Patent License</u>.  Effective as of the Closing Date, the Company shall grant to the Collateral Agent, for the benefit of the Secured Parties, a non-exclusive, royalty free, license (including the right to grant sublicenses) with respect to the Patents, which shall be evidenced by, and reflected in, the Patent License Agreement.  The Collateral Agent and the Secured Parties agree that the Collateral Agent shall only use such license following an Event of Default.

## ARTICLE III
## CONDITIONS PRECEDENT

3.1.    <u>Conditions to Closing</u>.  The obligation of each Purchaser to purchase its respective pro rata share of the Revenue Stream, the Notes and the Warrants on the Closing Date is subject to the satisfaction of the conditions set forth in this <u>Section 3.1</u>:

3.1.1.    <u>Deliveries.</u>  Each Company (and each of its Subsidiaries, as applicable) shall have delivered to each Purchaser and the Collateral Agent fully executed (where applicable) copies of the following:

3.1.1.1.    this Agreement;

3.1.1.2.    the Notes;

3.1.1.3.    the Security Agreement;

3.1.1.4.    the Patent License Agreement;

3.1.1.5.    the Patent Security Agreement;

62250363_5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011279

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

In order to induce the Purchasers to purchase the Revenue Stream, the Notes and the Warrants, each Company hereby represents and warrants to the Purchasers as of the Closing Date that:

4.1.     Organization and Business.  Each Company is (a) a duly organized and validly existing corporation or limited liability company, (b) in good standing under the laws of the jurisdiction of its incorporation or organization, and (c) has the power and authority, corporate or otherwise, necessary (i) to enter into and perform this Agreement and the Documents to which it is a party, and (ii) to carry on the business now conducted or proposed to be conducted by it. Except as listed on Schedule 4.1, the Issuer has no Subsidiaries and Uniloc Aus has no Subsidiaries other than the Issuer.   Schedule 4.1 sets forth each entity in which any Company holds an interest, directly or indirectly, and sets forth the ownership of all equity securities of each Company and each other such entity (including joint venture, membership or partnership interests, and including convertible securities, options or warrants).

4.2.     Qualification.  Each Company is duly and legally qualified to do business as a foreign corporation or limited liability company and is in good standing in each state or jurisdiction in which such qualification is required and is duly authorized, qualified and licensed under all laws, regulations, ordinances or orders of public authorities, or otherwise, to carry on its business in the places and in the manner in which it is conducted.

4.3.     Operations in Conformity with Law, etc.  The operations of each Company as now conducted or proposed to be conducted are not in violation in any material respect of, nor is the Company in default in any material respect under, any Legal Requirement.

4.4.     Authorization and Non-Contravention.  Each Company has taken all corporate, limited liability or other action required to execute, deliver and perform this Agreement and each other Document. All necessary consents, approvals and authorizations of any governmental or administrative agency or any other Person of any of the transactions contemplated hereby shall have been obtained and shall be in full force and effect.   This Agreement and each other Document does not (i) contravene the terms of any Company's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (x) any Contractual Obligation of any Company or its applicable Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Company is subject or (iii) violate any Legal Requirement.

4.5.     Intellectual Property.  As of the Closing Date, subject solely to the licensing agreements set forth on Schedule 4.5(a) (the "Existing Licenses") (true and complete copies of which have been delivered to the Purchasers), Uniloc Lux is the entire, valid, sole and exclusive beneficial and record owner of all right, title and interest to all of the Patents with good and marketable title free and clear of any and all Liens, charges and encumbrances, including, without limitation, that other than the Existing Licenses, there are no pledges, assignments, licenses, springing licenses, options, non-assertion agreements, earn-outs, monetization

-12-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                                    Uniloc Common Production to Google 0011282

agreements, profit and revenue sharing arrangements, derivative interests, fee and recovery splitting agreements, registered user agreements, shop rights and covenants by Uniloc Lux not to sue third persons, and Issuer has the power to bring and sustain action and recover for past, present and future infringement without having to join any other third party and that no provision of any Existing License will materially restrict the ability of the Issuer to pursue Monetization Activities. Uniloc Lux is listed as record owner of all of the Patents and the recordings in the United States Patent and Trademark Office do not reflect any defects in chain-of-title or unreleased liens, except as set forth on Schedule 4.5(b) . All of the Patents are subsisting and have not been adjudged invalid or unenforceable, in whole or in part, and none of the Patents are at this time the subject to any challenge to their validity or enforceability. To the knowledge of the Company, the Patents are valid and enforceable. The Company has no notice of any lawsuits, actions or opposition, cancellation, revocation, re-examination or reissue proceedings commenced or threatened with reference to any of the Patents.

4.6. _Material Agreements._ Schedule 4.6 sets forth each agreement relating to the purchase or other acquisition of any Patent, including seller notes issued in connection with such acquisition, and any other material agreement relating to any Patent (other than the Existing Licenses). Each such agreement is in full force and effect for the benefit of the Company and to the knowledge of the Company there are no material defaults under any such agreement.

4.7. _Margin Regulations._ The Company is not engaged, nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and the proceeds of the Notes, the Revenue Stream and the Warrants will not be used for any purpose that violates Regulation U of the Board of Governors of the United States Federal Reserve System.

4.8. _Investment Company Act._ The Company is not, and is not required to be, registered as an "investment company" under the Investment Company Act of 1940.

4.9. _USA PATRIOT Act, FCPA and OFAC._

4.9.1. To the extent applicable, the Company is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA Patriot Act.

4.9.2. No part of the proceeds of the Notes or the purchase price for the Revenue Stream will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.9.3. None of the Company nor, to the actual knowledge of the Company, any director, officer, agent, employee or controlled Affiliate of the Company, is currently the subject of any U.S. sanctions program administered by the Office of Foreign Assets

-13-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY Uniloc Common Production to Google 0011283

set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire its Notes, the Revenue Stream and the Warrants.

## ARTICLE VI
## COVENANTS

Until all of the Company's obligations with respect to the Notes and the Revenue Stream, have been paid in full in cash, the Company shall comply with the covenants set forth in this Article VI.

6.1.    Taxes and Other Charges.  The Company shall duly pay and discharge, or cause to be paid and discharged, before the same becomes in arrears, all taxes, assessments and other governmental charges imposed upon such Person and its properties, sales or activities, or upon the income or profits therefrom; *provided, however*, that any such tax, assessment, charge or claim need not be paid if the validity or amount thereof shall at the time be contested in good faith by appropriate proceedings and if such Person shall, in accordance with GAAP or applicable generally accepted accounting principles, have set aside on its books adequate reserves with respect thereto; *provided, further*, that the Company shall pay or bond, or cause to be paid or bonded, all such taxes, assessments, charges or other governmental claims immediately upon the commencement of proceedings to foreclose any Lien which may have attached as security therefor (except to the extent such proceedings have been dismissed or stayed).

6.2.    Conduct of Monetization Activities; Minimum Monetization Revenues.

6.2.1.    The Issuer shall undertake its best efforts to diligently pursue the monetization of the Patents and shall provide regular updates to the Purchasers and their advisors, and shall consult with Purchasers and their advisors on request, as to such activities.

6.2.2.    From the Closing Date through December 31, 2016, the Company shall have received at least $20,000,000 in Actual Monetization Revenues.  As of March 31, 2017 and the last day of each fiscal quarter thereafter, the Company shall have received at least $20,000,000 in Actual Monetization Revenues during the four fiscal quarter period ending on such date.

6.3.    Maintenance of Existence.  The Company shall do all things necessary to preserve, renew and keep in full force and effect and in good standing its legal existence and authority necessary to continue its business.

6.4.    Compliance with Legal Requirements.  The Company shall comply in all material respects with all valid Legal Requirements applicable to it, except where compliance therewith shall at the time be contested in good faith by appropriate proceedings.

6.5.    Notices; Reports.

6.5.1.    Certain Notices.  The Company shall, promptly following having notice or knowledge thereof, furnish to each of the Purchasers and such information as they may

-16-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011286

reasonably request concerning the Company's Monetization Activities and Actual Monetization Revenues, including without limitation the following:

6.5.1.1. any dispute, litigation, investigation, suspension or any administrative or arbitration proceeding by or against the Company for an amount in excess of $500,000 or affecting the Company's ownership rights with respect to the Patents; and

6.5.1.2. promptly upon acquiring knowledge thereof, the existence of any Default or Event of Default, specifying the nature thereof and what action the Company has taken, is taking or proposes to take with respect thereto.

Each notice pursuant to this Section shall be accompanied by a statement by an Authorized Officer of the Company, on behalf of the Company, setting forth details of the occurrence referred to therein, and stating what action the Company or other Person proposes to take with respect thereto and at what time. Each notice under Section 6.5.1.2 shall describe with particularity any and all clauses or provisions of this Agreement or other Document that have been breached or violated.

6.5.2. <u>Certain Reports</u>. The Issuer shall cause to be furnished to each of the Purchasers the following:

6.5.2.1. no later than the 15th day of every month, a report calculating in detail its Actual Monetization Revenues, in form and substance reasonably satisfactory to the Majority Purchasers;

6.5.2.2. copies of any demand, cease and desist or other similar letter and copies of any material filing in any litigation or arbitration relating to the Patents by or against the Company that is not subject to an "attorneys' eyes only" or other protective order, as soon as reasonably practical after receipt thereof or, in the case of any material letter sent or material filing made by the Company, which is not subject to an "attorneys' eyes only" or other protective order, as early as practical prior to the date such letter is to be sent or such filing is to be made;

6.5.2.3. promptly (and in any event within 10 Business Days) after execution thereof, copies of all judgments, settlement agreements or licenses with respect to the Patents; and

6.5.2.4. promptly (and in any event within 10 Business Days), such additional business, financial, corporate affairs and other information as the Majority Purchasers may from time to time reasonably request.

Subject to the preservation of any privilege, the Company shall authorize and direct any legal counsel or consultant engaged by it to discuss the status of the Company's Monetization Activities with the Purchasers and the Collateral Agent.

6.6. <u>Information Rights</u>.

-17-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011287

6.6.1.    Upon request of the Majority Purchasers, the Company shall permit any Purchaser and any Purchaser's duly authorized representatives and agents to visit during normal business hours and inspect any of its property, corporate books, and financial records related to the Patents, to examine and make copies of its books of accounts and other financial records related to the Patents and its Monetization Activities and Actual Monetization Revenues, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its managers, officers, employees and independent public accountants (and by this provision the Company hereby authorizes such accountants to discuss with the Purchasers the finances and affairs of the Company so long as (i) an officer or manager of the Company has been afforded a reasonable opportunity to be present for such discussion and (ii) such accountants shall be bound by standard confidentiality obligations), in each case related to the Patents and the Monetization Activities and Actual Monetization Revenues. In addition, upon request of the Majority Purchasers from time to time, and subject to any claims of privilege, the Company shall provide the Purchasers with a status update of any material development in any litigations or any administrative or arbitration proceeding related to the Patents.  All costs and expenses incurred by the Purchasers and their duly authorized representatives and agents in connection with the exercise of the Purchasers' rights pursuant to this <u>Section 6.6</u> shall be paid by the Company.

6.7.    <u>Indebtedness</u>.  The Company shall not create, incur, assume or otherwise become or remain liable with respect to any Indebtedness that is secured by the Patents or any rights related thereto.  The Company shall not incur any other Indebtedness, except for:

6.7.1.    Indebtedness in respect of the Obligations;

6.7.2.    unsecured trade payables that are not evidenced by a promissory note and are incurred in the Ordinary Course of Business;

6.7.3.    the existing Indebtedness set forth on <u>Schedule 6.7</u>; and

6.7.4.    additional unsecured Indebtedness that is subordinated to the rights of the Purchasers under this Agreement pursuant to an agreement in form and substance satisfactory to the Majority Purchasers.

6.8.    <u>Liens</u>.  The Company shall not create, incur, assume or suffer to exist any Lien upon any Patent other than the following ("<u>Permitted Liens</u>"):

6.8.1.    Liens securing the Obligations

6.8.2.    the Existing Licenses and other non-exclusive licenses that are entered into pursuant to the Company's Monetization Activities and otherwise in compliance with this Agreement, and

6.8.3.    the Lien to Alexander H. Good.

6.9.    <u>Management of Patents and Patent Licenses</u>.

-18-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                Uniloc Common Production to Google 0011288

6.9.1.   Dispositions.   The Company shall not make any Disposition of any Patents other than (i) entering into settlement agreements or non-exclusive licensing arrangements with respect to the Patents in pursuit of the Monetization Activities, (ii) sales of the Company's proprietary hardware and software products in the ordinary course of business *provided*, for the avoidance of doubt, that no such arrangements shall permit the use of any Patents other than as required for the sale of such products; and (iii) the entry into exclusive license agreements or sales of Patents with the written consent of the Majority Purchasers such consent not to be unreasonably withheld. For the avoidance of doubt, proceeds of any Disposition shall constitute Actual Monetization Revenues. The Company shall include in any Disposition (other than outright sales of Patents) a prohibition against any sublicenses, and a provision that terminates any such arrangement upon a Change of Control of the sublicensee.

6.9.2.   Preservation of Patents.   (a) The Company shall, at its own expense, take all reasonable steps to pursue the registration and maintenance of each Patent and shall take all reasonably necessary steps to preserve and protect each Patent and (b) the Company shall not do or permit any act or knowingly omit to do any act whereby any of the Patents may lapse, be terminated, or become invalid or unenforceable or placed in the public domain. At its option, the Collateral Agent or the Majority Purchasers may, at the Company's expense, take all reasonable steps to pursue the registration and maintenance of each Patent and take all reasonably necessary steps to preserve and protect each Patent and the Company hereby grants the Collateral Agent a power-of-attorney to take all steps in the Company's name in furtherance of the foregoing; *provided* that the foregoing shall not be interpreted as excusing the Company from the performance of, or imposing any obligation on the Collateral Agent or the Majority Purchasers to cure or perform any obligation of the Company; *provided further* that the Collateral Agent shall give the Company prompt written notice following any action taken by the Collateral Agent under this Section 6.9.2, and shall endeavor to the advance written notice where feasible. Notwithstanding the foregoing, the Company shall not be required to preserve the registration of any Patent that it determines is not necessary for its pursuit of its business objectives so long as the Company offers to assign such Patent to Fortress for no consideration prior to permitting any Patent to lapse, terminate or become invalid, unenforceable or placed in the public domain, with such first offer to be made within a reasonable time frame prior to the date on which such result would occur to permit time for Fortress to consider such offer and for the parties to effect any such transfer.

6.9.3.   Entry into Agreements.   Neither the Company nor any Affiliate of the Company shall enter into any contract or other agreement with respect to the Patents that contains confidentiality provisions prohibiting or otherwise restricting the Company or such Affiliate from disclosing the existence and content of such contract or other agreement to the Purchasers and their counsel.

6.10.   Minimum Liquidity.   Uniloc USA, Inc. and Uniloc Lux together, shall maintain not less than One Million Dollars ($1,000,000) in unrestricted cash and Cash Equivalents ("Liquidity") (not including amounts on deposit in the Cash Collateral Account except to the extent the Uniloc USA, Inc. and Uniloc Lux are entitled to such amounts), and shall provide monthly certifications demonstrating such Liquidity.

-19-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011289

6.11.  <u>Cash Collateral Account</u>.  Within 30 days following the Closing Date, the Issuer shall open a depository account (the "<u>Cash Collateral Account</u>") with U.S. Bank, N.A. which Cash Collateral Account shall be subject to a control agreement, substantially in the form of <u>Exhibit B</u> (and with such other changes as may be approved by the Collateral Agent and the Company) (the "<u>Control Agreement</u>"), between the Company, U.S. Bank, N.A. and the Collateral Agent.  The Issuer shall cause all Actual Monetization Revenues to be deposited into such Cash Collateral Account, shall provide instructions to each payor of Actual Monetization Revenues to directly deposit any Actual Monetization Revenues into the Cash Collateral Account, and the Issuer and Uniloc Lux hereby authorize the Majority Purchasers to inform any payor of Actual Monetization Revenues of the Company's obligation to direct all Actual Monetization Revenues to the Cash Collateral Account as required hereunder. On each deposit of Actual Monetization Revenues to the Cash Collateral Account, the Issuer shall deliver an officer's certificate in the form of <u>Exhibit C</u> to the Collateral Agent detailing the source and nature of such Actual Monetization Revenues and setting forth the Company's calculation of the required application of the resulting Actual Monetization Revenues. On a monthly basis on and after the Closing Date, but no later than the 15th day of each month, the Collateral Agent shall deliver to the Issuer a written statement (each a "<u>Collateral Agent Statement</u>") with reasonable detail showing the amounts applied by the Collateral Agent in the Cash Collateral Account for the prior month to the payment of the Notes or, after the payment in full of the Notes, the payments made to Purchasers, and payments to the Issuer in respect of the Actual Monetization Revenues.  The Cash Collateral Account shall be under the sole control of the Collateral Agent and neither the Issuer nor Uniloc Lux may have withdrawal rights with respect to, or otherwise control of, the Cash Collateral Account; <u>provided</u> that the Collateral Agent shall make withdrawals from the Cash Collateral Account promptly following the deposit of any Actual Monetization Revenues, and will apply such Actual Monetization Revenues to amounts due hereunder in accordance with this Agreement, and will release any excess amounts to the Issuer. The Company shall have access to account statements from the depositary bank concerning the Cash Collateral Account.

6.12.  <u>Further Assurances</u>.  Upon the reasonable request of the Majority Purchasers or the Collateral Agent, the Company shall (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Collateral Agent or Majority Purchasers may reasonably request from time to time in order to carry out the purposes of the Documents. Promptly upon the Company or Uniloc Lux acquiring any new Subsidiary, such Person shall cause such Subsidiary to execute the Collateral Documents and any other documentation requested by the Collateral Agent, and to take any action reasonably requested to grant to the Collateral Agent, and perfected, liens on its material assets.

6.12.1.  Within 60 days after the Closing Date, Uniloc Aus agrees to contribute its equity in Uniloc USA, Inc. to a newly created Delaware limited liability company and, to enter into a limited liability company operating agreement for such newly formed limited liability company substantially in the form attached hereto as <u>Exhibit I</u> and to cause such entity to execute a joinder of the Documents.

-20-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                                   Uniloc Common Production to Google 0011290

6.12.2. Within 90 days after the Closing Date, and at the Company's sole expense, Uniloc Lux shall cause the chain of title issues reflected on Schedule 4.5(b) to be remedied, and shall execute and deliver to the Collateral Agent an updated Patent License Agreement and Patent Security Agreement reflecting the correct filings.

6.12.3. Within 90 days after the Closing Date, and at the Company's sole expense, Uniloc Lux shall cause to be filed in the applicable foreign filing offices any filings required to perfect Collateral Agent's first priority lien in the Patents in China, Germany and the United Kingdom. For any other foreign jurisdiction, at the Purchasers' expense, the Collateral Agent may cause any other filings required to perfect a first priority lien in the Patents in such other jurisdictions and Uniloc Lux will take any actions reasonably requested by the Collateral Agent from time to time in order to carry out such filings.

6.12.4. Within 30 days after the Closing Date, and at the Company's sole expense, Uniloc Lux and Uniloc USA, Inc. shall complete an amendment to the License and Services Agreement dated January 1, 2013, on terms acceptable to the Majority Purchasers.

6.12.5. Within 60 days after the Closing Date, Uniloc, USA, Inc. shall have caused the dissolution of each of its Subsidiaries, and shall have caused such Subsidiaries' assets, if any, to be distributed to Uniloc USA, Inc.

6.12.6. Within 30 days after the Closing Date, and at the Company's sole expense, the Issuer and D/A Investment Holdings LLC shall have delivered to the Purchasers a legal capacity opinion of counsel for the Issuer and D/A Investment Holdings LLC addressed to the Collateral Agent and Purchasers in customary form and otherwise in form and substance reasonably satisfactory to the Collateral Agent and Purchasers.

6.13. Confidentiality. Each party hereto will hold, and will cause its respective Affiliates and its and their respective directors, officers, employees, agents, members, investors, auditors, attorneys, financial advisors, other consultants and advisors and assignees to hold, in strict confidence, unless disclosure to a regulatory authority is necessary in connection with any necessary regulatory approval, examination or inspection or unless disclosure is required by judicial or administrative process or, in the written opinion of its counsel, by other requirement of law or the applicable requirements of any regulatory agency or relevant stock exchange, all non-public records, books, contracts, instruments, computer data and other data and information (collectively, "Information") concerning the other party hereto furnished to it by or on behalf of such other party or its representatives pursuant to this Agreement (except to the extent that such information can be shown to have been (1) previously known by such party on a non-confidential basis or becomes available to such party on a non-confidential basis, (2) publicly available through no fault of such party or (3) later lawfully acquired from other sources by such party), and neither party hereto shall release or disclose such Information to any other person, except on a confidential basis to its officers, directors, employees, agents, members, investors, Affiliates, auditors, attorneys, financial advisors, other consultants and advisors and except in connection with any proposed assignment or participation of the rights of a Purchaser under this

-21-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0011291

Agreement made in accordance with Section 9.10.2, provided such prospective assignee or participant has agreed to be bound by the confidentiality provisions consistent with those set forth herein.

6.14. Use of Proceeds. The proceeds of the Notes shall be used to pay expenses of the Company's pursuant of Monetization Activities (or to reimburse the Company for the payment of such expenses), for growth capital, for working capital and for other general corporate purposes that are not in violation of this agreement.

6.15. Restricted Payments. No Company shall make, nor shall any Company permit any Subsidiary of such Company to make, directly or indirectly any Restricted Payment, except (i) Restricted Payments from a Subsidiary of a Company to such Company and (ii) Restricted Payments made out of Excess Liquidity. The applicable Company shall provide the Purchasers with not less than 10 Business Days prior written notice prior to making any Restricted Payment under clause (ii) above, which notice shall be accompanied by a certification setting forth the calculation of the Liquidity Reserve Amount and Excess Liquidity supporting such proposed Restricted Payment, in detail satisfactory to the Purchasers.

6.16. Third Amendment Due Authorization and Legal Opinions. Company shall deliver to the Collateral Agent and the Purchasers customary evidence of due authorization as well as legal opinions, in customary form and otherwise in form and substance reasonably satisfactory to the Collateral Agent and the Purchasers regarding the transactions contemplated by the Third Amendment to Revenue Sharing and Note and Warrant Purchase Agreement, dated as of May 15, 2017, no later than May 26, 2017.

## ARTICLE VII
## EVENTS OF DEFAULT

7.1. Events of Default. Each of the following events is referred to as an "Event of Default":

7.1.1. Payment. The Company shall fail to make any payment due hereunder within 3 Business Days of when such payment is due and payable.

7.1.2. Other Covenants. The Company shall (x) fail to perform or observe any of the covenants or agreements contained in Article VI or (y) fail to perform or observe any of the covenants or agreements elsewhere in this Agreement or in any other Document (other than those covenants or agreements specified in clause (x) above) such failure continues for thirty days after the earlier of (i) written notice to the Company by the Collateral Agent or any Purchaser of such failure or (ii) knowledge of the Company of such failure.

7.1.3. Representations and Warranties. Any representation or warranty of or with respect to the Company, pursuant to or in connection with any Document, or in any financial statement, report, notice, mortgage, assignment or certificate delivered by the Company so representing to the other parties hereto in connection herewith or therewith, shall be false in any material respect on the date as of which it was made.

-22-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                              Uniloc Common Production to Google 0011292

Document, including directing the Company to take any action requested by the Majority Purchasers (or the Collateral Agent, acting at the direction of the Majority Purchasers) in any Monetization Activity regarding the Patents;

        7.2.2.   <u>Acceleration</u>. The Majority Purchasers may, by notice in writing to the Company, declare the remaining unpaid amount of the then-outstanding Notes, together with accrued and unpaid interest and fees thereon, and the balance of the Revenue Stream, to be immediately due and payable; *provided* that if a Bankruptcy Event of Default pursuant to <u>Section 7.1.8</u> shall have occurred, such amounts shall automatically become immediately due and payable; and provided, that in such event, the Company shall immediately and unconditionally be obligated to pay, as liquidated damages with respect to the Revenue Stream, the maximum amount of the Revenue Stream in full, in cash, i.e., the Issuer shall pay to the Purchasers in respect of the Revenue Stream $23,400,00, less any amounts previously applied to the Revenue Stream.

        7.2.3.   <u>Standstill</u>.  Upon notice in writing from the Majority Purchasers, the Company shall not enter into any new pledges, assignments, licenses, springing licenses, options, non-assertion agreements, earn-outs, monetization agreements, profit and revenue sharing arrangements, derivative interests, fee and recovery splitting agreements, registered user agreements, shop rights and covenants by the Company not to sue third persons with respect to any of the Patents; and

        7.2.4.   <u>Cumulative Remedies</u>.  To the extent not prohibited by applicable law which cannot be waived, each party's rights hereunder and under the other Documents shall be cumulative;

*provided* that, effective upon the Majority Purchasers (or the Collateral Agent, acting at the direction of the Majority Purchasers) enforcing any such rights or remedies under this Agreement or any other Document, or under applicable law, the Purchasers and the Collateral Agent shall (1) grant, and do hereby grant, to the Company a non-exclusive, royalty-free, world-wide license (with the right to sublicense to third parties under the Existing Licenses and the sale of proprietary products and any other licenses entered into in compliance with this Agreement) to the Patents, which license shall be non-revocable by any third party transferee or any other person or entity that acquires rights in the Patents (by foreclosure or otherwise) at any time following such exercise of rights or remedies, and (2) require as a condition to the effectiveness of any such transfer or assignment (by foreclosure or otherwise) of the Patents or rights in the Patents, that the applicable transferee or assignee acknowledge and agree to the non-revocable grant to the Company of the perpetual license of the type described in the immediately preceding clause (1), which acknowledgement and agreement by such transferee or assignee shall be made in a writing, signed by a duly authorized officer of such transferee or assignee, made to and for the express benefit of the Company, and the original of which shall be delivered by the Purchasers or the Collateral Agent to the Company promptly following any such transfer or assignment.

        7.3.   <u>Annulment of Defaults</u>.  Once an Event of Default has occurred, such Event of Default shall be deemed to exist and be continuing for all purposes of this Agreement until the

-25-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY        Uniloc Common Production to Google 0011295

earlier of (x) Majority Purchasers shall have waived such Event of Default in writing, (y) the Company shall have cured such Event of Default to the Majority Purchasers' reasonable satisfaction or the Company or such Event of Default otherwise ceases to exist, or (z) the Collateral Agent and the Purchasers or Majority Purchasers (as required by <u>Section 9.4.1</u>) have entered into an amendment to this Agreement which by its express terms cures such Event of Default, at which time such Event of Default shall no longer be deemed to exist or to have continued. No such action by the parties hereto shall prevent the occurrence of, or effect a waiver with respect to, any subsequent Event of Default or impair any rights of the parties hereto upon the occurrence thereof.

    7.4.   <u>Waivers</u>. To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, the Company waives:

    7.4.1.   all presentments, demands for performance, notices of nonperformance (except to the extent required by this Agreement), protests, notices of protest and notices of dishonor;

    7.4.2.   any requirement of diligence or promptness on the part of the Purchasers in the enforcement of its rights under this Agreement;

    7.4.3.   any and all notices of every kind and description which may be required to be given by any statute or rule of law; and

    7.4.4.   any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under this Agreement or with respect to the Obligations.

## ARTICLE VIII
## COLLATERAL AGENT

    8.1.   <u>Appointment of Collateral Agent</u>. Each of the Purchasers hereby appoints Fortress Credit Co LLC as Collateral Agent to act for them as collateral agent, to hold any pledged collateral and any other collateral perfected by perfection or control for the benefit of the Purchasers; *provided* that the rights of the Purchasers to direct the Collateral Agent and to receive proceeds of Collateral shall be prior to, and controlling of, any rights of the Purchasers. Notwithstanding, but without limiting the foregoing, the Collateral Agent shall take direction from the Majority Purchasers and shall distribute any proceeds of the Collateral in accordance with <u>Section 2.4</u>, such that any proceeds of Term A/B Priority Collateral shall first be applied to satisfy the Obligations owing to the Term A/B Purchaser, as provided under Section 2.4.1, and the proceeds of Term C Priority Collateral shall first be applied to satisfy the Obligations owing to the Term C Purchaser as provided under Section 2.4.2, in each case, prior to being applied to the Obligations owing to the other Purchaser.

    8.2.   <u>Collateral</u>. The Collateral Agent shall act at the instruction of the Majority Purchasers with respect to providing any vote, consent or taking other action with respect to the Collateral.

62250363_5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    Uniloc Common Production to Google 0011296

Indemnitor; *provided further*, that with respect to any claim as to which the Indemnitee is controlling the defense, the Indemnitor will not be liable to any Indemnitee for any settlement of any claim pursuant to this Section 9.2 that is effected without its prior written consent, which consent shall not be unreasonably withheld. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 9.2 may be unenforceable because it is violative of any law or public policy, the Company shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. Notwithstanding anything to the contrary in this Agreement, no party shall be liable to the other party or any third party for any indirect, incidental, exemplary, special, punitive or consequential damages (including with respect to lost revenue, lost profits or savings or business interruption) of any kind or nature whatsoever suffered by the other party or any third party howsoever caused and regardless of the form or cause of action, even if such damages are foreseeable or such party has been advised of the possibility of such damages. The provisions of this Section 9.2 shall survive the repayment in full of the Notes and the termination of this Agreement.

9.3. <u>Notices</u>. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and delivered via facsimile, email (in each case, followed promptly by delivery from a nationally recognized overnight courier) or a nationally recognized overnight courier. Such notices, demands and other communications will be delivered or sent to the address indicated on Schedule 9.3 or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party. Any such communication shall be deemed to have been received when actually delivered or refused.

9.4. <u>Amendments, Consents, Waivers, etc.</u>

9.4.1. <u>Amendments</u>. No amendment, modification, termination or waiver of any provision of this Agreement shall in any event be effective without the written consent of each of the Company, the Collateral Agent and the Majority Purchasers; *provided* that the consent of each affected Purchaser shall be required for any amendment that (i) waives or reduces any amounts owed to it under this Agreement or extends the date for payment of any amount hereunder, (ii) releases the Company or (iii) releases all or any material portion of the Collateral, except in connection with any Disposition of Patents to the extent permitted under Section 6.9.1. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Company in any case shall entitle the Company to any further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 9.4.1 shall be binding upon the holders of the Obligations at the time outstanding and each future holder thereof.

9.4.2. <u>Course of Dealing; No Implied Waivers</u>. No course of dealing between the Purchasers and the Company shall operate as a waiver of any Purchaser's rights under this Agreement or with respect to the Obligations. In particular, no delay or omission on the part of any Purchaser in exercising any right under this Agreement or with respect to the Obligations shall operate as a waiver of such right or any other right hereunder or

-30-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0011300

thereunder. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.

9.5. No Strict Construction. The parties have participated jointly in the negotiation and drafting of this Agreement with counsel sophisticated in financing transactions. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

9.6. Certain Acknowledgments. Each of the Company and the Purchasers acknowledges that:

9.6.1. it has been advised by counsel in the negotiation, execution and delivery of this Agreement; and

9.6.2. no joint venture is created hereby or otherwise exists by virtue of the transactions contemplated hereby or thereby among the Company and the Purchasers.

9.7. Venue; Service of Process; Certain Waivers. The Company and Purchaser:

9.7.1. irrevocably submit to the exclusive jurisdiction of any New York state court or federal court sitting in New York, New York, and any court having jurisdiction over appeals of matters heard in such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement or the subject matter hereof or thereof;

9.7.2. waive to the extent not prohibited by applicable law that cannot be waived, and agree not to assert, by way of motion, as a defense or otherwise, in any such proceeding brought in any of the above-named courts, any claim that they are not subject personally to the jurisdiction of such court, that their property is exempt or immune from attachment or execution, that such proceeding is brought in an inconvenient forum, that the venue of such proceeding is improper, or that this Agreement, or the subject matter hereof or thereof, may not be enforced in or by such court;

9.7.3. consent to service of process in any such proceeding in any manner at the time permitted under the applicable laws of the State of New York and agree that service of process by registered or certified mail, return receipt requested, at the address specified in or pursuant to Section 9.3 is reasonably calculated to give actual notice; and

9.7.4. waive to the extent not prohibited by applicable law that cannot be waived any right to claim or recover in any such proceeding any special, exemplary, punitive or consequential damages.

9.8. WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH COMPANY AND EACH PURCHASER WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM OR PROCEEDING ARISING OUT OF

-31-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY          Uniloc Common Production to Google 0011301

OR RELATING TO THIS AGREEMENT OR THE CONDUCT OF THE PARTIES HERETO, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. The Company acknowledges that it has been informed by the Purchasers that the foregoing sentence constitutes a material inducement upon which the Purchasers have relied and will rely in entering into this Agreement. Any of the Company or Purchasers may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of the Company and Purchasers to the waiver of their rights to trial by jury.

9.9. <u>Interpretation; Governing Law; etc</u>. All covenants, agreements, representations and warranties made in this Agreement or in certificates delivered pursuant hereto or thereto shall be deemed to have been relied on by each Purchaser, notwithstanding any investigation made by such Purchaser, and shall survive the execution and delivery to the Purchasers hereof and thereof. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof, and any invalid or unenforceable provision shall be modified so as to be enforced to the maximum extent of its validity or enforceability. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof. This Agreement and the Documents constitute the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior and contemporaneous understandings and agreements, whether written or oral. This Agreement may be executed in any number of counterparts which together shall constitute one instrument. This Agreement, and any issue, claim or proceeding arising out of or relating to this Agreement or the Documents or the conduct of the parties hereto, whether now existing or hereafter arising and whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws of the State of New York.

9.10. <u>Successors and Assigns</u>

9.10.1. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted by Sections <u>9.10.2</u> and <u>9.10.3</u>.

9.10.2. The Company may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Majority Purchasers. Subject to <u>Section 9.10.4</u> below, any Purchaser may sell, assign, participate or transfer all or any part of their rights under this Agreement to an Eligible Assignee (as defined below); *provided* that such Purchaser and the assignee of such Purchaser shall have delivered an executed Assignment and Assumption Agreement substantially in the form attached hereto as <u>Exhibit D</u> to the Company and each other Purchaser. In the case of any sale, assignment, transfer or negotiation of all or part of the rights of a Purchaser under this Agreement that is authorized under this <u>Section 9.10.2</u>, the assignee, transferee or recipient shall have, to the extent of such sale, assignment, transfer or negotiation, the same rights, benefits and obligations as it would if it were a Purchaser hereunder. The Purchasers agree to provide to the Company prompt written notice of any sales, assignments or transfers permitted hereunder, including the name and address of the transferee(s). "Eligible Assignee" means any Affiliate of the Purchasers or the Collateral Agent, any commercial bank, insurance company, finance company, financial institution,

-32-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011302

## SCHEDULE 4.5(a)

## EXISTING LICENSES

## (Updated May 10, 2017)

31. License and Services Agreement dated effective as of January 1, 2013, by and between Uniloc USA, Inc. and Uniloc Luxembourg S.A. and the same such agreement dated effective September 19, 2014; February 22, 2016; and February 21, 2017; and Amendment to License and Services Agreement dated February 26, 2015.

32. Patent License Agreement dated as of December 23, 2013, between Uniloc Luxembourg S.A. and Device Authority, Inc. and subsequent First Amendment to Patent License Agreement dated August 5, 2014.

33. Patent License Agreement effective December 30, 2014, by Uniloc Luxembourg S.A. and Uniloc USA, Inc. and between Fortress Credit Co LLC.

34. Technology License and Ownership Allocation Agreement dated as of November 19, 2016 between Uniloc Luxembourg S.A. and NewCo for the use of the Centurion Platform for Agreed Limited Purposes.

35. See attached listing of licenses and license agreements.

SUMMARY OF UNILOC LICENSE AGREEMENTS
Updated May 10, 2017



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0011326

62250363_5



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0011327

EXHIBIT E

# PATENT LICENSE AGREEMENT

**THIS PATENT LICENSE AGREEMENT** (the "**Agreement**") is made and entered into effective as of December 30, 2014 by and among:

**Uniloc Luxembourg, S.A.**, a public limited liability company (*société anonyme*), incorporated under the laws of the Grand Duchy of Luxembourg, with registered office at 15, rue Edward Steichen, L-2540 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 159.161 ("**Uniloc Lux**");

**Uniloc USA, Inc.**, a Texas corporation having its principal place of business located at 7160 Dallas Parkway, Suite 380, Plano, TX 75024 ("**Uniloc USA**" and, collectively with the Uniloc Lux, "**Licensor**"); and

**Fortress Credit Co LLC**, an entity incorporated under the laws of Delaware having its principal place of business located at 1345 Avenue of the Americas, 46th Floor, New York, NY 1005 ("**Licensee**").

Licensor and Licensee are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS**, pursuant to the License and Services Agreement (the "**Existing License Agreement**"), effective as of January 1, 2013, between Uniloc Lux and Uniloc USA, Uniloc Lux has licensed certain patents to Uniloc USA and Uniloc USA has agreed to provide certain services to Uniloc Lux; and

**WHEREAS**, the Parties have entered into (i) the Revenue Sharing and Note and Warrant Purchase Agreement, dated as of the date hereof (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Purchase Agreement**"), by and among the Licensor, Uniloc Corporation PTY Limited, the Purchasers (including the Licensee) and the Licensee, acting as the Collateral Agent and (ii) the Security Agreement, dated as of the date hereof (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Grantors (as defined therein, including Licensor) and the Licensee, acting as the Collateral Agent;

**WHEREAS**, in consideration of the investments set forth in the Purchase Agreement, Licensor agreed to grant certain rights, including rights to license patents and patent applications, to the Licensee for the benefit of the Secured Parties; and

**WHEREAS**, Licensor is the owner of certain patents and patent applications identified in Schedule I(a) of the Purchase Agreement (as updated from time to time), which Schedule I(a) shall be an integral part of this Agreement; and

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Parties hereto agree as follows:

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

UNILOC_APPLE_2017_18366

Uniloc Common Production to Google000065

1. **Definitions**

In this Agreement, the following terms shall have the assigned meaning. Capitalized terms used in this Agreement but not defined herein shall have the meaning given to them in the Purchase Agreement and/or the Security Agreement, as applicable.

"**Licensed Patents**" shall mean the Patents listed on Schedule I(a) of the Purchase Agreement, as updated from time to time.

2. **License**

2.1 Subject to the terms and conditions herein and in the Purchase Agreement, Licensor hereby grants to Licensee a non-exclusive, transferrable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free, and worldwide license to the Licensed Patents, including, but not limited to, the rights to make, have made, market, use, sell, offer for sale, import, export and distribute the inventions disclosed in the Licensed Patents and otherwise exploit the Licensed Patents in any lawful manner in Licensee's sole and absolute discretion solely for the benefit of the Secured Parties ("**Patent License**"), provided that Licensee shall only use the Patent License following an Event of Default.

2.2 If Licensee elects to grant any sublicense(s) pursuant to the Patent License in Section 2.1, Licensee shall (x) obtain the prior written approval of Licensor before entering into any sublicense agreement imposing financial obligations or restrictions on Licensor and (y) provide written notice within fifteen days of entering into any sublicense agreement.

2.3 Notwithstanding any term contained in the Existing License Agreement, Uniloc USA hereby consents to the present grant by both Uniloc Lux and Uniloc USA of a license of the Licensed Patents to the Licensee as set forth herein.

3. **Representations, Warranties and Acknowledgements**

3.1 Each Party represents, warrants and covenant to the other that the execution, delivery and performance of this Agreement is within each Party's powers and has been duly authorized.

3.2 Licensor hereby represents, warrants and covenant that it is the sole and exclusive owner of all rights, title and interest in and to the Licensed Patents.

3.3 EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER PARTY MAKES ANY WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, AND EACH PARTY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE OR THAT ARISE BY COURSE OF DEALING OR BY REASON OF CUSTOM OR USAGE IN THE TRADE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

3.4 Notwithstanding anything to the contrary in this Agreement, no Party shall be liable to the other or any third party for any indirect, incidental, exemplary, special, punitive or

47666641_3

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

UNILOC_APPLE_2017_18367

Uniloc Common Production to Google000066

consequential damages (including with respect to lost revenue, lost profits or savings or business interruption) of any kind or nature whatsoever suffered by the other Party or any third party howsoever caused and regardless of the form or cause of action, even if such damages are foreseeable or such party has been advised of the possibility of such damages.

## 4. Infringement

Upon request, Licensee shall notify Licensor of any infringement of the Licensed Patents by third parties of which Licensee become aware. Licensor shall have the sole right, at its expense, to bring any action on account of any such infringement of the Licensed Patents, and Licensee shall reasonably cooperate with Licensor, as Licensor may request and at Licensor's expense, in connection with any such action brought by Licensor.

## 5. Termination

5.1 The Parties may terminate this Agreement at any time by mutual written agreement executed by both Parties provided that any sublicenses granted hereunder prior to the termination of this Agreement shall survive according to the respective terms and conditions of such sublicenses.

5.2 The Agreement shall end after the later of (x) the expiration of the last Licensed Patent to expire, (y) the date on which all statutes of limitations have fully run for bringing infringement claims under the Licensed Patents and (z) the termination of any sublicensing agreement by Licensee with regards to the Licensed Patents. Breach(es), material or otherwise, of this Agreement by either Party or any other Person will not constitute grounds by which this Agreement may be terminated.

## 6. Survival

Any rights and obligations which by their nature survive and continue after any expiration or termination of this Agreement will survive and continue and will bind the Parties and their successors and assigns, until such rights are extinguished and obligations are fulfilled.

## 7. Statement of Intent With Respect to Bankruptcy.

The Parties intend that the licenses granted under this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, 111 U.S.C. § 101, et seq. ("**Bankruptcy Code**"), licenses of rights to "intellectual property" as defined in the Bankruptcy Code.

## 8. Assignment

Licensee and each of its sublicensees may, without the consent of Licensor, assign any or all of their rights and interests, and delegate any or all of their obligations without restriction. The rights and obligations of the Parties hereto shall inure to the benefit of,

47666641_3

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

UNILOC_APPLE_2017_18368

Uniloc Common Production to Google000067

and be binding and enforceable upon and by, the respective successors and assigns of the Parties.

9.  **Entire Agreement and Construction**

    This Agreement along with the pertinent provisions of the Purchase Agreement and the other Documents constitute the sole, final and entire understanding of the parties hereto concerning the subject matter hereof, and all prior understandings having been merged herein. This Agreement cannot be modified or amended except by a writing signed by the Parties hereto. The language used in this Agreement will be deemed to be the language chosen by the Parties hereto to express their mutual intent, and no rule of strict construction will be applied against any Party.

10. **Severability**

    The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

11. **Notices**

    All notices, requests, claims, demands, and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, or by overnight delivery service from a recognized carrier, to the respective Party as follows:

    if to Licensor:

    > 7160 Dallas Parkway, Suite 380
    > Plano, TX 75024
    > Attn: Craig Etchegoyen and Sean Burdick

    > With a copy to:

    > Jeffrey C. Anderson
    > Gray Plant Mooty
    > 500 IDS Center
    > 80 South Eighth Street
    > Minneapolis, MN 55402
    > Tel: 612-632-3000

47666641_3

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

CONFIDENTIAL - ATTORNEYS EYES ONLY

UNILOC_APPLE_2017_18369

Uniloc Common Production to Google000068

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**UNILOC USA, INC.**
as Uniloc USA

By: _____
Name:   Sean D. Burdick
Title:    President


**UNILOC LUXEMBOURG S.A.**
as Uniloc Lux

By: _____
Name:   Craig Etchegoyen
Title:    CEO

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**
CONFIDENTIAL - ATTORNEYS EYES ONLY

**FORTRESS CREDIT CO LLC,**
as Licensee

By: _____
Name:
Title:    CONSTANTINE M. DAKOLIAS
          PRESIDENT

[Signature Page to Patent License Agreement]

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT F

1            UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2             SAN FRANCISCO DIVISION

3

4  UNILOC USA, INC., et al.,   Case Nos.: 3:18-cv-00360-WHA
                         Case Nos.: 3:18-cv-00363-WHA
5           Plaintiffs,  Case Nos.: 3:18-cv-00365-WHA
                         Case Nos.: 3:18-cv-00572-WHA
6  vs.

7  APPLE INC.,

8          Defendant.
   _____//
9

10

11        CONFIDENTIAL - ATTORNEYS' EYES ONLY

12          DEPOSITION OF EREZ LEVY

13         Friday, September 21, 2018

14

15

16  REPORTED BY:

17  APRIL DAWN HEVEROH, RPR, CLR, CCRR, CSR No. 8759

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY        Uniloc Common Production to Google 0004864

1    Uniloc Luxembourg and Uniloc USA to be part of this

2    license to Fortress Credit?

3        A.    I do not recall.

4        Q.    Are you aware of any patents that were excluded

5    from this license?

6        A.    I do not recall.

7        Q.    Did you take any steps to verify whether the

8    parties intended for all patents owned by Uniloc

9    Luxembourg to be part of this license to Fortress

10   Credit?

11       A.    In preparation for this deposition?

12       Q.    Or in general.

13       A.    No.

14       Q.    Did you take any steps to determine whether any

15   particular patents were excluded from this license

16   between Fortress and Uniloc?

17       A.    No.

18       Q.    Nevertheless, sitting here today, you're not

19   aware of any patents that were excluded from this

20   license, correct?

21       A.    That is correct.

22       Q.    To the best of your understanding, this

23   agreement was intended to include all of Uniloc

24   Luxembourg's patent portfolio, correct?

25       A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY          Uniloc Common Production to Google 0004929

1    moment.

2            MS. NEFF:  Thank you, Counsel.

3        Q.   Do you see that in the revenue sharing

4    agreement we were just looking at, the first appendix

5    listed is appendix 1, definitions?

6        A.   Yes.

7        Q.   That document we do have.

8            (Whereupon, Defendant's Exhibit 1013 was marked

9             for identification.)

10   BY MS. NEFF:

11       Q.   I've marked for you as Exhibit 1013 to the

12   deposition appendix 1 to the revenue sharing agreement.

13            Would you turn with me, please, to the page

14   ending in 326.  Are you there?

15       A.   I am.

16       Q.   Do you see that "patents" means all

17   intellectual property of the company, company meaning

18   Uniloc Luxembourg, Uniloc Corporation, Uniloc USA and DA

19   Investment Holdings?

20       A.   Yes.

21       Q.   The parties intended that Fortress' rights as

22   described in the revenue sharing and note and warrant

23   purchase agreement would attach to all of Uniloc

24   Luxembourg, Uniloc Corporation, Uniloc USA and DA

25   Investment Holdings' intellectual property, right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0004934

1    A.   Yes, that's what the document says.

2         (Whereupon, Defendant's Exhibit 1014 was marked

3          for identification.)

4  BY MS. NEFF:

5    Q.   I've handed you our next exhibit.

6    A.   Thank you.

7    Q.   You recognize this as the third amendment to

8  the revenue sharing and note and warrant purchase

9  agreement, correct?

10   A.   Yes.

11   Q.   What was the general purpose of this amendment

12  from a business perspective?

13   A.   To provide additional capital to the company.

14   Q.   This agreement is between Uniloc entities and

15  Fortress entities, right?

16   A.   That's what the document articulates, yeah.

17   Q.   The Uniloc entities include Uniloc USA, Uniloc

18  Luxembourg, Uniloc Corporation and DA Investment

19  Holdings, correct?

20   A.   The document speaks for itself.

21   Q.   Am I, nevertheless, correct that those Uniloc

22  entities are listed as the Uniloc entities that are

23  parties to this amendment?

24   A.   Yes.

25   Q.   Uniloc USA is referred to as the issuer in this

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY          Uniloc Common Production to Google 0004935

1 by this section for any dispute, correct?

2     A.   I have never been made aware, yes.

3     Q.   Do you have any knowledge of how the company

4 provided that notice?

5     A.   I don't.

6     Q.   Do you have any knowledge of who from the

7 company would have sent that notice?

8     A.   I don't.

9     Q.   Who at Fortress would have received any such

10 notice? You mentioned the general counsel's office.

11     A.   That is correct.

12     Q.   Who --

13     A.   Like Dan Hulea and anybody in that group. It's

14 a relatively large group of in-house counsels.

15     Q.   So attorneys for Fortress would have received

16 any notice pursuant to section 6.5.1; is that right?

17     A.   That's my understanding.

18     Q.   Are there any instances of which you are aware

19 where the company should have provided notice under

20 section 6.5.1, but failed to do so?

21     A.   I am not aware of any.

22     Q.   Section 6.5.1.2 requires the company to give

23 notice regarding existing default or an event of default

24 and specify the nature. Do you see that?

25     A.   I see that.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY     Uniloc Common Production to Google 0004946

1     Q.   Did the company ever provide notice of any

2   default or event of default as required by this section?

3     A.   I am not aware of it.

4     Q.   Had the company provided such notice of

5   default, would you have expected to have been made

6   aware?

7     A.   Yes.

8     Q.   How many times -- withdrawn.

9          Section 6.5.2 also requires Uniloc USA as

10   issuer to furnish certain reports to the purchasers.  Do

11   you see that?

12     A.   Yes.

13     Q.   How did Uniloc USA provide those reports?

14     A.   What do you mean how?

15     Q.   In what form?

16     A.   I don't know.

17     Q.   Do you know who from Uniloc USA sent those

18   reports?

19     A.   No.

20     Q.   Do you know who at Fortress would have received

21   those reports from Uniloc USA?

22     A.   Usually, the -- there's a group called the

23   asset management and they kind of receive reports and --

24   from the company, and then they report to us if there's

25   any anomaly.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                Uniloc Common Production to Google 0004947

1    Q.    Section 7.3 refers to annulment of an event of

2  default, right?

3    A.    Uh-huh.

4    Q.    Is that a "yes"?

5    A.    Yes.  Sorry.

6    Q.    And do you see that section 7.4 refers to

7  waiving an event of default in writing?  Withdrawn.

8         Still under 7.3 --

9    A.    If you're going to ask me, can I read it?

10  'Cause I'm not sure I remember --

11    Q.    Please do.

12    A.    Okay.

13    Q.    Section 7.3 refers to waiving an event of

14  default in writing, correct?

15    A.    Yes, (X).

16    Q.    Are you aware of any instance where the

17  majority purchasers waived an event of default in

18  writing?

19    A.    I am not aware.

20    Q.    Did you do anything to research whether there

21  were any occasions where the major purchasers waived an

22  event of default in writing?

23    A.    No.

24    Q.    Clause (Y) refers to curing a default where the

25  default ceases to exist.  Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY            Uniloc Common Production to Google 0004952

1    A.    I do.

2    Q.    Are you aware of any instance where an event of

3    default was cured to the reasonable satisfaction of the

4    major purchasers?

5    A.    I am not aware of an event of default.

6    Q.    Are you aware of any instance where an event of

7    default was in existence but then ceased to exist?

8    A.    I am not aware of any such event.

9    Q.    Clause (Z) refers to an amendment to the

10   agreement that cures an event of default.  Do you see

11   that?

12   A.    I do.

13   Q.    Are you aware of any amendment to this

14   agreement that cures an event of default?

15   A.    No.

16   Q.    This agreement has been amended three times,

17   right?

18   A.    Correct.

19   Q.    Did any of those amendments cure an event of

20   default?

21   A.    Not that I'm aware of.

22   Q.    Did you speak with anyone to determine whether

23   any of those amendments cured an event of default?

24   A.    No.  I'm just not aware of an event of default.

25   Q.    So far we've been talking about the time period

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0004953

1                    REPORTER CERTIFICATE

2              I hereby certify that the witness in the

3    foregoing deposition was by me duly sworn to testify to

4    the truth, the whole truth and nothing but the truth in

5    the within-entitled cause; that said deposition was

6    taken at the time and place herein named; that the

7    deposition is a true record of the witness' testimony as

8    reported to the best of my ability by me, a duly

9    certified shorthand reporter and a disinterested person,

10   and was thereafter transcribed under my direction into

11   typewriting by computer; that the witness was given an

12   opportunity to read and correct said deposition and to

13   subscribe the same.  Should the signature of the witness

14   not be affixed to the deposition, the witness shall not

15   have availed himself or herself of the opportunity to

16   sign or the signature has been waived.

17              I further certify that I am not interested

18   in the outcome of said action, nor connected with, nor

19   related to any of the parties in said action, nor to

20   their respective counsel.

21              IN WITNESS WHEREOF, I have hereunto set my

22   hand this _____ day of _____, 2018.

23

24              _April D. Heveroh_
                 APRIL DAWN HEVEROH
25               CSR NO. 8759

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY          Uniloc Common Production to Google 0005047

# EXHIBIT G

CERTIFIED COPY

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                 SAN FRANCISCO DIVISION

 3                        - - -

 4

 5   UNILOC USA, INC., et al.,    :   CASE NOS.
                    Plaintiffs,   :   3:18-cv-00360-WHA
 6                                :   3:18-cv-00363-WHA
                    vs.           :   3:18-cv-00365-WHA
 7                                :   3:13-cv-00572-WHA
     APPLE INC.,                  :
 8                  Defendant.    :

 9                        - - -

10
                CONFIDENTIAL - ATTORNEYS' EYES ONLY
11                  Monday, October 8, 2018

12                        - - -

13

14          Videotaped deposition of DRAKE TURNER, held at

15   GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM, L.L.P., 429

16   Santa Monica Boulevard, Suite 710, Santa Monica,

17   California, commencing at approximately 9:04 a.m.,

18   before Rosemary Locklear, a Registered Professional

19   Reporter, Certified Realtime Reporter and California CSR

20   (#13969).

21

22                        - - -

23

24             GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 971.591.5672 Fax
25                deps@golkow.com
```

1   Q.      And when you say "the lending agreement," are

2   you referring to the Revenue Sharing and Note and

3   Warrant Purchase Agreement that I mentioned earlier?

4   A.      Yes.

5   Q.      Now, we discussed earlier how Uniloc Luxembourg

6   didn't acquire the patents in suit until May 2017;

7   correct?

8   A.      Yes.

9   Q.      But the December of 2014 agreements with

10  Fortress or the other entities that you mentioned

11  applied to patents that Uniloc Luxembourg might acquire

12  in the future as well; correct?

13  A.      Yes.

14  Q.      So, in other words, that's how Fortress and

15  these other entities, CF, et cetera, obtained a security

16  interest in the patents in suit.  Yes?

17  A.      Generally, that's correct.

18          MS. ABENDSHIEN:  This was previously marked as

19  1012.

20  BY MS. ABENDSHIEN:

21  Q.      Mr. Turner, before turning to this document, I'd

22  like to follow up with you on your previous response.

23          In response to my question about how Fortress

24  and the other entities, CF, et cetera, obtained a

25  security interest in the patents in suit, and this was

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0005106

1   A.      Yes.

2   Q.      And this is the reference that would provide the

3   additional specific details for a particular row or line

4   item, in this case, Other Operating Income; is that

5   right?

6   A.      Correct.

7   Q.      Okay.  And here do you see, right below Other

8   Operating Income, it says, Litigation and licensing

9   revenue?

10  A.      Yes.

11  Q.      And the number to the right of that label, under

12  the column 2017 USD, is 14,360,989; is that right?

13  A.      That's correct.

14  Q.      Okay.  And if we turn back to Page -- I think

15  it's 16837 -- or excuse me, pardon me -- 16839, in

16  Row 5, Other operating income, under the Current year

17  column, we have the number 14,360,989; correct?

18  A.      That's correct.

19  Q.      So that's the same number.

20  A.      That is the same number.

21  Q.      So Row 5, Other operating income, here reflects,

22  as we see on Page 16849, Litigation and licensing

23  revenue; correct?

24  A.      Yes.

25  Q.      Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0005149

1    A.      Excuse me.  Yes.

2    Q.      And that description is consistent with the more

3    general definition that we saw in Section 2.2.9 of the

4    Notes; is that right?

5    A.      Yes.

6    Q.      And that number includes all litigation and

7    licensing revenue obtained for the fiscal year ending

8    June 30th, 2017, by Uniloc Luxembourg; correct?

9    A.      Correct.

10   Q.      And as you explained before, that number

11   reflects and includes the litigation and licensing

12   revenue obtained directly by Uniloc USA; correct?

13   A.      The number is the same.

14   Q.      Okay.  Now, let's turn back to Page 16839.

15   A.      Okay.

16   Q.      Do you see in Row 13 where it says Loss for the

17   financial year?

18   A.      Yes.

19   Q.      And then in the Current year column, there's the

20   number 6,970,368; is that right?

21   A.      That's correct.

22   Q.      What kind of losses would be included in that

23   number?

24   A.      Sorry.  When you asked that, I don't know what

25   you mean when you say what kind of losses are included.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY       Uniloc Common Production to Google 0005150

1    Q.        I'll rephrase.

2              What is meant by Loss for the financial year?

3    What does that refer to?

4    A.        It's the net amount -- for purposes of these

5    financial statements and my understanding of Uniloc --

6    excuse me -- of Luxembourg statutory accounting and

7    presentation, Line 13 that you're talking about, Loss

8    for the financial year, is merely the net of total

9    income, less total charges, which are on the previous

10   page, 16838. So it's a mathematical result.

11   Q.        Okay.

12   A.        Which shows that the charges were greater than

13   the income in the amount of $6,970,368.

14   Q.        Losses are separate and distinct from revenue;

15   right?

16   A.        Losses, in my -- to my understanding as an

17   accountant, are the result of the interplay between

18   income and expenses or income and deductions or income

19   and charges, and either it's -- if one is greater than

20   the other, you have net income, if one is less than the

21   other, you have a net loss.

22   Q.        So for the financial year ending June 30th,

23   2017, all of the litigation and licensing revenue is

24   included in the figure at Row 5; correct?

25   A.        Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY            Uniloc Common Production to Google 0005151

1  STATE OF CALIFORNIA          )

2  COUNTY OF LOS ANGELES        )

3        I, ROSEMARY LOCKLEAR, a Certified Shorthand

4  Reporter of the State of California, duly authorized to

5  administer oaths pursuant to Section 2025 of the

6  California Code of Civil Procedure, do hereby certify

7  that

8        DRAKE TURNER, the witness in the foregoing

9  deposition, was by me duly sworn to testify the truth,

10 the whole truth and nothing but the truth in the

11 within-entitled cause; that said testimony of said

12 witness was reported by me, a disinterested person, and

13 was thereafter transcribed under my direction into

14 typewriting and is a true and correct transcription of

15 said proceedings.

16       I further certify that I am not of counsel or

17 attorney for either or any of the parties in the

18 foregoing deposition and caption named, nor in any

19 way interested in the outcome of the cause named in

20 said deposition dated the_____ day of

21 _____, 2018.

22

23 *Rosemary Locklear*

24

25 ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY          Uniloc Common Production to Google 0005212

# EXHIBIT H

## Uniloc Luxembourg S.A.

*Société Anonyme*
*14 rue Edward Steichen L-2540 Luxembourg*
*R.C.S. Luxembourg : B 159 161 Subscribed*
*Capital : USD 55,153*

## Management Report of the Board of Directors
## For the year ended 30 June 2017

**Continued from prior page:**

The overall chill in the environment for companies operating in the patent enforcement space continued, due to a variety of factors such as adverse rulings on some significant cases wholly unrelated to Uniloc's patents. Some of the well-known publicly traded entities operating in the space have effectively exit the business, continuing an unusually challenging environment for traditional investors. As such, it remains difficult to obtain equity capital, especially for private concerns. In such environments, there may be opportunities for consolidation among companies with complementary operations or competitive advantages.

The Company continues to use its Centurion platform for strategic and tactical use in all aspects of the Company's patent operations, including (but not limited to) offensive and defensive enforcement efforts, development and acquisition, competitive negotiations, reduced cost of enforcement, reduced reliance on outside experts, and the development of additional potential revenue channels. Its use has augmented the results achieved during this fiscal year, supporting a continuing expansion of the revenue pipeline. The Company believes this platform continues to provide a competitive advantage that will allow for outperforming versus any peer group.

The Company did not have any branches during the year ended 30 June 2017.

The Company did not redeem any shares during the year ended 30 June 2017.

There were no material adjusting events subsequent to 30 June 2017.

| RCSL Nr. : | B 159 161 | Matricule : | 2011 2203 266 |
|---|---|---|---|

## B. INCOME

| | | Reference(s) | | Current year | | Previous year |
|---|---|---|---|---|---|---|
| 1. | Net turnover | 1701 _____ | 701 | _____ | 702 | _____ |
| 2. | Change in inventories of finished goods and of work and contracts in progress | 1703 _____ | 703 | _____ | 704 | _____ |
| 3. | Fixed assets under development | 1705 _____ | 705 | _____ | 706 | _____ |
| 4. | Reversal of value adjustments | 1707 _____ | 707 | _____ | 708 | _____ |
| | a) on formation expenses and on tangible and intangible fixed assets | 1709 _____ | 700 | _____ | 710 | _____ |
| | b) on current assets | 1711 _____ | 711 | _____ | 712 | _____ |
| 5. | Other operating income | 1713 __11__ | 713 | 14,360,989 | 714 | 7,312,692 |
| 6. | Income from financial fixed assets | 1715 _____ | 715 | _____ | 716 | _____ |
| | a) derived from affiliated undertakings | 1717 _____ | 717 | _____ | 718 | _____ |
| | b) other income from participating interests | 1719 _____ | 719 | _____ | 720 | _____ |
| 7. | Income from financial current assets | 1721 _____ | 721 | _____ | 722 | _____ |
| | a) derived from affiliated undertakings | 1723 _____ | 723 | _____ | 724 | _____ |
| | b) other income from financial current assets | 1725 _____ | 725 | _____ | 726 | _____ |
| 8. | Other interest and other financial income | 1727 _____ | 727 | _____ | 728 | _____ |
| | a) derived from affiliated undertakings | 1729 _____ | 729 | _____ | 730 | _____ |
| | b) other interest and similar financial income | 1731 _____ | 731 | _____ | 732 | _____ |
| 9. | Share of profits of undertakings accounted for under the equity method | 1745 _____ | 745 | _____ | 746 | _____ |
| 10. | Extraordinary income | 1733 _____ | 733 | _____ | 734 | _____ |
| 13. | Loss for the financial year | 1735 _____ | 735 | 6,970,368 | 736 | 7,165,338 |
| | TOTAL INCOME | | 737 | 21,331,357 | 738 | 14,478,030 |

The notes in the annex form an integral part of the annual accounts

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0009827

| 10. | INTEREST AND OTHER FINANCIAL CHARGES | 2017 USD | 2016 USD |
|---|---|---|---|
| | Interest concerning affiliated undertakings | - | - |
| | Exchange losses | 1,140 | 6,735 |
| | Other interest charges | 1,418,866 | 833,735 |
| | Other financial charges | 3,533,128 | 493,469 |
| | | **4,953,134** | **1,333,939** |

| 11. | OTHER OPERATING INCOME | 2017 USD | 2016 USD |
|---|---|---|---|
| | Litigation and licensing revenue | 14,360,989 | 7,276,292 |
| | Reduction in provisions for taxes | - | 36,400 |
| | | **14,360,989** | **7,312,692** |

For the years ended 30 June 2017 and 30 June 2016, the caption is only composed of revenue from litigation settlements.

| 12. | NUMBER OF EMPLOYEES | 2017 | 2016 |
|---|---|---|---|
| | Average number of employees in full-time employment during the year | | |
| | Employees | 2 | 2 |
| | | **2** | **2** |

As at 30 June 2017 there were two employees in the Company, the Chief Executive Officer and the Chief Financial Officer.

| 13. | STAFF COSTS | 2017 USD | 2016 USD |
|---|---|---|---|
| | Bonuses and incentives | 1,258,550 | 777,500 |
| | Base wages | 931,200 | 630,000 |
| | Social security on salaries and wages | 46,863 | 39,925 |
| | | **2,236,623** | **1,447,425** |

# EXHIBIT I

# THIRD AMENDMENT TO
## REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT

This THIRD AMENDMENT TO REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT (this "Amendment") is dated as of May 15, 2017 (the "Third Amendment Effective Date") among Uniloc USA, Inc. a Texas corporation ("Issuer"), Uniloc Luxembourg S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand Duchy of Luxembourg, with registered office at 14, rue Edward Steichen, L-2540 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 159.161 ("Uniloc Lux"), Uniloc Corporation PTY Limited ("Uniloc Aus") and D/A Investment Holdings LLC (together with Uniloc Lux and Uniloc Aus, the "Guarantors", and, collectively, with Issuer, the "Company" and each, a "Company"), Fortress Credit Co LLC as collateral agent (the "Collateral Agent") and the CF DB EZ LLC (which is the successor by assignment of the initial Purchaser Fortress Credit Co LLC)(as Purchaser of the Term A and Term B Notes, and together with its successors and assigns, the "Term A/B Purchaser") and CF DB EZ 2017 LLC (as Purchaser of the Term C Notes, and together with its successors and assigns, the "Term C Purchaser")(such Purchasers together with their successors and assigns, the "Purchasers"), and amends that certain Revenue Sharing and Note and Warrant Purchase Agreement between the Company, the Collateral Agent and the Purchasers as of December 30, 2014 (such Agreement amended hereby and as previously amended by that certain FIRST AMENDMENT TO REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT dated February 24, 2015, that certain SECOND AMENDMENT TO REVENUE SHARING AND NOTE WARRANT PURCHASE AGREEMENT dated as of May 27, 2016 and as may be further amended, supplemented or otherwise modified and in effect from time to time, the "Agreement").[1]

WHEREAS, on December 30, 2014, the Issuer issued to the Term A/B Purchaser $10,000,000 in original principal amount of Notes along with the Revenue Stream, and on May 27, 2016, the Issuer issued to the Term A/B Purchaser an additional $6,000,000 in original principal amount of Notes, which issuance resulted in an increase in the amounts payable to the Term A/B Purchaser with respect to the Revenue Stream;

WHEREAS, all of the Note Obligations owing with respect to the Notes issued on December 30, 2014 have been paid in full other than the Termination Fee related to such Notes, and approximately $4,000,000 has been paid with respect to the Revenue Stream;

WHEREAS, no principal payments or payments with respect to the related Termination Fee have been made with respect to the Notes issued on May 27, 2016, and the outstanding amount of principal with respect to such Notes as of the date hereof is $6,170,158.94;

---

[1] Capitalized terms used and not otherwise defined in this Amendment shall have the meanings specified in the Agreement.

62201773_14

WHEREAS, the Company has requested that the Term C Purchaser acquire a further $10,000,000 in original principal amount of Notes on the terms and conditions specified herein, and that the Purchasers agree to certain modifications to the provisions of the Agreement relating to the application of Monetization Revenues to the Note Obligations and to the Revenue Share, and the Term C Purchaser is prepared to acquire such additional Notes and the Purchasers are willing to agree to such modifications, each on the terms and conditions specified herein;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1.**     Amendments. The Agreement shall be amended as set forth herein such that, after giving effect to this Amendment, the Agreement shall be in the form of Exhibit I hereto:[2]

(a)     The following definitions shall be added to Appendix I:

"Excess Liquidity" means, for purposes of any determination as to whether a Restricted Payment is permitted to be made, an amount equal to (w) the unrestricted Cash and Cash Equivalents of the Company as of the date of such determination minus (x) the Liquidity Reserve Amount as of such date of determination, minus (y) an amount equal to all liabilities of the Companies and their Subsidiaries which are due and payable as of the applicable date of determination or within 30 days after such date (with the exception of liabilities of the Companies to one another or to either of their respective Subsidiaries, or liabilities of any such Subsidiaries to one another or to either Company) minus (z) the proposed amount of the Restricted Payment which is the subject of such determination.

"Liquidity Reserve Amount" means an amount equal to the product of (x) six multiplied by (y) the average monthly expenditures paid or required to be paid in cash during the most recently completed trailing twelve month period, including, without limitation, interest, compensation, rent, capital expenditures, debt service, cash taxes (including taxes payable with respect to such period), sales, general and administrative costs, patent maintenance fees, legal fees, etc.

"Maturity Date" means (x) with respect to the Term A Notes, June 30, 2018, (y) with respect to the Term B Notes, March 27, 2019 and (y) with respect to the Term C Notes, November 15, 2020.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of a Company or a Subsidiary of such Company, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Capital Stock, or on account of any return of capital to such Company's or such Subsidiary's stockholders, partners or members (or the equivalent Person thereof).

---

[2] Exhibit I to be a conformed copy reflecting the Amendments through this Amendment.

62201773_14

"Term A Notes" means the Notes issued on December 30, 2014 in the original principal amount of $10,000,000.

"Term A Revenue Stream Amount" means $9,000,000.

"Term A Termination Fee" means an amount equal to $350,000.

"Term A/B Priority Collateral" means the Patents to which the Company holds rights as of May 12, 2017, as set forth on Schedule I(a).

"Term A/B Purchaser" means CF DB EZ LLC and its successors and assigns.

"Term B Notes" means the Notes issued on May 27, 2016 in the original principal amount of $6,000,000.

"Term B Revenue Stream Amount" means $5,400,000 or, to the extent paid in full prior to the first to occur of (x) the acceleration of the Revenue Stream or (y) March 27, 2019, the amount set forth on Appendix II.

"Term B Termination Fee" means an amount equal to $210,000.

"Term C Notes" means the Notes issued on May 15, 2017 in the original principal amount of $10,000,000.

"Term C Priority Collateral" means any Patents acquired, or developed by the Company, after May 12, 2017, but in any event to include those Patents set forth on Schedule I(b).

"Term C Purchaser" means CF DB EZ 2017 LLC and its successors and assigns.

"Term C Revenue Stream Amount" means $9,000,000 or, to the extent paid in full prior to the first to occur of (x) the acceleration of the Revenue Stream or (y) March 15, 2020, the amount set forth on Appendix III.

"Term C Termination Fee" means an amount equal to $400,000.

"Termination Fee" means, as applicable, the Term A Termination Fee, the Term B Termination Fee and the Term C Termination Fee and "Termination Fees" means all such Termination Fees.

(b)     The definition of Patents is amended and restated as follows:

"Patents" means all intellectual property of the Company, including letters Patent set forth on Schedules I(a) and Schedule I(b), whether registered in the United States or any other jurisdiction, all registrations and recordings thereof, including all re-examination certificates and all utility models, including registrations, recordings and pending applications, and all reissues, continuations, divisions, continuations-in-part, renewals, improvements or extensions thereof and the inventions disclosed or claimed therein.

(c)     The definition of Revenue Stream is amended and restated as follows:

62201773_14

"Revenue Stream" means a right to receive a portion of Actual Monetization Revenues equal to the sum of the Term A Revenue Stream Amount plus the Term B Revenue Stream Amount plus the Term C Revenue Stream Amount; provided, that upon an acceleration, the Revenue Stream shall represent an absolute entitlement to receive such amounts without regard to the existence of Actual Monetization Revenues."

(d)     Appendices II and III to this Amendment shall be added to the Agreement as Appendices II and III thereto.

(e)     Section 2.1.2 shall be amended to add the following proviso to the end of the second sentence: "; provided, further, that after the contemplated issuance of the Term Loan C Notes, the Revenue Stream Basis shall be increased to $1,300,000."

(f)     Section 2.2.1.1. and 3.2.3 shall be each amended to replace the reference to "$16,000,000" with "$26,000,000."

(g)     Section 2.2.1.3 shall be amended to replace the reference to "June 30, 2016" with "November 15, 2020" and "$5,000,000" with "$16,000,000".

(h)     Section 2.2.2. of the Agreement is amended and restated as follows:

"2.2.2. Interest on the Notes. The unpaid principal amount of the Term A Notes (including any PIK Interest) shall bear cash interest at a rate equal to LIBOR plus 12% per annum, the unpaid principal amount of the Term B Notes (including any PIK Interest) shall bear cash interest at a rate equal to LIBOR plus 10% per annum and the Term C Notes (including any PIK Interest) shall bear cash interest at a rate equal to LIBOR plus 9% per annum; provided that upon and during the continuance of an Event of Default, the interest rate per annum on each of the Notes shall increase by an additional 2% per annum. Interest on the principal amount of any then outstanding Notes shall be paid on the last Business Day of each calendar month (the "Interest Payment Date"), starting with the calendar month ending January 31, 2015. Such interest shall be paid in cash except that 4% per annum (or, in the case of the Term B Notes and Term C Notes, 3% per annum) of the interest due on each Interest Payment Date shall be paid-in-kind, by increasing the principal amount of the Notes by the amount of such interest, effective as of the applicable Interest Payment Date ("PIK Interest"). PIK Interest shall be treated as principal of the Note for all purposes of interest accrual or the calculation of any prepayment premium."

(i)     Section 2.2.3 of the Agreement is amended and restated as follows:

"2.2.3.1. The Issuer shall pay to the applicable Purchaser acquiring the applicable Notes, a structuring fee equal to $150,000 at the issuance of the Term A Notes, $90,000 at the issuance of the Term B Notes and $200,000 at the issuance of the Term C Notes (each such payment, the "Structuring Fee" related to such issuance), which amount shall be netted out of the funding at each such issuance.

62201773_14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    Uniloc Common Production to Google 0011256

2.2.3.2. The Issuer shall pay to the applicable Purchaser, the Termination Fees for its Notes in accordance with, and at the times specified in <u>Section 2.4</u> or, if not paid prior to such date, upon the first to occur of (x) any acceleration of the Note Obligations or (y) November 15, 2020."

(j)    <u>Section 2.2.4.1.</u> of the Agreement shall be amended and restated as follows:

"<u>2.2.4.1. Payment at Maturity</u>. The principal of the Notes and all unpaid interest thereon or other amounts owing with respect thereto (other than the applicable Termination Fee for such Notes, which shall be due at the times specified in Section 2.2.3.2) shall be paid in full in cash on the applicable Maturity Date for such Notes, but in any event not later than November 15, 2020."

(k)    <u>Section 2.2.4.2</u> shall be amended and restated as follows:

"<u>2.2.4.2 Optional Prepayments</u>. The Issuer may prepay the Notes from time to time in whole or in part, without penalty or premium, except that:

i)  with respect to the Term A Notes, any optional prepayments of such Notes in the first 6 months after the issuance thereof Closing Date shall be accompanied by a prepayment premium equal to 5.00% of the principal amount prepaid; any optional prepayments of such Notes after the first 6 months from the Closing Date and prior to the second anniversary of the Closing Date shall be accompanied by a prepayment premium equal to 3.00% of the principal amount prepaid; any optional prepayments of such Notes after the second anniversary of the Closing Date and prior to the 30 month anniversary of the Closing Date, shall be accompanied by a prepayment premium equal to 1.00% of the principal amount prepaid; and optional prepayments following the 30 month anniversary of the Closing Date shall be at par;

ii) with respect to the Term B Notes, any optional prepayments of such Notes in the first 6 months after the issuance thereof shall be accompanied by a prepayment premium equal to 5.00% of the principal amount prepaid; any optional prepayments of such Notes after the first 6 months from the issuance thereof and prior to the second anniversary of such issuance shall be accompanied by a prepayment premium equal to 3.00% of the principal amount prepaid; any optional prepayments of such Notes after the second anniversary of the issuance thereof and prior to the 30 month anniversary of such issuance shall be accompanied by a prepayment premium equal to 1.00% of the principal amount prepaid, and optional prepayments following the 30 month anniversary of issuance shall be at par; and

(iii) with respect to the Term C Notes, any optional prepayments of such notes in the first 6 months after the issuance thereof shall be accompanied by a prepayment premium equal to 5.00% of the principal amount prepaid; any optional prepayments of such Notes after the first 6 months from the issuance thereof and prior to the second anniversary of such issuance shall be accompanied by a prepayment premium equal to 3.00% of the principal amount prepaid; any optional prepayments of such Notes after the second anniversary of the issuance thereof and prior to the 30 month

62201773_14

anniversary of such issuance shall be accompanied by a prepayment premium equal to 1.00% of the principal prepaid, and optional prepayments following the 30th month anniversary of issuance shall be at par.

Any such prepayment of Notes shall include accrued and unpaid interest on the amount prepaid."

(l)     Section 2.2.4.3. of the Agreement shall be amended and restated as follows:

"2.2.4.3.  Amortization.  With respect to the Term A Notes, commencing on the last Business Day of January, 2016, the Issuer shall make monthly amortization payments each in a principal amount equal to the amount which, calculated based on the principal amount outstanding as of such payment date (and re-calculated monthly to the extent necessary), would result in the Issuer's making equal monthly payments of principal on the Notes from such date through the Term A Maturity Date.  With respect to Term B Notes, commencing on the last Business Day of June, 2017, the Issuer shall make monthly amortization payments each in a principal amount equal to the amount which, calculated based on the principal amount outstanding as of such payment date (and re-calculated monthly to the extent necessary), would result in the Issuer's making equal monthly payments of principal on such Notes from such date through the Term B Maturity Date. With respect to the Term C Notes, commencing on the last Business Day of May, 2018, the Issuer shall make monthly amortization payments each in a principal amount equal to the amount which, calculated based on the principal amount outstanding as of such payment date (and re-calculated monthly to the extent necessary), would result in the Issuer's making equal monthly payments of principal on such Notes from such date through the Term C Maturity Date. "

(m)    Section 2.4 of the Agreement shall be amended and restated as follows:

"2.4 Monetization Revenues.   From and after the Third Amendment Effective Date, 33% of Actual Monetization Revenues received by the Company or deposited in the Cash Collateral Account shall be paid to the Purchasers, and applied to the Note Obligations and the Revenue Stream, as set forth in Sections 2.4.1 and 2.4.2 below; provided that, notwithstanding the foregoing, and for the avoidance of doubt in the event of acceleration of the Notes and/or of the Revenue Stream, 100% of the Actual Monetization Revenues received since the last Business Day of the preceding month shall be so applied.

2.4.1   Term A/B Notes and Revenue Stream.  To the Term A/B Purchaser (x) any Actual Monetization Revenues which arise from, or relate to, the Term A/B Priority Collateral and (y) following payment in full of all Obligations related to the Term C Notes and payment in full of the Term C Revenue Stream Amount, any Actual Monetization Revenues which arise from, or relate to, the Term C Priority Collateral:

62201773_14

FIRST, to the Revenue Stream until the Term A/B Purchaser has received an aggregate amount with respect to the Revenue Stream equal to $5.0 million, which amount shall be applied to the satisfaction of the Term A Revenue Stream Amount (acknowledging that approximately $4,000,000 has been applied to the Term A Revenue Stream as of the Third Amendment Effective Date);

SECOND, to the Term A Termination Fee until paid in full;

THIRD, to the Note Obligations with respect to the Term B Notes until paid in full, first to interest, then to principal and then to the Term B Termination Fee; and

FOURTH, to the Revenue Stream until the Term A/B Purchaser has received a total amount with respect to the Revenue Stream equal to the sum of the Term A Revenue Stream Amount plus the Term B Revenue Stream Amount.

      2.4.2, Term C Notes and Revenue Stream. To the Term C Purchaser, (x) any Actual Monetization Revenues which arise from, or relate to, the Term C Priority Collateral and (y) following payment in full of all Obligations related to the Term A Notes and Term B Notes and payment in full of the Term A Revenue Stream Amount and the Term B Revenue Stream Amount, any Actual Monetization Revenues which arise from, or relate to, the Term A/B Priority Collateral:

FIRST, to the Note Obligations with respect to the Term C Notes until paid in full, first to interest, then to principal and then to the Term C Termination Fee; and

SECOND, to the Revenue Stream until the Term C Purchaser has received the Term C Revenue Stream Amount.

The Issuer may prepay any or all of the remaining balance of the Term A Revenue Stream Amount, the Term B Revenue Stream Amount and/or the Term C Revenue Stream Amount subject, in the case of the Term B Revenue Stream Amount, to the prior payment in full of the Term A Revenue Stream Amount and all Note Obligations with respect to the Term A Notes and the Term B Notes (including the applicable Termination Fees) and further subject, in the case of the Term C Revenue Stream Amount, to the prior payment in full of all Note Obligations with respect to the Term C Notes (including the Term C Termination Fee)."

(n)    A new Section 6.15 shall be added as follows:

"Section 6.15 Restricted Payments. No Company shall make, nor shall any Company permit any Subsidiary of such Company to make, directly or indirectly any Restricted Payment, except (i) Restricted Payments from a Subsidiary of a Company to such Company and (ii) Restricted Payments made out of Excess Liquidity. The applicable Company shall provide the Purchasers with not less than 10 Business Days

62201773_14

prior written notice prior to making any Restricted Payment under clause (ii) above, which notice shall be accompanied by a certification setting forth the calculation of the Liquidity Reserve Amount and Excess Liquidity supporting such proposed Restricted Payment, in detail satisfactory to the Purchasers.

(o)     A new Section 6.16 shall be added as follows:

"Section 6.16 Third Amendment Due Authorization and Legal Opinions. Company shall deliver to the Collateral Agent and the Purchasers customary evidence of due authorization as well as legal opinions, in customary form and otherwise in form and substance reasonably satisfactory to the Collateral Agent and the Purchasers regarding the transactions contemplated by the Third Amendment to Revenue Sharing and Note and Warrant Purchase Agreement, dated as of May 15, 2017, no later than May 26, 2017.

(p)     Section 7.2.2 is amended to replace the phrase "20x of the Revenue Stream Basis (i.e., $16 million based on a Revenue Stream Basis of $800,000)" with "$23,400,000"

(q)     The last sentence of Section 8.1 is amended and restated as follows:

"Notwithstanding, but without limiting the foregoing, the Collateral Agent shall take direction from the Majority Purchasers and shall distribute any proceeds of the Collateral in accordance with Section 2.4, such that any proceeds of Term A/B Priority Collateral shall first be applied to satisfy the Obligations owing to the Term A/B Purchaser, as provided under Section 2.4.1, and the proceeds of Term C Priority Collateral shall first be applied to satisfy the Obligations owing to the Term C Purchaser as provided under Section 2.4.2, in each case, prior to being applied to the Obligations owing to the other Purchaser."

(r)     Schedule (I)(b) hereto is added to the Agreement as Schedule (I)(b).

**Section 2.**     Tax Allocations. It is the parties' conclusion and intent that the modifications to the prepayment terms of the Notes and to the calculation of the Revenue Stream reflect substantially similar economics to the Purchasers' existing rights and do not constitute substantial modifications of the Notes or the Revenue Stream. In the event that such modifications do constitute substantial modifications to the Notes and/or the Revenue Stream, the Company and the Purchasers agree that the issue prices of the Notes and/or the Revenue Stream to the extent that either or both are deemed reissued are, respectively, equal to the original purchase price of the Notes plus any amortized original issue discount and to the purchase price of the Revenue Stream.

**Section 3.**     Effectiveness. The effectiveness of this Amendment is subject to:

3.01 Fully Executed Amendment. The Purchasers and the Issuer having received a fully executed copy of this Amendment.

3.02 Representations and Warranties; No Default. The representations and warranties of the Company contained in the Agreement being true and correct in all material respects, and there existing no Default or Event of Default, each on and as of such the Third Amendment Effective Date.

62201773_14

3.03 <u>Due Authorization</u>. The execution, delivery, and performance by the Company of this Amendment having been duly authorized by all necessary corporate or other organizational action on the part of the Company and not (i) violating any material provision of federal, state, or local law or regulation applicable to the Company, the Governing Documents of the Company or its Subsidiaries, or any order, judgment, or decree of any court or other Governmental Authority binding on the Company or its Subsidiaries, (ii) conflicting with, resulting in a breach of, or constituting (with due notice or lapse of time or both) a default under any material agreement of the Company or its Subsidiaries where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) resulting in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of the Company, other than Permitted Liens, or (iv) requiring any approval of any holder of Capital Stock of the Company or any approval or consent of any Person under any material agreement of the Company, other than consents or approvals that have been obtained and that are still in force and effect.

3.04 <u>Expenses</u>. The Company having paid all fees and expenses (including attorneys' fees and expenses) incurred by the Collateral Agent or the Purchasers in connection with the preparation, negotiation, execution and delivery of this Amendment or otherwise due under the Agreement. The Company agrees to promptly pay any additional such amounts invoiced following the effectiveness of the Amendment.

3.05 <u>Schedule 4.5. to the Security Agreement.</u> The Company shall deliver an updated Schedule 4.5 to the Security Agreement, which shall be attached hereto as <u>Exhibit II</u>.

**Section 4.** <u>Miscellaneous</u>. Except as specifically amended or waived above, the Agreement and the other Documents shall remain unchanged and in full force and effect and are hereby ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Collateral Agent or any Purchaser under the Agreement or any Document, nor constitute a waiver of any provision of the Agreement or any Document. This Amendment is a Document for all purposes of the Agreement. This Amendment may be executed in any number of counterparts, and by different parties hereto on separate counterpart signature pages, and all such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of a counterpart signature page by facsimile transmission or by e-mail transmission of an Adobe portable document format file (also known as a *"PDF"* file) shall be effective as delivery of a manually executed counterpart signature page. Section headings used in this Amendment are for reference only and shall not affect the construction of this Amendment.

**Section 5.** <u>Governing Law</u>. This Amendment, and any issue, claim or proceeding arising out of or relating to this Amendment or the conduct of the parties hereto, whether now existing or hereafter arising and whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws of the State of New York.

62201773_14

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered as of the day and year first above written.

**Purchasers**:

The Term A/B Purchaser:
CF DB EZ LLC

By: _James K. Noble, III_
Title: Secretary

The Term C Purchaser:
CF DB EZ 2017 LLC

By: _James K. Noble, III_
Title: Secretary

**Collateral Agent**:

Fortress Credit Co LLC

By: _James K. Noble, III_
Title: Secretary

[Signature Page to Third Amendment to Revenue Sharing and Note and Warrant Purchase Agreement]

**Issuer:**

UNILOC USA, INC.

By:    Sean D. Burdick
Title:  President

**Guarantors:**

UNILOC CORPORATION PTY LIMITED

By:    Craig Etchegoyen
Title:   Chairman

UNILOC LUXEMBOURG S.A.

By:    Craig Etchegoyen   /   Ivona Falda
Title:   Director A      /   Director B

D/A INVESTMENT HOLDINGS LLC

By:    Craig Etchegoyen
Title:   CEO, Uniloc Luxembourg S.A., Managing
       Member

# EXHIBIT J

Trials@uspto.gov
571-272-7822

Paper 38
Entered: December 3, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

DISTINCTIVE DEVELOPMENTS, LTD, ELECTRONIC
ARTS INC., GAMELOFT S.E., HALFBRICK STUDIOS PTY
LTD., LAMINAR RESEARCH LLC, MOJANG AB, and
SQUARE ENIX, INC.,
Petitioner,

v.

UNILOC USA, INC. and UNILOC LUXEMBOURG S.A.,
Patent Owner.

———————

Case IPR2013-00391
Patent 6,857,067 B2

———————

Before JAMESON LEE, ALLEN R. MacDONALD, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

CLEMENTS, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

CONFIDENTIAL - ATTORNEYS EYES ONLY

IPR2013-00391
Patent 6,857,067 B2

## I.   INTRODUCTION

Distinctive Developments, Ltd., Electronic Arts Inc., Gameloft
S.E., Halfbrick Studios Pty Ltd., Laminar Research LLC, Mojang AB,
and Square Enix, Inc. (collectively, "Petitioner") filed an Amended
Petition requesting *inter partes* review of claims 1, 20–22, 30, 31, 35,
67, 107, and 108 ("the challenged claims") of U.S. Patent No.
6,857,067 B2 (Ex. 1001, "the '067 patent"). Paper 11 ("Pet.").
Uniloc USA, Inc., and Uniloc Luxembourg S.A. ("Patent Owner")
filed a Preliminary Response. Paper 14 ("Prelim. Resp."). On
December 18, 2013, we instituted an *inter partes* review of claims 1,
20–22, 30, 31, 67, 107, and 108 on certain grounds of unpatentability
alleged in the Petition. Paper 15 ("Dec. to Inst."). After institution of
trial, Patent Owner filed a Patent Owner Response (Paper 22, "PO
Resp.") to which Petitioner filed a Reply (Paper 24, "Pet. Reply").

Oral argument was held on July 11, 2014.[1]

We have jurisdiction under 35 U.S.C. §§ 6(c) and 314. This
Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and
37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has
shown by a preponderance of the evidence that claims 1, 20, 22, 30,
31, 67, 107, and 108 of the '067 patent are unpatentable, but has not
shown by a preponderance of the evidence that claims 21 and 22 are
unpatentable.

---

[1] A transcript of the oral hearing is included in the record as Paper 37
("Tr.").

2

   Uniloc Common Production to Google000100

EXHIBIT K

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNILOC USA, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>E-MDS, INC.,<br><br>Defendant. | § § § § § § § § § | **Case No. 6:14-cv-00625**<br>**(consolidated case)** |
| UNILOC USA, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EPIC SYSTEMS CORPORATION<br><br>Defendant. | § § § § § § § § § | Case No. 6:14-cv-00626<br><br>**JURY TRIAL DEMANDED** |
| UNILOC USA, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MEDHOST, INC.,<br><br>Defendant. | § § § § § § § § § | Case No. 6:14-cv-00630<br><br>**JURY TRIAL DEMANDED** |
| UNILOC USA, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CERNER CORPORATION,<br><br>Defendant. | § § § § § § § § § | Case No. 6:14-cv-00632<br><br>**JURY TRIAL DEMANDED** |

| UNILOC USA, INC., et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | Case No. 6:14-cv-00633 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| COMPUTER PROGRAMS and SYSTEMS, INC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

| UNILOC USA, INC., et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | Case No. 6:14-cv-00692 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| E-MDS, INC. (a Texas Corporation) | § | |
| | § | |
| | § | |
| Defendant. | § | |

**DEFENDANTS EPIC SYSTEMS, MEDHOST, CERNER, CPSI, AND E-MDS'S JOINT MOTION TO DISMISS PLAINTIFFS' COMPLAINT UNDER RULE 12(b)(6) FOR FAILURE TO ALLEGE INFRINGEMENT OF A PATENTABLE CLAIM UNDER 35 U.S.C. § 101**

Defendants Epic Systems Corporation ("Epic"), Medhost, Inc. ("Medhost"), Cerner Corporation ("Cerner"), Computer Programs and Systems, Inc. ("CPSI"), and E-MDS, Inc. ("E-MDS")(collectively, "Defendants") hereby move this Court to dismiss the Complaint filed by Uniloc USA, Inc. and Uniloc Luxembourg S.A. (collectively, "Uniloc" or "Plaintiffs") in the above-captioned case under Federal Rule of Civil Procedure 12(b)(6) because the Asserted Patents attempt to cover abstract ideas which, as a matter of law, are ineligible as patentable subject matter under 35 U.S.C. § 101.   More specifically, Plaintiffs' Complaint alleges infringement of patents that cover nothing more than (1) organizing medical information data and (2) storing user-defined formulas for medical data using general purpose computers.  The Complaint therefore fails to state a claim upon which relief can be granted, and should be dismissed.

## I.   INTRODUCTION

On July 18, 2014, Plaintiffs filed the above-captioned lawsuit against Defendants alleging infringement of U.S. Patents Nos. 5,682,526 ("the '526 Patent")[1], and 5,715,451 ("the '451 Patent").[2]  The '526 and '451 Patents are collectively referred to herein as the "Asserted Patents."

The Supreme Court has ruled time and again that "abstract ideas" may not be removed from the public domain and owned as private property under our patent laws.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012); *Bilski v. Kappos*, 130 S. Ct. 3218 (2010).  Such fundamental truths are "part of the storehouse of knowledge of all men ... free to all men and reserved exclusively to none."  *Bilski*, 130 S. Ct. at 3225 (quoting *Funk Brothers Seed Co. v. Kalo Inoculant Co.*, 333

---

[1]  The '526 Patent was attached to the filed Complaint as Exhibit A.
[2]  The '451 Patent was attached to the filed Complaint as Exhibit B.

U.S. 127, 130 (1948)); *see Mayo*, 132 S. Ct. at 1301.  The two Asserted Patents in this case violate this basic tenet of U.S. patent law.

Even a cursory review of the Asserted Patents compels the conclusion that the United States Patent and Trademark Office ("PTO") erred in issuing the Asserted Patents.  These patents improperly attempt to cover the abstract and well-known ideas of organizing and storing information.  For example, the claims of the '526 Patent are directed to "a method and system for flexibly organizing, recording, and displaying medical patient care information."  '526 Patent at 3:15-16.  This abstract process of organizing medical information has been performed for centuries by human beings simply by maintaining physical records of patient care information.  Further, the Federal Circuit has explicitly stated that the concept of electronically organizing data constitutes a patent-ineligible abstract idea.  *Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014).  With respect to the '451 Patent, the claims are directed to "a method and system for constructing formulae for processing medical data."  '451 Patent at 1:42-43.  The concept of storing user-defined formulas is an abstract idea which was fundamental even to the earliest known computers.

The Asserted Patents, on their face, therefore fail to pass the threshold requirement of 35 U.S.C. § 101 that a patent claim patent-eligible subject matter.  Defendants move for dismissal of this action under Federal Rule of Civil Procedure 12(b)(6) because the claims of the '526 Patent and '451 Patents[3] are drawn to abstract ideas not eligible for patent protection as a matter of law.

---

[3]  Defendants note that Plaintiffs' Complaint alleges infringement of "at least Claim 1" of the '526 Patent and "at least Claim 6" of the '451 Patent.  Accordingly, Defendants' analysis is principally directed to those claims.  For purposes of this motion, the independent claims of each Asserted Patent are substantially similar to those claims (respectively), and should be invalidated for the same reasons. *See* Section III, below.  Further, the dependent claims fail to add any limitations that would render the claims valid. Thus Claim 1 of the '526 Patent and Claim 6 of the '451 Patent should be considered exemplary of the other claims of the Asserted Patents. To the extent necessary, Defendants reserve the right to amend their arguments to specifically address other claims.

# EXHIBIT L

**ASSET PURCHASE AGREEMENT**

by and between

**UNILOC 2017 LLC**

and

**UNILOC LUXEMBOURG S.A.**

Dated as of March 28, 2018

102403507.21

CONFIDENTIAL - ATTORNEYS EYES ONLY

Amount by wire transfer with the Escrow Agent, to be managed and paid out by the Escrow Agent pursuant to the terms of the Escrow Agreement, (c) assume the Assumed Liabilities and (d) pay, or cause to be paid, on behalf of Seller the amounts payable to each Note Purchaser in respect of the Notes (as such term is defined in the Revenue Sharing Agreement) issued pursuant to the Revenue Sharing Agreement (the "Payoff Indebtedness") in order to fully discharge such Payoff Indebtedness and terminate all applicable obligations and liabilities of Seller and any of its Affiliates related thereto, as specified in the Payoff and Termination Agreement and in accordance with this Agreement. For the avoidance of doubt, any obligation of Buyer to Seller with respect to the Uniloc Earnout Payments (as hereinafter defined) shall be validly and fully discharged by delivery of the relevant funds, subject to and in accordance with the Earnout Agreement (as hereinafter defined), to Uniloc Earnout Shareholders LLC, which Seller hereby expressly designated as agent (it being acknowledged and agreed that Buyer shall have no liability whatsoever in relation to the further distribution of such funds to the shareholders of Seller or by Uniloc Earnout Shareholders LLC to the holders of its equity interests in accordance with the Earnout Agreement).

Section 2.7    Closing.

(a)    The sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166-0193, at 10:00 a.m. Eastern Daylight Time on the second (2nd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date), or at such other place or at such other time or on such other date as Seller and Buyer mutually may agree in writing. The day on which the Closing takes place is referred to as the "Closing Date."

(b)    At the Closing, Seller shall deliver or cause to be delivered to Buyer the following documents:

(i)    a counterpart of the bill of sale for the Purchased Assets, in the form of Exhibit A (the "Bill of Sale"), duly executed by Seller;

(ii)    an instrument of assignment of Seller Intellectual Property, in the form of Exhibit B (the "Assignment of Intellectual Property"), duly executed by Seller;

(iii)    a patent assignment, in the form of Exhibit C (the "Patent Assignment"), duly executed by Seller;

(iv)    an instrument of assignment of Seller Contracts, in the form of Exhibit D (the "Assignment of Contracts"), duly executed by Seller;

(v)    a counterpart of the Escrow Agreement, in the form of Exhibit E (the "Escrow Agreement"), duly executed by Seller;

(vi)    a counterpart of the Payoff and Termination Agreement, in the form of Exhibit F (the "Payoff and Termination Agreement"), duly executed by Seller, Uniloc

16

USA, Uniloc Aus, D/A Investment Holdings and Uniloc USA Holdings, LLC, a Delaware limited liability company;

    (vii) a counterpart of the Earnout and Release Agreement, in the form of Exhibit G (the "Earnout Agreement"), duly executed by Uniloc Earnout Shareholders LLC;

    (viii) a counterpart of the license agreement, in the form of Exhibit H (the "Uniloc Lux EU License Agreement"), duly executed by Seller;

    (ix) a counterpart of the license agreement, in the form of Exhibit I (the "Uniloc USA License Agreement"), duly executed by Uniloc USA;

    (x) a counterpart of the license agreement, in the form of Exhibit J (the "Uniloc Licensing EU License Agreement"), duly executed by Uniloc Licensing EU;

    (xi) a counterpart of the license agreement, in the form of Exhibit K (the "Uniloc Licensing USA License Agreement"), duly executed by Uniloc Licensing USA;

    (xii) counterparts of the services agreement, in the form of Exhibit L (the "Uniloc Lux Services Agreement"), duly executed by Seller and Uniloc Licensing USA;

    (xiii) counterparts of the services agreement, in the form of Exhibit M (the "Uniloc Licensing EU Services Agreement"), duly executed by Uniloc Licensing EU and Uniloc Licensing USA;

    (xiv) counterparts of the services agreement, in the form of Exhibit N (the "Uniloc Licensing USA Services Agreement"), duly executed by Uniloc Licensing USA and Uniloc USA;

    (xv) counterparts of the services agreement, in the form of Exhibit O (the "Uniloc 2017 Services Agreement"), duly executed by Uniloc Licensing USA;

    (xvi) counterparts of the termination agreement with respect to that certain License and Services Agreement, dated as of January 1, 2013, as amended on February 26, 2015, and certain other agreements between Seller and Uniloc USA, in the form of Exhibit P (the "Termination Agreement"), duly executed by Seller and Uniloc USA;

    (xvii) a counterpart of the deed with respect to the assignment of certain Patents, in the form of Exhibit Q (the "German Patent Deed"), duly executed by Seller;

    (xviii) evidence, in form and substance reasonably satisfactory to Buyer, that the Technology License and Ownership Allocation Agreement, dated as of November 19, 2016, as amended on July 13, 2017, by and between Seller and Ninox IP Advisors, Inc., has been terminated and is no longer in force or effect;

    (xix) evidence, in form and substance reasonably satisfactory to Buyer, that the Patent Acquisition Undertaking Agreement, dated as of January 26, 2018, by and among Seller, Uniloc USA and WSOU Investments II, LLC, a Delaware limited liability company, has

CONFIDENTIAL - ATTORNEYS EYES ONLY    Uniloc Common Production to Google001290

IN WITNESS WHEREOF, Buyer and Seller have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

**UNILOC 2017 LLC**

By: _____
Name:
Title:  CONSTANTINE M. DAKOLIAS
         PRESIDENT

CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google001331

**SELLER:**

**UNILOC LUXEMBOURG S.A.**

By: _____
    Name:  Craig Etchegoyen
    Title:   Director A

By: _____
    Name:  Ivona Falda
    Title:   Director B

*[Signature Page to Asset Purchase Agreement]*

# EXHIBIT M

## TERMINATION AGREEMENT

**THIS TERMINATION AGREEMENT**, dated as of May 3, 2018 (this "**Termination Agreement**"), is by and between **Uniloc USA, Inc.**, a Texas corporation and **Uniloc Luxembourg S.A.**, a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg, having its registered office at 14, rue Edward Steichen, L-2540 Luxembourg, registered with the Register of Commerce and Companies (R.C.S. Luxembourg) under number B 159161 (each a "**Party**", and together, the "**Parties**").

**WHEREAS**, the Parties are party to the License Agreements set forth on Exhibit A (the "**Agreements**"); and

**WHEREAS**, the Parties desire to terminate the Agreements on the terms set forth herein.

**NOW, THEREFORE**, in consideration of the premises set forth above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     <u>Termination of the Agreement</u>. Each Party agrees and acknowledges that the Agreements are hereby terminated as of the date hereof. From and after the date hereof, the Agreements will be of no further force or effect, without any further action on the part of the Parties. Notwithstanding anything to the contrary in the Agreements, neither of the Parties shall have any further rights, duties, liabilities or obligations thereunder or in respect thereof (except with respect to those provisions of the Agreements which survive the termination of the Agreements in accordance with their terms).

2.     <u>Miscellaneous</u>.

    (a)     This Termination Agreement shall be governed by the laws of the state of Delaware, applicable to contracts made and to be performed in the state of Delaware in all respects. The Parties irrevocably and unconditionally submit to the non-exclusive jurisdiction of a federal or state court located in Wilmington, Delaware in connection with any proceedings commenced resulting from this Termination Agreement, without regard to any principles of conflicts of laws, and irrevocably waive any objection to venue of inconvenient forum. This Termination Agreement will inure to the benefit of and be binding upon each of the Parties and each of their respective successors and assigns.

    (b)     This Termination Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitutes one and the same agreement. Delivery of an executed counterpart of this Termination Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Termination Agreement.

*Remainder of page intentionally left blank; signature page follows.*

IN WITNESS WHEREOF, the Parties have executed this Termination Agreement as of the date first written above.

UNILOC USA, INC.

By: _____
Name: Sean D. Burdick
Title: President

CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google002307

**UNILOC LUXEMBOURG S.À R.L.**

By: _____

Name: Craig Etchegoyen

Title: Class A Manager


By: _____

Name: Ivona Falda

Title: Class B Manager

*[Signature Page to Termination Agreement]*

CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT N

## PAYOFF AND TERMINATION AGREEMENT

This Payoff and Termination Agreement, dated as of May 3, 2018 (this "Termination Agreement"), by and among Uniloc USA, Inc., a Texas corporation ("Issuer"), Uniloc Luxembourg S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand Duchy of Luxembourg, with registered office at 15, rue Edward Steichen, L-2540 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 159.161 ("Uniloc Lux"), Uniloc Corporation PTY Limited ("Uniloc Aus"), D/A Investment Holdings LLC ("D/A Investment Holdings"), Uniloc USA Holdings, LLC, a Delaware limited liability company ("Uniloc USA Holdings" and, together with Issuer, Uniloc Lux, Uniloc Aus and D/A Investment Holdings, "Uniloc Entities"), Fortress Credit Co LLC, as collateral agent ("Collateral Agent"), CF DB EZ LLC, a Delaware limited liability company ("CF DB") and CF DB EZ 2017 LLC, a Delaware limited liability company ("CF DB 2017" and, together with CF DB, "Purchasers" and, together with Collateral Agent, "Fortress Entities"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Revenue Sharing Agreement (as hereinafter defined).

WHEREAS, Issuer, Uniloc Lux, Uniloc Aus, D/A Investment Holdings, Collateral Agent and Purchasers are party to that certain Revenue Sharing and Note and Warrant Purchase Agreement, dated as of December 30, 2014, as amended on February 24, 2015, May 27, 2016 and May 15, 2017 (the "Revenue Sharing Agreement"), pursuant to which (a) Purchasers acquired, and Issuer granted, issued and sold to Purchasers, (i) the Revenue Stream and (ii) the Notes and (b) Purchasers purchased from Uniloc Lux, and Uniloc Lux issued and sold to Purchasers, the Warrants, in each case, subject to the terms of the Revenue Sharing Agreement;

WHEREAS, in connection with the consummation of the transactions contemplated by the Revenue Sharing Agreement, (a) Uniloc Lux, Uniloc Aus, Issuer and Collateral Agent entered into that certain Security Agreement, dated as of December 30, 2014 (the "Security Agreement"), (b) Uniloc Aus, Uniloc Lux, D/A Investment Holdings and Collateral Agent entered into that certain Guaranty Agreement, dated as of December 30, 2014 (the "Guaranty Agreement"), (c) Uniloc Lux and Collateral Agent entered into that certain Account Pledge Agreement, dated December 30, 2014 (the "Account Pledge Agreement"), (d) Uniloc Lux, Issuer and Collateral Agent entered into that certain Patent License Agreement, dated as of December 30, 2014 (the "Patent License Agreement"), (e) Uniloc Lux, Uniloc Aus and Collateral Agent entered into that certain Patent Security Agreement, dated as of December 30, 2014 (the "Patent Security Agreement"), (f) Uniloc Lux, Uniloc Aus, Issuer, Collateral Agent and U.S. Bank National Association ("Depositary Bank") entered into that certain Blocked Account Control Agreement, dated as of December 30, 2014 (the "Blocked Account Control Agreement") and (g) Uniloc Aus, CF DB and Uniloc USA Holdings entered into that certain Limited Liability Company Agreement of Uniloc USA Holdings, dated as of February 20, 2015 (the "Uniloc USA Holdings LLC Agreement");

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of March 28, 2018 (the "Asset Purchase Agreement"), by and between Uniloc 2017 LLC, a Delaware limited liability company ("Uniloc 2017") and Uniloc Lux, Uniloc Lux shall sell to Uniloc 2017, and

**UNILOC LUXEMBOURG S.À R.L.**

By: _____
Name: Craig Etchegoyen
Title: Class A Manager


By: _____
Name: Ivona Fałda
Title: Class B Manager

CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google002277

UNILOC USA, INC.

By: _____
Name:  Sean D. Burdick
Title:  President

CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google002278

**UNILOC USA HOLDINGS, LLC**

By: _____
Name:  Sean D. Burdick
Title:  President

*[Signature Page to Payoff and Termination Agreement]*

CONFIDENTIAL - ATTORNEYS EYES ONLY

**D/A INVESTMENT HOLDINGS LLC**

By:     Uniloc Luxembourg, S.A.,
        the Managing Member

        By:  Craig Etchegoyen
        Title:  CEO

*[Signature Page to Payoff and Termination Agreement]*

**UNILOC CORPORATION PTY LIMITED**

By: _____
Name: Craig Etchegoyen
Title: CEO

*[Signature Page to Payoff and Termination Agreement]*

CONFIDENTIAL - ATTORNEYS EYES ONLY

**CF DB EZ 2017 LLC**

By: _____
Name:
Title:      CONSTANTINE M. DAKOLIAS
                PRESIDENT

*[Signature Page to Payoff and Termination Agreement]*

**CF DB EZ LLC**

By: _____
    Name:   CONSTANTINE M. DAKOLIAS
    Title:    PRESIDENT

*[Signature Page to Payoff and Termination Agreement]*

CONFIDENTIAL - ATTORNEYS EYES ONLY

IN WITNESS WHEREOF, the parties hereto have executed this Termination Agreement as of the date first written above.

**FORTRESS CREDIT CO LLC**

By: _____

Name:
Title: CONSTANTINE M. DAKOLIAS
PRESIDENT

*[Signature Page to Payoff and Termination Agreement]*

EXHIBIT O

# PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT ("Patent Assignment") is made as of May 3, 2018 by Uniloc Luxembourg S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg, having its registered office at 14, rue Edward Steichen, L-2540 Luxembourg, registered with the Register of Commerce and Companies (R.C.S. Luxembourg) under number B 159161 ("Assignor"), and Uniloc 2017 LLC, a Delaware limited liability company ("Assignee"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

WHEREAS, Assignor and Assignee are party to that certain Asset Purchase Agreement, dated as of March 28, 2018 (the "Purchase Agreement"), pursuant to which Assignee has agreed to purchase, and Assignor has agreed to sell, convey, assign, transfer and deliver to Assignee, all of Assignor's right, title and interest in, to and under the Seller Intellectual Property on the terms and conditions set forth in the Purchase Agreement; and

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to execute and deliver this Patent Assignment by which the Patents set forth in Exhibit A hereto (the "Transferred Patents") are assigned and conveyed by Assignor to Assignee at the Closing.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, upon the terms and subject to the conditions set forth in the Purchase Agreement, it is hereby agreed that:

1.     Patent Conveyance. Assignor does hereby irrevocable and unconditionally:

    (a)    sell, transfer, convey, assign and deliver to Assignee all of Assignor's right, title and interest in, to and under, free and clear of all Encumbrances (other than Permitted Encumbrances) and liabilities (other than Assumed Liabilities): (i) the Transferred Patents and the inventions disclosed therein, including any patents issuing on any applications included in the Transferred Patents and all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations and divisionals of any of the Transferred Patents and all foreign patents, foreign patent applications, and foreign counterparts relating to any of the foregoing, including, without limitation, certificates of invention, utility models and other governmental grants or issuances and any patents and patent applications that claim priority from any of the foregoing; (ii) all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, the Transferred Patents, including, without limitation, all causes of action and other enforcement rights for (A) damages, (B) injunctive relief and (C) any other remedies of any kind for past, current and future infringement; and (iii) all rights to collect royalties or other payments under or on account of the Transferred Patents, the same to be held by Assignee for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, including all rights therein provided by international conventions and treaties. This assignment includes assignment to Assignee of the right to make application in its own behalf for protection of the Transferred Patents and any patents

issued on the Transferred Patents, in the United States and countries foreign to the United States, and to claim under the Patent Cooperation Treaty, the International Convention and/or other international arrangement for any such application the date of any earlier application to gain priority with respect to other applications.

(b) agree, without charge to Assignee, to assist Assignee in perfecting Assignee's right, title and interest throughout the world in all Transferred Patents assigned to Assignee hereunder, include executing applications, assignments, declarations, affidavits, and any other papers in connection therewith reasonably necessary to perfect such right, title and interest in Assignee. In the event Assignee is unable for any reason, after reasonable effort, to secure Assignor's signature on any document needed to perfect the transfer of ownership of the Transferred Patents, Assignor hereby irrevocably designates and appoints Assignee and its duly authorized officers and agents as Assignor's agent and attorney-in-fact, which appointment is coupled with an interest, to act for and on Assignor's behalf to execute and file such documents, with the same legal force and effect as if executed by Assignor. Assignor agree to provide such assistance and cooperation as Assignee may reasonably request in connection with Assignee's prosecution of any patent applications included in the Transferred Patents (including appeals in connection therewith), including providing documents and materials in the possession or control of Assignor and making the named inventors in any of the patent applications reasonably available to Assignee upon reasonable prior notice if such inventors remain employed by Assignor or any of its Affiliates at the time of Assignor's receipt of such written notice from Assignee.

2.     Terms of the Purchase Agreement. This Patent Assignment is being delivered pursuant to the Purchase Agreement, and is subject to the representations, warranties, conditions, limitations, covenants and agreements set forth in the Purchase Agreement. Assignor and Assignee acknowledge and agree that the representations, warranties, conditions, limitations, covenants and agreements contained in the Purchase Agreement shall not be superseded hereby, but shall remain in full force and effect to the full extent provided therein. The rights and remedies of Assignee, Assignor or Parent under the Purchase Agreement shall not be deemed to be enlarged, modified, or in any way altered by the terms of this Patent Assignment. In the event of any conflict between the terms of the Purchase Agreement and the terms of this Patent Assignment, the terms of the Purchase Agreement shall prevail.

3.     Governing Law. This Patent Assignment and all disputes or controversies arising out of or relating to this Assignment or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

4.     Counterparts; Facsimile or .pdf Signature. This Patent Assignment may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. This Patent Assignment may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

*Remainder of page left intentionally blank; signature page follows.*

2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY     Uniloc Common Production to Google 0010267

IN WITNESS WHEREOF, Assignor has caused this Patent Assignment to be executed as of the date first above written.

**ASSIGNOR:**

**UNILOC LUXEMBOURG S.À R.L.**

By: _____
Name: Craig Etchegoyen
Title: Class A Manager


By: _____
Name: Ivona Falda
Title: Class B Manager

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0010268

Assignee hereby accepts assignment of the Transferred Patents.

**ASSIGNEE:**

**UNILOC 2017 LLC**

By: _____
    Name: CONSTANTINE M. DAKOLIAS
    Title: PRESIDENT

*[Signature Page to Patent Assignment]*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

## Exhibit A

## Transferred Patents

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 12/634,324 | 8855083 | US | INTER-ACCESS NETWORK HANDOVER |
| 12/634,394 | 8750243 | US | NETWORK MOBILITY |
| 12/196,419 | 8982855 | US | SYSTEMS AND METHODS FOR IMPROVED MOBILITY AND QUALITY OF SERVICE IN A WIRELESS NETWORK |
| 14/479,034 | | US | INTER-ACCESS NETWORK HANDOVER |
| 14/271,195 | 9271210 | US | NETWORK MOBILITY |
| 09/589,794 | 6564229 | US | SYSTEM AND METHOD FOR PAUSING AND RESUMING MOVE/COPY OPERATIONS |
| 09/507,526 | 7216351 | US | SYSTEMS AND METHODS FOR SYNCHRONIZING MULTI-MODAL INTERACTIONS |
| 08/365,269 | 6110228 | US | METHOD AND APPARATUS FOR SOFTWARE MAINTENANCE AT REMOTE NODES |
| 09/594,004 | 7024696 | US | METHOD AND SYSTEM FOR PREVENTION OF PIRACY OF A GIVEN SOFTWARE APPLICATION VIA A COMMUNICATIONS NETWORK |
| 13/451,477 | 8613110 | US | SOFTWARE PIRACY PREVENTION THROUGH REMOTE ENFORCEMENT OF AN ACTIVATION THRESHOLD |
| 14/070,207 | 9298893 | US | ACTIVATION CODE SYSTEM AND METHOD FOR PREVENTING SOFTWARE PIRACY |
| 09/211,529 | 6324578 | US | METHODS, SYSTEMS AND COMPUTER PROGRAM PRODUCTS FOR MANAGEMENT OF CONFIGURABLE APPLICATION PROGRAMS ON A NETWORK |
| 09/211,528 | 6510466 | US | METHODS, SYSTEMS AND COMPUTER PROGRAM PRODUCTS FOR CENTRALIZED MANAGEMENT OF APPLICATION PROGRAMS ON A NETWORK |
| 09/829,854 | 6728766 | US | METHODS, SYSTEMS AND COMPUTER PROGRAM PRODUCTS FOR LICENSE USE MANAGEMENT ON A NETWORK |
| 09/870,608 | 7069293 | US | METHODS, SYSTEMS AND COMPUTER PROGRAM PRODUCTS FOR DISTRIBUTION OF APPLICATION PROGRAMS TO A TARGET STATION ON A NETWORK |
| 08/586,149 | 6489974 | US | BUOY ICON NOTIFICATION OF OBJECT INTERFACE ACCESSIBILITY IN MULTITASKING COMPUTER ENVIRONMENT |
| 09/792,045 | 6857067 | US | SYSTEM AND METHOD FOR PREVENTING UNAUTHORIZED ACCESS TO ELECTRONIC DATA |

Exhibit A-1

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/590,859 | 7197144 | US | METHOD AND APPARATUS TO AUTHENTICATE A USER'S SYSTEM TO PREVENT UNAUTHORIZED USE OF SOFTWARE PRODUCTS DISTRIBUTED TO USERS |
| 11/644455 | 7653508 | US | HUMAN ACTIVITY MONITORING DEVICE |
| 11/698633 | 7690556 | US | STEP COUNTER ACCOUNTING FOR INCLINE |
| 12/694135 | 7881902 | US | HUMAN ACTIVITY MONITORING DEVICE |
| 13/018321 | 8712723 | US | HUMAN ACTIVITY MONITORING DEVICE |
| 12/247950 | 8872646 | US | METHOD AND SYSTEM FOR WAKING UP A DEVICE DUE TO MOTION |
| 09/727727 | 7092671 | US | METHOD AND SYSTEM FOR WIRELESSLY AUTODIALING A TELEPHONE NUMBER FROM A RECORD STORED ON A PERSONAL INFORMATION DEVICE |
| 10/712451 | 7330013 | US | APPARATUS AND METHOD FOR CHARGING AND DISCHARGING A BATTERY |
| 08/430943 | 6580422 | US | REMOTE COMPUTER DISPLAY USING GRAPHICS PRIMITIVES SENT OVER A WIRELESS LINK |
| 10/011140 | 6661203 | US | BATTERY CHARGING AND DISCHARGING SYSTEM OPTIMIZED FOR HIGH TEMPERATURE ENVIRONMENTS |
| 09/181431 | 6161134 | US | METHOD, APPARATUS AND COMMUNICATIONS SYSTEM FOR COMPANION INFORMATION AND NETWORK APPLIANCES |
| 09/451388 | 6446127 | US | SYSTEM AND METHOD FOR PROVIDING USER MOBILITY SERVICES ON A TELEPHONY NETWORK |
| 09/237609 | 6216158 | US | SYSTEM AND METHOD USING A PALM SIZED COMPUTER TO CONTROL NETWORK DEVICES |
| 09/558413 | 6622018 | US | PORTABLE DEVICE CONTROL CONSOLE WITH WIRELESS CONNECTION |
| 09/246606 | 6363053 | US | METHOD AND APPARATUS FOR MEASUREMENT-BASED CONFORMANCE TESTING OF SERVICE LEVEL AGREEMENTS IN NETWORKS |
| 10/671375 | 8539552 | US | SYSTEM AND METHOD FOR NETWORK BASED POLICY ENFORCEMENT OF INTELLIGENT-CLIENT FEATURES |
| 09/303832 | 6731642 | US | ` |
| 10/834418 | 7573873 | US | INTERNET TELEPHONY USING NETWORK ADDRESS TRANSLATION |
| 09/728833 | 6856616 | US | SYSTEM AND METHOD FOR PROVIDING SERVICE PROVIDER CONFIGURATIONS FOR TELEPHONES USING A CENTRAL SERVER IN A DATA NETWORK TELEPHONY SYSTEM |
| 10/259542 | 7240200 | US | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY VIA COMBINED HARDWARE AND SOFTWARE AUTHENTICATION |

Exhibit A-2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 11/764748 | 7734921 | US | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY VIA COMBINED HARDWARE AND SOFTWARE AUTHENTICATION |
| 12/134134 | 7721098 | US | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY VIA COMBINED HARDWARE AND SOFTWARE AUTHENTICATION |
| 08/927660 | 6886013 | US | HTTP CACHING PROXY TO FILTER AND CONTROL DISPLAY OF DATA IN A WEB BROWSER |
| 09/098373 | 6496693 | US | METHOD AND APPARATUS FOR TRANSMITTING DATA TO A PAGER IN A COMMUNICATIONS SYSTEM |
| 09/080022 | 6212522 | US | SEARCHING AND CONDITIONALLY SERVING BOOKMARK SETS BASED ON KEYWORDS |
| 09/116862 | 6247021 | US | SEARCHABLE BOOKMARK SETS AS AN INTERNET ADVERTISING MEDIUM |
| 09/116861 | 6314423 | US | SEARCHING AND SERVING BOOKMARK SETS BASED ON CLIENT SPECIFIC INFORMATION |
| 09/116860 | 6324566 | US | INTERNET ADVERTISING VIA BOOKMARK SET BASED ON CLIENT SPECIFIC INFORMATION |
| 09/116859 | 6223178 | US | SUBSCRIPTION AND INTERNET ADVERTISING VIA SEARCHED AND UPDATED BOOKMARK SETS |
| 09/116858 | 6256639 | US | PROVIDING INTERNET TRAVEL SERVICES VIA BOOKMARK SET |
| 09/113678 | 6128655 | US | DISTRIBUTING MECHANISM FOR FILTERING, FORMATTING AND REUSE OF WEB BASED CONTENT |
| 09/113674 | 6314526 | US | RESOURCE GROUP QUORUM SCHEME FOR HIGHLY SCALABLE AND HIGHLY AVAILABLE CLUSTER SYSTEM MANAGEMENT |
| 09/627030 | 6542591 | US | METHOD AND SYSTEM FOR CALLER IDENTIFICATION CALLBACK LISTS |
| 10/047005 | 6961561 | US | ENHANCING/LIMITING USE OF MOBILE ELECTRONIC DEVICES |
| 11/684047 | 7570015 | US | CONDITIONAL BATTERY CHARGING SYSTEM |
| 11/664078 | 8160566 | US | MESSAGE SENDER CONTROLLABLE MESSAGING SYSTEM |
| 13/277405 | 8589780 | US | PROCESSING GEOGRAPHICAL DATA IN A DOCUMENT |
| 14/241702 | 9265024 | US | DETERMINING LOCATION OF MOBILE DEVICE |
| 12/130471 | 7944353 | US | SYSTEM AND METHOD FOR DETECTING AND BROADCASTING A CRITICAL EVENT |

Exhibit A-3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/510182 | 6813630 | US | SYSTEM AND METHOD FOR COMMUNICATING INFORMATION BETWEEN A CLIENT AND A HOST |
| 10/322954 | 8719284 | US | METHOD, SYSTEM AND PROGRAM PRODUCT FOR FILTERING AN ENTRY OF DATA ITEMS |
| 11/780715 | 7849344 | US | METHOD FOR IMPROVING ACCURACY IN PROVIDING INFORMATION PERTAINING TO BATTERY POWER CAPACITY |
| 08/979713 | 6141754 | US | INTEGRATED METHOD AND SYSTEM FOR CONTROLLING INFORMATION ACCESS AND DISTRIBUTION |
| 09/398374 | 6446069 | US | PATENT ACCESS CONTROL SYSTEM FOR A MULTIMEDIA DATASTORE |
| 09/052722 | 6711160 | US | PACKET NETWORK TELEPHONE INTERFACE SYSTEM FOR POTS |
| 2579916 | 2579916 | CA | A METHOD FOR CONTROLLING A MOBILE PHONE |
| 03821273.0 | ZL03821273.0 | CN | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY |
| 98118480.4 | ZL98118480.4 | CN | CACHING PROXY THAT FILTERS AND CONTROLS THE DATA DISPLAYED IN THE BROWSER |
| 02819369.5 | ZL02819369.5 | CN | ENHANCING/LIMITING USE OF MOBILE ELECTRONIC DEVICES |
| 200410012092.1 | ZL200410012092.1 | CN | MOBILE PHONE AND ITS CONTROL METHOD |
| 201010526403.1 | ZL201010526403.1 | CN | METHOD AND SYSTEM FOR PROCESSING GEOGRAPHICAL POSITION DATA IN FILE |
| 201110270296.5 | ZL201110270296.5 | CN | METHOD AND DEVICE FOR DETERMINING POSITION OF MOBILE EQUIPMENT |
| 00122515.4 | ZL00122515.4 | CN | INFORMATION CONTENT FOR TRANSMISSION BETWEEN CUSTOMER END AND HOST MACHINE |
| 200310114332.4 | ZL200310114332.4 | CN | METHOD AND SYSTEM FOR FILTERING DATA ITEM |
| 03798246.9 | 60330976.3 | DE | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY |
| 05797162.4 | 602005037637.2 | DE | A METHOD FOR CONTROLLING A MOBILE PHONE |
| 03798246.9 | 1547305 | FR | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY |
| 03798246.9 | 1547305 | GB | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY |
| 9816410.6 | 2329310 | GB | HTTP CACHING PROXY TO FILTER AND CONTROL DISPLAY OF DATA IN A WEB BROWSER |
| 9909081.3 | 2338577 | GB | TRANSMITTING DATA TO E.G. A PAGER |

Exhibit A-4

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 05797162.4 | 1800500 | GB | A METHOD FOR CONTROLLING A MOBILE PHONE |
| 162437 | 162437 | IL | METHOD FOR LIMITING THE USE OF MOBILE ELECTRONIC EQUIPMENT |
| 552/DELNP/2005 | 259481 | IN | A SYSTEM AND METHOD FOR GUARANTEEING MESSAGE INTEGRITY |
| 1788/CHENP/2007 | 253286 | IN | A METHOD FOR CONTROLLING A MOBILE PHONE |
| 2004-539185 | 4793843 | JP | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY VIA COMBINED HARDWARE AND SOFTWARE AUTHENTICATION |
| 10-238680 | 2994351 | JP | HTTP CACHING PROXY TO FILTER AND CONTROL DISPLAY OF DATA IN A WEB BROWSER |
| 2003-563257 | 4225914 | JP | ENHANCING/ LIMITING USE OF MOBILE ELECTRONIC DEVICES |
| 2007-532881 | 5220413 | JP | MESSAGE SENDER CONTROLLABLE MESSAGING SYSTEM |
| 2014-523175 | 5706585 | JP | DETERMINING LOCATION OF MOBILE DEVICE |
| 2000-225340 | 4267186 | JP | SYSTEM AND METHOD FOR COMMUNICATING INFORMATION CONTENT BETWEEN A CLIENT AND A HOST |
| 11-064012 | 3202003 | JP | PACKET NETWORK TELEPHONE INTERFACE SYSTEM FOR POTS |
| 2005-7003128 | 0702499 | KR | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY VIA COMBINED HARDWARE AND SOFTWARE AUTHENTICATION |
| 1999-0022327 | 0326982 | KR | A RESOURCE GROUP QUORUM SCHEME FOR HIGHLY SCALABLE AND HIGHLY AVAILABLE CLUSTER SYSTEM MANAGEMENT |
| 2004-7010406 | 0570140 | KR | ENHANCING/ LIMITING USE OF MOBILE ELECTRONIC DEVICES |
| 200500935-2 | 109890 | SG | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY VIA COMBINED HARDWARE AND SOFTWARE AUTHENTICATION |
| 200004103-8 | 101939 | SG | SYSTEM AND METHOD FOR COMMUNICATING INFORMATION CONTENT BETWEEN A CLIENT AND A HOST |
| 92121018 | I225195 | TW | SYSTEM AND METHOD FOR GUARANTEEING SOFTWARE INTEGRITY VIA COMBINED HARDWARE AND SOFTWARE AUTHENTICATION |
| 92100604 | I222307 | TW | ENHANCING/ LIMITING USE OF MOBILE ELECTRONIC DEVICES |
| 94132845 | I392395 | TW | MESSAGE SENDER CONTROLLABLE MESSAGING SYSTEM |
| 89107051 | NI-154225 | TW | SYSTEM AND METHOD FOR COMMUNICATING INFORMATION CONTENT BETWEEN A CLIENT AND A HOST |

Exhibit A-5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 822814 | GB 2466225 | GB | INTER-ACCESS NETWORK HANDOVER |
| 08 228 15.7 | 2466226 | GB | NETWORK MOBILITY |
| 05 192 57.0 | 2430581 | GB | ACCESS ROUTER SELECTION |
| 518106 | 2430111 | GB | A METHOD OF CONFIRMING DATAGRAM RECEPTION IN UNIDIRECTIONAL NETWORKS |
| 518107.8 | 2429876 | GB | METHOD OF PROVIDING ACCESS TO PACKET-SWITCHED SERVICES IN HETEROGENEOUS NETWORK ENVIRONMENT |
| 716529.3 | 2452699 | GB | MOBILITY AND QUALITY OF SERVICE |
| 421397.1 | 2418568 | GB | A METHOD OF ESTIMATING THE CELL LOCATION OF A MOBILE TERMINAL IN HETEROGENEOUS NETWORK ENVIRONMENT |
| 2004308435 | 2004308435 | AU | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 2550994 | | CA | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 2734781 | 2734781 | CA | CONTENT, TRAFFIC AND ADVERTISING ENGINE, SYSTEM AND METHOD |
| 200480041712.20 | 101088273 | CN | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 4181/DELNP/2006 | | IN | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 1189/KOLNP/2011 | | IN | CONTENT, TRAFFIC AND ADVERTISING ENGINE, SYSTEM AND METHOD |
| 2006-547341 | 5101108 | JP | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 2012-56519 | 5531044 | JP | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 11/019,655 | 7804948 | US | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 12/723,750 | 7853000 | US | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 12/907,550 | 8571194 | US | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 13/357,132 | 8594294 | US | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 14/052,166 | 9172815 | US | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 12/545,129 | 8782540 | US | CONTENT, TRAFFIC AND ADVERTISING ENGINE, SYSTEM AND METHOD |
| 12/545,125 | 8700731 | US | SYSTEM AND METHOD FOR AGGREGATING AND PROVIDING AUDIO AND VISUAL PRESENTATIONS VIA A COMPUTER NETWORK |
| 12/545,131 | 8407609 | US | SYSTEM AND METHOD FOR PROVIDING AND TRACKING THE PROVISION OF AUDIO AND VISUAL PRESENTATIONS VIA A COMPUTER NETWORK |
| 14/299,221 | 9412119 | US | CONTENT, TRAFFIC AND ADVERTISING ENGINE, SYSTEM AND METHOD |

Exhibit A-6

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 15/454,251 | | US | SYSTEM AND METHOD FOR AGGREGATING AND PROVIDING AUDIO AND VISUAL PRESENTATIONS VIA A COMPUTER NETWORK |
| 93140135 | I419543 | TW | SYSTEM AND METHOD FOR INITIATING A CONFERENCE CALL |
| 10/346,989 | 7337151 | US | AUTOMATED PRICING SYSTEM |
| 12/011,270 | 7769595 | US | AUTOMATED PRICING AND/OR "GREEN" INDICATING METHOD AND SYSTEM |
| 12/004,187 | 7783523 | US | AUTOMATED PRICING SYSTEM |
| 12/802,848 | 8260628 | US | AUTOMATED PRICING AND/OR "GREEN" INDICATING METHOD AND SYSTEM |
| 12/803,404 | 8266005 | US | AUTOMATED PRICING SYSTEM |
| 13/587,124 | 8515820 | US | AUTOMATED PRICING SYSTEM |
| 13/942,523 | | US | AUTOMATED PRICING SYSTEM |
| 09/436515 | 6736759 | US | EXERCISE MONITORING SYSTEM AND METHODS |
| 10/847208 | 7220220 | US | EXERCISE MONITORING SYSTEM AND METHODS |
| 10/036,298 | 7092953 | US | APPARATUS AND METHODS FOR INTELLECTUAL PROPERTY DATABASE NAVIGATION |
| 10/035,347 | 7099849 | US | INTEGRATED MEDIA MANAGEMENT AND RIGHTS DISTRIBUTION APPARATUS |
| 10/740,030 | 7535890 | US | SYSTEM AND METHOD FOR INSTANT VOIP MESSAGING |
| 12/398,076 | 8199747 | US | SYSTEM AND METHOD FOR INSTANT VOIP MESSAGING |
| 12/398,063 | 8243723 | US | SYSTEM AND METHOD FOR INSTANT VOIP MESSAGING |
| 13/546,673 | 8724622 | US | SYSTEM AND METHOD FOR INSTANT VOIP MESSAGING |
| 14/224,125 | 8995433 | US | SYSTEM AND METHOD FOR INSTANT VOIP MESSAGING |
| 14/633,057 | 9621490 | US | SYSTEM AND METHOD FOR INSTANT VOIP MESSAGING |
| 08/951,177 | 5939833 | US | FIELD EMISSION DEVICE WITH LOW DRIVING VOLTAGE |
| 08/984,505 | 5954788 | US | APPARATUS FOR PERFORMING MODULAR MULTIPLICATION |
| 09/027,598 | 5973490 | US | LINE DRIVER WITH ADAPTIVE OUTPUT IMPEDANCE |
| 08/969,729 | 5991288 | US | VOICE CODING APPARATUS AT A CODE DIVISION MULTIPLE ACCESS BASE STATION |
| 08/959,084 | 6025877 | US | SCALABLE TRANSMISSION METHOD OF VISUAL OBJECTS SEGMENTED BY CONTENT-BASE |
| 08/987,832 | 6035349 | US | STRUCTURE OF PORTABLE MULTIMEDIA DATA INPUT/OUTPUT PROCESSOR AND METHOD FOR DRIVING THE SAME |

Exhibit A-7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/006,904 | 6039248 | US | METHOD FOR PREPARING SAFE ELECTRONIC NOTARIZED DOCUMENTS IN ELECTRONIC COMMERCE |
| 08/990,047 | 6041036 | US | DUAL RECEIVE, DUAL TRANSMIT FAULT TOLERANT NETWORK ARRANGEMENT AND PACKET HANDLING METHOD |
| 09/135,576 | 6057736 | US | GAIN CONTROLLED AMPLIFIER |
| 09/146,529 | 6064265 | US | GAIN CONTROL CIRCUIT FOR LOW-NOISE AMPLIFIER |
| 09/227,107 | 6068588 | US | COUNTERBALANCED PUMP |
| 09/063,666 | 6085091 | US | METHOD FOR CONTROLLING HAND OFF OF MOBILE TERMINAL IN CODE DIVISION MULTIPLE ACCESS MOBILE COMMUNICATION SYSTEM |
| 09/135,645 | 6087232 | US | FABRICATION METHOD OF LATERAL DOUBLE DIFFUSED MOS TRANSISTORS |
| 09/275,363 | 6104354 | US | RADIO APPARATUS |
| 09/074,617 | 6108592 | US | VOICE-CONTROLLED MOTORIZED WHEELCHAIR WITH SENSORS AND DISPLAYS |
| 09/062,947 | 6111438 | US | CURRENT MEMORY AND CIRCUIT ARRANGEMENT COMPRISING CURRENT MEMORIES |
| 08/968,403 | 6118890 | US | SYSTEM AND METHOD FOR BROAD CLASSIFICATION OF BIOMETRIC PATTERNS |
| 08/987,551 | 6128289 | US | VOICE CODING METHOD AT A CODE DIVISION MULTIPLE ACCESS BASE STATION |
| 09/141,244 | 6128492 | US | METHOD FOR TRACING CENTRALIZED PROCESS POSITION OF MOBILE STATION USING RADIO LAN |
| 09/018,984 | 6130964 | US | IMAGE SEGMENTATION AND OBJECT TRACKING METHOD AND CORRESPONDING SYSTEM |
| 09/162,791 | 6133765 | US | SWITCHED-CURRENT MEMORY |
| 09/429,752 | 6147896 | US | NONVOLATILE FERROELECTRIC MEMORY USING SELECTIVE REFERENCE CELL |
| 08/989,875 | 6151676 | US | ADMINISTRATION AND UTILIZATION OF SECRET FRESH RANDOM NUMBERS IN A NETWORKED ENVIRONMENT |
| 09/444,898 | 6166337 | US | DEVICE INCLUDING A PRINTED CIRCUIT BOARD WHICH IS CONTACTED BY DEPRESSING A KEY LOCATED AT A HOUSING WALL WHICH MAKES AN ANGLE WITH THE PRINTED CIRCUIT BOARD |
| 09/031,374 | 6167237 | US | UNIVERSAL WIRELESS COMMUNICATION SYSTEM, A TRANSMISSION PROTOCOL, A WIRELESS COMMUNICATION STATION, AND A RADIO BASE STATION |

Exhibit A-8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/050,679 | 6182220 | US | SYSTEM AND METHOD FOR BUILDING AND EXCHANGING ENCRYPTED PASSWORDS BETWEEN A CLIENT AND SERVER |
| 09/030,435 | 6185318 | US | SYSTEM AND METHOD FOR MATCHING (FINGERPRINT) IMAGES USING AN ALIGNED STRING-BASED REPRESENTATION |
| 09/334,504 | 6190319 | US | SELF CALIBRATING LINEAR POSITION SENSOR |
| 09/107,528 | 6195392 | US | METHOD AND ARRANGEMENT FOR GENERATING PROGRAM CLOCK REFERENCE VALUES (PCRS) IN MPEG BITSTREAMS |
| 09/300,804 | 6201844 | US | TRANSCODING OF A DATA STREAM |
| 09/238,537 | 6215403 | US | WIRELESS MONITORING SYSTEM |
| 09/145,331 | 6219724 | US | DIRECT MEMORY ACCESS CONTROLLER |
| 09/244,209 | 6229994 | US | FITTING DEVICE FOR SEPARATE ELEMENTS OF A MOBILE TELEPHONE HANDSET AND THE HANDSET THUS OBTAINED |
| 09/024,632 | 6239772 | US | VIDEO MOIRE REDUCTION |
| 09/050,595 | 6239773 | US | IMAGE DISPLAY DEVICE HAVING A DRIVE CIRCUIT FOR DIFFERENTIALLY CONTROLLING THE LUMINOSITY OF WINDOWS IN THE DISPLAY |
| 09/047,684 | 6240300 | US | TELEPHONY DEVICE COMPRISING A BASE STATION AND AT LEAST A SUBSCRIBER UNIT AND METHOD FOR CONNECTING TO SUCH A TELEPHONY DEVICE |
| 08/976,710 | 6246447 | US | VIDEO FORMAT ADAPTIVE BEAM SIZE FOR VIDEO MOIRE REDUCTION |
| 09/435,039 | 6249251 | US | HARDWARE-EFFICIENT DEMODULATOR FOR CDMA ADAPTIVE ANTENNA ARRAY SYSTEMS |
| 09/102,949 | 6253201 | US | SCALABLE SOLUTION FOR IMAGE RETRIEVAL |
| 09/217,408 | 6260031 | US | CODE COMPACTION BY EVOLUTIONARY ALGORITHM |
| 08/977,951 | 6271826 | US | MIXING A GRAPHICS SIGNAL AND A VIDEO SIGNAL |
| 09/131,334 | 6275956 | US | INTEGRATED DYNAMIC-VISUAL PARALLEL DEBUGGING APPARATUS AND METHOD THEREOF |
| 09/206,031 | 6281903 | US | METHODS AND APPARATUS FOR EMBEDDING 2D IMAGE CONTENT INTO 3D MODELS |
| 09/031,198 | 6289316 | US | PROGRESS NOTES MODEL IN A CLINICAL INFORMATION SYSTEM |
| 09/432,896 | 6290640 | US | UNCOUPLED ROTARY LINEAR PUMP |
| 09/549,803 | 6300885 | US | DUAL ALDC DECOMPRESSORS INSIDE PRINTER ASIC |
| 09/031,696 | 6301641 | US | METHOD FOR REDUCING THE FREQUENCY OF CACHE MISSES IN A COMPUTER |

Exhibit A-9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/264,912 | 6308191 | US | PROGRAMMABLE PROCESSOR CIRCUIT WITH A RECONFIGURABLE MEMORY FOR REALIZING A DIGITAL FILTER |
| 09/030,363 | 6314197 | US | DETERMINING AN ALIGNMENT ESTIMATION BETWEEN TWO ( FINGERPRINT) IMAGES |
| 09/393,279 | 6316281 | US | METHOD FOR FABRICATING A HYBRID OPTICAL INTEGRATED CIRCUIT EMPLOYING SOI OPTICAL WAVEGUIDE |
| 09/369,540 | 6323824 | US | DIELECTRIC RESONATOR ANTENNA |
| 09/079,662 | 6326965 | US | INTERACTIVE REPRESENTATION AND RETRIEVAL OF MULTI-DIMENSIONAL DATA USING VIEW ELEMENTS |
| 09/216,261 | 6337972 | US | MELODIC ALERTS FOR COMMUNICATIONS DEVICE |
| 09/478,474 | 6349114 | US | CAMERA MOTION PARAMETERS ESTIMATION METHOD |
| 09/216,266 | 6349154 | US | METHOD AND ARRANGEMENT FOR CREATING A HIGH-RESOLUTION STILL PICTURE |
| 09/244,841 | 6351564 | US | METHOD OF SWITCHING OF CODED VIDEO SEQUENCES AND CORRESPONDING DEVICE |
| 08/994,827 | 6356288 | US | DIVERSION AGENT USES CINEMATOGRAPHIC TECHNIQUES TO MASK LATENCY |
| 09/519,548 | 6359658 | US | SUBJECTIVE NOISE MEASUREMENT ACTIVE VIDEO SIGNAL |
| 09/006,657 | 6363380 | US | MULTIMEDIA COMPUTER SYSTEM WITH STORY SEGMENTATION CAPABILITY AND OPERATING PROGRAM THEREFOR INCLUDING FINITE AUTOMATION VIDEO PARSER |
| 09/384,763 | 6366885 | US | SPEECH DRIVEN LIP SYNTHESIS USING VISEME BASED HIDDEN MARKOV MODELS |
| 09/475,743 | 6366908 | US | KEYFACT-BASED TEXT RETRIEVAL SYSTEM, KEYFACT-BASED TEXT INDEX METHOD, AND RETRIEVAL METHOD |
| 09/198,928 | 6382867 | US | JOINING DEVICE FOR FIRMLY JOINING PLASTIC JOINING PARTS TOGETHER |
| 09/276,870 | 6385607 | US | GENERATING REGRESSION TREES WITH OBLIQUE HYPERPLANES |
| 09/241,016 | 6396875 | US | METHOD OF SWITCHING OF CODED VIDEO SEQUENCES AND CORRESPONDING DEVICE |
| 09/454,389 | 6400932 | US | LOW OFFSET AUTOMATIC FREQUENCY TUNING CIRCUITS FOR CONTINUOUS-TIME FILTER |
| 09/865,004 | 6404011 | US | SEMICONDUCTOR POWER INTEGRATED CIRCUIT |
| 09/333,633 | 6405301 | US | PARALLEL DATA PROCESSING |
| 09/773,160 | 6407681 | US | QUANTIZATION METHOD FOR BIT RATE TRANSCODING APPLICATIONS |

Exhibit A-10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/966,112 | 6411542 | US | FERROELECTRIC MEMORY DEVICE HAVING FERROELECTRIC MEMORY TRANSISTORS CONNECTED TO SEPARATE WELL LINES |
| 09/499,920 | 6431447 | US | SYSTEM AND METHOD FOR READING A BARCODE USING LASER DIODE ARRAY |
| 09/579,313 | 6432135 | US | TORSION HEART VALVE |
| 09/569,916 | 6436027 | US | HYDRODYNAMIC BLOOD BEARING |
| 09/899,441 | 6437545 | US | DC / DC CONVERTER INCLUDING CONTROL MEANS FOR CONTROLLING MULTIPLE OUTPUTS USING SEPARATE SWITCHING CYCLES FOR EACH OUTPUT |
| 09/549,689 | 6439457 | US | METHOD AND SYSTEM FOR PERSONALIZED MESSAGE STORAGE AND RETRIEVAL |
| 10/012,015 | 6469910 | US | ELECTRONIC DEVICE WITH A VARIABLE KEYBOARD |
| 09/116,769 | 6473095 | US | HISTOGRAM METHOD FOR CHARACTERIZING VIDEO CONTENT |
| 09/550,607 | 6473114 | US | METHOD AND SYSTEM FOR INDICATING CHANGE OF SPEAKER IN A VIDEOCONFERENCE APPLICATION |
| 09/757,786 | 6477211 | US | TRANSCODING OF A DATA STREAM |
| 09/198,045 | 6480480 | US | WIRELESS LOCAL AREA NETWORK COMPRISING A CONTROLLER AND AT LEAST ONE CANDIDATE-CONTROLLER TERMINAL |
| 09/409,814 | 6480849 | US | EFFICIENT CONCURRENCY CONTROL METHOD FOR HIGH DIMENSIONAL INDEX STRUCTURES |
| 09/855,581 | 6483456 | US | GPS RECEIVER |
| 09/497,345 | 6484172 | US | CONCURRENCY CONTROL METHOD FOR HIGH-DIMENSIONAL INDEX STRUCTURE USING LATCH AND LOCK |
| 09/884,222 | 6498541 | US | COMMUNICATION BUS SYSTEM AND APPARATUS AND DEVICE FOR USE IN SUCH A SYSTEM |
| 09/615,880 | 6498814 | US | DRIFT-FREE TRANSCODER AND RELATED METHOD |
| 09/459,255 | 6501744 | US | SLOTTED MODE IN WIRELESS CDMA SYSTEMS |
| 09/232,896 | 6502105 | US | REGION-BASED IMAGE ARCHIVING AND RETRIEVING SYSTEM |
| 09/366,695 | 6526183 | US | STATIC IMAGE GENERATION METHOD AND DEVICE |
| 09/920,040 | 6528741 | US | TEXT ENTRY ON PORTABLE DEVICE |
| 09/104,900 | 6529600 | US | METHOD AND DEVICE FOR PREVENTING PIRACY OF VIDEO MATERIAL FROM THEATER SCREENS |
| 09/499,915 | 6529882 | US | METHOD FOR MANAGING GROUP MEMBERSHIP IN INTERNET MULTICAST APPLICATIONS |

Exhibit A-11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/678,966 | 6539071 | US | FREQUENCY CORRECTION AT THE RECEIVER END IN A PACKET TRANSMISSION SYSTEM |
| 10/032,754 | 6541319 | US | METHOD OF MANUFACTURING A SELF-ALIGNED GATE TRANSISTOR WITH P-TYPE IMPURITIES SELECTIVELY IMPLANTED BELOW THE GATE, SOURCE AND DRAIN ELECTRODES |
| 10/086,047 | 6543025 | US | TRANSMISSION SYSTEM WITH ADAPTIVE CHANNEL ENCODER AND DECODER |
| 09/411,460 | 6553110 | US | SELECTIVE TELEPHONE CALLER IDENTIFICATION SERVICE |
| 09/374,692 | 6577629 | US | SWITCHING NETWORK WITH COMPLETE TRANSFER OF THE CONTENTS OF A HEADER FIELD OF A CELL |
| 09/475,224 | 6584212 | US | APPARATUS FOR MOTION ESTIMATION WITH CONTROL PART IMPLEMENTED BY STATE TRANSITION DIAGRAM |
| 10/112,359 | 6593603 | US | PSEUDOMORPHIC HIGH ELECTRON MOBILITY TRANSISTOR POWER DEVICE AND METHOD FOR MANUFACTURING THE SAME |
| 09/382,732 | 6597802 | US | SYSTEM AND METHOD FOR GENERATING A ROLLED SURFACE REPRESENTATION FROM A SET OF PARTIAL IMAGES |
| 09/580,169 | 6598146 | US | DATA-PROCESSING ARRANGEMENT COMPRISING A PLURALITY OF PROCESSING AND MEMORY CIRCUITS |
| 09/062,941 | 6606641 | US | SYSTEM FOR VARYING THE DYNAMIC RANGE OF COEFFICIENTS IN A DIGITAL FILTER |
| 10/032,720 | 6608578 | US | CURRENT CELL DRIVING CIRCUIT IN DIGITAL-TO-ANALOG CONVERTER |
| 09/498,921 | 6614759 | US | ONU FUNCTION PROCESSING APPARATUS IN ATM-PON SYSTEM |
| 09/448,531 | 6614761 | US | ADSL SUBSCRIBER PROCESSING EQUIPMENT IN ATM SWITCH |
| 09/495,741 | 6614928 | US | AUTOMATIC PARCEL VOLUME CAPTURE SYSTEM AND VOLUME CAPTURE METHOD USING PARCEL IMAGE RECOGNITION |
| 10/114,507 | 6621440 | US | DIGITAL TO ANALOGUE CONVERTER |
| 09/708,165 | 6628712 | US | SEAMLESS SWITCHING OF MPEG VIDEO STREAMS |
| 10/032,987 | 6636435 | US | FERROELECTRIC MEMORY CELL ARRAY AND METHOD OF STORING DATA USING THE SAME |
| 09/757,613 | 6731285 | US | SYSTEM AND METHOD FOR PROVIDING HIGH PERFORMANCE IMAGE MAGNIFICATION IN A WEB BROWSER |
| 10/092,902 | 6741929 | US | VIRTUAL NAVIGATION SYSTEM AND METHOD USING MOVING IMAGE |

Exhibit A-12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/325,929 | 6774697 | US | INPUT AND OUTPUT PORT CIRCUIT |
| 09/425,657 | 6781951 | US | RADIO COMMUNICATION SYSTEM |
| 09/952,193 | 6910175 | US | ENCODER REDUNDANCY SELECTION SYSTEM AND METHOD |
| 09/773,413 | 6937645 | US | COMMUNICATION SYSTEM AND A RECEIVER FOR USE IN THE SYSTEM |
| 09/694,455 | 6961473 | US | FASTER TRANSFORMS USING EARLY ABORTS AND PRECISION REFINEMENTS |
| 10/230,563 | 6963117 | US | MICROELECTROMECHANICAL DEVICE USING RESISTIVE ELECTROMECHANICAL CONTACT |
| 09/795,020 | 6963377 | US | ENCODING METHOD AND DEVICE INCLUDING THRESHOLDING PIXEL-TO-PIXEL DIFFERENCES |
| 09/411,756 | 6966027 | US | METHOD AND APPARATUS FOR STREAMING XML CONTENT |
| 10/221,069 | 6968007 | US | METHOD AND DEVICE FOR SCALABLE VIDEO TRANSCODING |
| 09/557,600 | 6973055 | US | NETWORK WITH SEVERAL NETWORK CLUSTERS FOR WIRELESS TRANSMISSION OF PACKETS |
| 09/774,925 | 6975991 | US | WEARABLE DISPLAY SYSTEM WITH INDICATORS OF SPEAKERS |
| 10/083,334 | 6978026 | US | CIRCUIT ARRANGEMENT FOR GAINING A STEREO SUBCARRIER AND AN RDS CARRIER |
| 10/161,795 | 6980599 | US | VIDEO DECODING SYSTEM AND METHOD HAVING POST-PROCESSING TO REDUCE SHARPNESS PREDICTION DRIFT |
| 09/908,197 | 6981046 | US | SYSTEM FOR THE EFFICIENT TRANSMISSION OF PARTIAL OBJECTS IN DISTRIBUTED DATA BASES |
| 10/084,724 | 6982748 | US | AUTOMATICALLY SWITCHED CAMERA SYSTEM WITH INDICATOR FOR NOTIFYING THE NEXT SUBJECT OF THE CAMERA SYSTEM |
| 09/928,795 | 6985603 | US | METHOD AND APPARATUS FOR EXTENDING VIDEO CONTENT ANALYSIS TO MULTIPLE CHANNELS |
| 10/015,965 | 6986466 | US | DATA-PROCESSING SYSTEM |
| 10/732,720 | 6989716 | US | VARIABLE GAIN AMPLIFIER |
| 09/616,631 | 6990496 | US | SYSTEM AND METHOD FOR AUTOMATED CLASSIFICATION OF TEXT BY TIME SLICING |
| 10/175,607 | 6992697 | US | METHOD AND APPARATUS TO MEASURE VIDEO QUALITY ON ANY DISPLAY DEVICE WITH ANY IMAGE SIZE STARTING FROM A KNOW DISPLAY TYPE AND SIZE |
| 09/741,654 | 6992719 | US | METHOD AND DEVICE FOR FOCUSING A CAMERA UTILIZING FILTERS CONTAINED IN A PROCESSOR |

Exhibit A-13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/857,964 | 6992976 | US | NETWORK FOR A RECONFIGURATION AFTER A STEP-BY-STEP REPAIR OF DEFECTS |
| 09/633,760 | 6993179 | US | STRAPDOWN SYSTEM FOR THREE-DIMENSIONAL RECONSTRUCTION |
| 10/749,749 | 6995452 | US | MOSFET DEVICE WITH NANOSCALE CHANNEL AND METHOD OF MANUFACTURING THE SAME |
| 10/098,456 | 6996181 | US | MOTION ESTIMATION METHOD BY EMPLOYING A STOCHASTIC SAMPLING TECHNIQUE |
| 10/491,373 | 6996279 | US | COMPRESSED STORAGE OF DATA ITEMS |
| 10/327,881 | 6999127 | US | APPARATUS AND METHOD FOR IMAGE CONVERSION AND AUTOMATIC ERROR CORRECTION FOR DIGITAL TELEVISION RECEIVER |
| 09/992,922 | 7003150 | US | HOMOGRAPHY TRANSFER FROM POINT MATCHES |
| 10/643,253 | 7003409 | US | PREDICTIVE FAILURE ANALYSIS AND FAILURE ISOLATION USING CURRENT SENSING |
| 10/865,382 | 7006044 | US | MICROSTRIP PATCH ANTENNA USING MEMS TECHNOLOGY |
| 10/173,160 | 7006659 | US | METHOD FOR EMBEDDING AND EXTRACTING A SPATIAL DOMAIN BLIND WATERMARK USING SAMPLE EXPANSION |
| 09/938,377 | 7010159 | US | APPARATUS AND METHOD FOR COMBINING RANDOM SET OF VIDEO FEATURES IN A NON-LINEAR SCHEME TO BEST DESCRIBE PERCEPTUAL QUALITY OF VIDEO SEQUENCES USING HEURISTIC SEARCH METHODOLOGY |
| 10/262,796 | 7019985 | US | ELECTRONIC DEVICE WITH A VARIABLE KEYBOARD |
| 09/961,996 | 7020252 | US | GROUP AUDIO MESSAGE BOARD |
| 09/938,630 | 7023850 | US | MULTICASTING APPARATUS AND METHOD IN SHARED MEMORY SWITCH |
| 09/975,152 | 7027421 | US | METHOD AND APPARATUS FOR SEARCHER BEAMFORMING IN CDMA BASE STATION SYSTEM USING ARRAY ANTENNA |
| 10/022,731 | 7027491 | US | INTERFERENCE CANCELLATION RECEIVER FOR USE IN A CDMA SYSTEM |
| 10/196,096 | 7027588 | US | TELEPHONE APPARATUS COMPRISING MONITORING MEANS |
| 09/993,061 | 7031497 | US | METHOD FOR COMPUTING OPTICAL FLOW UNDER THE EPIPOLAR CONSTRAINT |
| 10/122,746 | 7035586 | US | WIRELESS INTERCONNECTION METHOD AND ASSEMBLY FOR ESTABLISHING A BIDIRECTIONAL COMMUNICATION BETWEEN AUDIO AND/OR VIDEO DEVICES |
| 10/076,352 | 7038721 | US | GAMMA CORRECTION CIRCUIT |

Exhibit A-14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY Uniloc Common Production to Google 0010283

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/025,797 | 7039094 | US | ADAPTIVE RAKE RECEIVING APPARATUS CONSTRAINED WITH AT LEAST ONE CONSTRAINT FOR USE IN MOBILE COMMUNICATION SYSTEM AND METHOD THEREFOR |
| 10/201,368 | 7039837 | US | SIGNAL CODING |
| 10/015,807 | 7048191 | US | 4-STATE BAR CODE PRINTING AND READING SYSTEM AND METHOD FOR CONTROLLING THE SAME |
| 09/967,548 | 7050511 | US | IN-BAND ADJACENT-CHANNEL DIGITAL AUDIO BROADCASTING SYSTEM |
| 09/752,667 | 7054365 | US | METHOD FOR PROVIDING VARIABLE BIT RATE IN STREAMING SERVICE |
| 09/995,718 | 7054856 | US | SYSTEM FOR DRAWING PATENT MAP USING TECHNICAL FIELD WORD AND METHOD THEREFOR |
| 10/273,256 | 7065701 | US | METHOD FOR ITERATIVELY DECODING BLOCK TURBO CODES AND RECORDING MEDIUM FOR STORING ITERATIVE DECODING PROGRAM OF BLOCK TURBO CODES |
| 10/269,567 | 7076490 | US | OBJECT-RELATIONAL DATABASE MANAGEMENT SYSTEM AND METHOD FOR DELETING CLASS INSTANCE FOR THE SAME |
| 10/180,406 | 7079704 | US | OBJECTIVE METHOD AND SYSTEM FOR ESTIMATING PERCEIVED IMAGE AND VIDEO SHARPNESS |
| 10/067,414 | 7081919 | US | GREEN RECONSTRUCTION FOR IMAGE SENSORS |
| 10/134,212 | 7082156 | US | METHOD OF DETECTING, AND A RECEIVER FOR, A SPREAD SPECTRUM SIGNAL |
| 09/686,830 | 7085929 | US | METHOD AND APPARATUS FOR REVOCATION LIST MANAGEMENT USING A CONTACT LIST HAVING A CONTACT COUNT FIELD |
| 09/987,933 | 7093290 | US | SECURITY SYSTEM FOR NETWORKS AND THE METHOD THEREOF |
| 09/995,740 | 7099376 | US | METHOD FOR PARALLEL TYPE INTERFERENCE CANCELLATION IN CODE DIVISION MULTIPLE ACCESS RECEIVER |
| 09/763,843 | 7103061 | US | SYNCHRONIZATION CODEWORD FOR INTERFERENCE REDUCTION IN A CDMA SYSTEM |
| 11/026,455 | 7123194 | US | ROTATABLE MICROSTRIP PATCH ANTENNA AND ARRAY ANTENNA USING THE SAME |
| 09/737,190 | 7124034 | US | METHOD FOR CHANGING A TARGET ARRAY, A METHOD FOR ANALYZING A STRUCTURE, AND AN APPARATUS, A STORAGE MEDIUM AND A TRANSMISSION MEDIUM THEREFOR |

Exhibit A-15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/187,340 | 7134017 | US | METHOD FOR PROVIDING A TRUSTED PATH BETWEEN A CLIENT AND A SYSTEM |
| 09/817,457 | 7136371 | US | TIME SLOT SORTING METHOD FOR A WIRELESS NETWORK |
| 10/150,827 | 7142578 | US | SINGLE BEAMFORMING STRUCTURE FOR MULTIPLE MODULATION SCHEMES |
| 09/634,731 | 7151562 | US | METHOD AND APPARATUS FOR EXTERNAL CALIBRATION OF A CAMERA VIA A GRAPHICAL USER INTERFACE |
| 10/136,959 | 7154892 | US | METHOD AND APPARATUS FOR MANAGING LPM-BASED CAM LOOK-UP TABLE, AND RECORDING MEDIUM THEREFOR |
| 09/663,315 | 7161952 | US | WIRELESS NETWORK WITH A PLURALITY OF PERSISTENCY PROBABILITIES FOR ACCESSING A RACH CHANNEL |
| 10/098,436 | 7184420 | US | METHOD FOR DYNAMICALLY LOCATING A WIRELESS TCP PROXY IN A WIRED/WIRELESS INTEGRATED NETWORK |
| 09/580,167 | 7188165 | US | METHOD OF, AND A HETEROGENEOUS NETWORK FOR, TRANSMITTING DATA PACKETS |
| 09/653,782 | 7190979 | US | BATTERY ECONOMIZING IN A COMMUNICATIONS SYSTEM |
| 10/365,780 | 7194734 | US | METHOD OF EXECUTING AN INTERPRETER PROGRAM |
| 10/523,389 | 7206555 | US | ANTENNA DIVERSITY SYSTEM AND METHOD FOR OPERATING SAID SYSTEM |
| 10/551,311 | 7212158 | US | METHOD AND APPARATUS FOR BEAMFORMING BASED ON BROADBAND ANTENNA |
| 10/540,101 | 7212159 | US | POSITIONING SYSTEM, APPARATUS AND METHOD |
| 10/734,574 | 7212585 | US | QUADRATURE MODULATION TRANSMITTER |
| 10/185,385 | 7236548 | US | BIT LEVEL DIVERSITY COMBINING FOR COFDM SYSTEM |
| 10/266,302 | 7251251 | US | METHOD OF AND SYSTEM FOR TRANSMITTING A PLURALITY OF MESSAGES |
| 10/557,346 | 7265609 | US | TRANSCONDUCTOR CIRCUITS |
| 09/372,459 | 7639283 | US | COLOR SIGNAL MATRIX ADJUSTMENT |
| 10/550,337 | 7650115 | US | METHOD OF, AND APPARATUS FOR, PROTECTING FROM RADIO FREQUENCY INTERFERENCE |
| 11/447,527 | 7728882 | US | GREEN RECONSTRUCTION FOR IMAGE SENSORS |
| 11/567,772 | 7739392 | US | METHOD AND SYSTEM FOR TRANSFERRING A COMMUNICATION SESSION |
| 10/935,342 | 7764637 | US | PEER-TO-PEER MOBILE INSTANT MESSAGING METHOD AND DEVICE |

Exhibit A-16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 11/120,587 | 7847842 | US | PREVENTING GREEN NON-UNIFORMITY IN IMAGE SENSORS |
| 09/560,203 | 8332302 | US | METHOD AND APPARATUS FOR AUCTIONING ITEMS |
| 13/463,540 | 8369298 | US | METHOD FOR ESTABLISHING NETWORK CONNECTIONS BETWEEN STATIONARY TERMINALS AND REMOTE DEVICES THROUGH MOBILE DEVICES |
| 12/353,662 | 8484089 | US | METHOD AND SYSTEM FOR A HOSTED DIGITAL MUSIC LIBRARY SHARING SERVICE |
| 12/103,591 | 8606856 | US | DIGITAL MEDIA ASSET IDENTIFICATION SYSTEM AND METHOD |
| 13/603,372 | 8626838 | US | DIGITAL MEDIA ASSET IDENTIFICATION SYSTEM & METHOD |
| 13/110,819 | 8649314 | US | PEER-TO-PEER MOBILE DATA TRANSFER METHOD AND DEVICE |
| 13/210,089 | 8706636 | US | SYSTEM & METHOD FOR UNIQUE DIGITAL ASSET IDENTIFICATION AND TRANSACTION MANAGEMENT |
| 13/759,950 | 8774149 | US | METHOD FOR ESTABLISHING NETWORK CONNECTIONS BETWEEN STATIONARY TERMINALS AND REMOTE DEVICES THROUGH MOBILE DEVICES |
| 12/398,102 | 8972880 | US | APPLICATION PROGRAMMING INTERFACE FOR TRANSFERRING CONTENT FROM THE WEB TO DEVICES |
| 09/878,684 | 6664891 | US | DATA DELIVERY THROUGH PORTABLE DEVICES |
| 09/876,514 | 6993049 | US | COMMUNICATION SYSTEM |
| 12/896,686 | 8194632 | US | METHOD FOR ESTABLISHING NETWORK CONNECTIONS BETWEEN STATIONARY TERMINALS AND REMOTE DEVICES THROUGH MOBILE DEVICES |
| 13/193,579 | 8406116 | US | MOBILE CONFERENCING METHOD AND SYSTEM |
| 10/151,087 | 7167487 | US | NETWORK WITH LOGIC CHANNELS AND TRANSPORT CHANNELS |
| 09/455,124 | 6868079 | US | RADIO COMMUNICATION SYSTEM WITH REQUEST RE-TRANSMISSION UNTIL ACKNOWLEDGED |
| 09/739,507 | 6836654 | US | ANTI-THEFT PROTECTION FOR A RADIOTELEPHONY DEVICE |
| 08/742,688 | 5960366 | US | WRIST-WATCH WIRELESS TELEPHONE |
| 09/876,515 | 7587207 | US | DATA DELIVERY THROUGH BEACONS |
| 09/597,198 | 7136999 | US | METHOD AND SYSTEM FOR ELECTRONIC DEVICE AUTHENTICATION |
| 10/323,228 | 6985758 | US | MOBILE DEVICE POWER SAVING |

Exhibit A-17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/739,474 | 6901272 | US | ERGONOMIC SYSTEM FOR CONTROL OF DEVICES THROUGH PORTABLE WIRELESS TERMINALS |
| 13/079,767 | 8018877 | US | MOBILE CONFERENCING METHOD AND SYSTEM |
| 09/920,041 | 7020106 | US | RADIO COMMUNICATION SYSTEM |
| 07/965,956 | 5483468 | US | SYSTEM AND METHOD FOR CONCURRENT RECORDING AND DISPLAYING OF SYSTEM PERFORMANCE DATA |
| 08/348,071 | 5619526 | US | CDMA BASE STATION MODULATOR FOR DIGITAL CELLULAR MOBILE COMMUNICATION SYSTEMS |
| 08/665,868 | 5639677 | US | METHOD OF MAKING A GAAS POWER SEMICONDUCTOR DEVICE OPERATING AT A LOW VOLTAGE |
| 08/353,044 | 5657421 | US | SPEECH SIGNAL TRANSMITTER WHEREIN CODING IS MAINTAINED DURING SPEECH PAUSES DESPITE SUBSTANTIAL SHUTDOWN OF THE TRANSMITTER |
| 08/634,635 | 5659687 | US | DEVICE FOR CONTROLLING MEMORY DATA PATH IN PARALLEL PROCESSING COMPUTER SYSTEM |
| 08/438,153 | 5692125 | US | SYSTEM AND METHOD FOR SCHEDULING LINKED EVENTS WITH FIXED AND DYNAMIC CONDITIONS |
| 08/673,882 | 5774673 | US | SYSTEM FOR COMMUNICATING BETWEEN A DYNAMIC GROUP OF APPARATUSES |
| 08/544,571 | 5835849 | US | CELLULAR MOBILE RADIO SYSTEM COMPRISING SUB-CELLS |
| 09/027,599 | 5936393 | US | LINE DRIVER WITH ADAPTIVE OUTPUT IMPEDANCE |
| 08/888,355 | 5940295 | US | DISTRIBUTED EXECUTION PROCESS FOR AN INTERACTIVE MULTIMEDIA PROGRAM, AND A LOCAL STATION USING THIS METHOD |
| 08/742,674 | 5949351 | US | REMOTE CONTROL METHOD AND SYSTEM THEREFOR |
| 09/079,478 | 5970318 | US | FABRICATION METHOD OF AN ORGANIC ELECTROLUMINESCENT DEVICES |
| 08/974,199 | 6008743 | US | METHOD AND APPARATUS FOR SWITCHING BETWEEN DATA COMPRESSION MODES |
| 08/280,271 | 6052108 | US | METHOD OF DISPLAYING TEXT HAVING IMPROVED USABILITY |
| 09/007,818 | 6058437 | US | D.M.A. DEVICE THAT HANDLES CACHE MISSES BY MANAGING AN ADDRESS OF AN AREA OF ALLOTTED VIA A DAEMON PROCESSOR |
| 08/977,826 | 6067333 | US | ADAPTIVE SERIAL AND PARALLEL MIXED INTERFERENCE CANCELLATION METHOD |

Exhibit A-18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/022,910 | 6070169 | US | METHOD AND SYSTEM FOR THE DETERMINATION OF A PARTICULAR DATA OBJECT UTILIZING ATTRIBUTES ASSOCIATED WITH THE OBJECT |
| 08/992,291 | 6084982 | US | METHOD OF CHROMA-KEYING FOR A DIGITAL VIDEO COMPRESSION SYSTEM |
| 09/136,733 | 6127952 | US | VIDEO DATA RECORDING APPARATUS |
| 09/139,726 | 6138234 | US | NODE BOOTING METHOD IN HIGH-SPEED PARALLEL COMPUTER |
| 09/603,495 | 6148029 | US | METHOD OF VARIABLE-LENGTH ENCODING OF IMAGES AND DEVICE FOR PERFORMING SAID |
| 09/122,755 | 6150187 | US | ENCAPSULATION METHOD OF A POLYMER OR ORGANIC LIGHT EMITTING DEVICE |
| 08/738,988 | 6154468 | US | FAST SYNC-BYTE SEARCH SCHEME FOR PACKET FRAMING |
| 08/977,989 | 6154496 | US | VIDEO BUFFER FOR SEAMLESS SPLICING OF MPEG STREAMS |
| 08/959,215 | 6169790 | US | METHOD OF RESTRICTING THE DURATION OF TELEPHONE CALLS AND TELEPHONE IMPLEMENTING SUCH A METHOD |
| 09/135,860 | 6178512 | US | WIRELESS NETWORK |
| 09/116,063 | 6190314 | US | COMPUTER INPUT DEVICE WITH BIOSENSORS FOR SENSING USER EMOTIONS |
| 09/116,903 | 6195388 | US | APPARATUS AND METHOD FOR ENCODING MULTIPLE VIDEO PROGRAMS |
| 08/770,024 | 6198728 | US | MEDIUM ACCESS CONTROL (MAC) PROTOCOL FOR WIRELESS ATM |
| 09/134,108 | 6198909 | US | COMMUNICATION ENVIRONMENT WITH PLURALITY OF RADIO SYSTEMS |
| 09/047,682 | 6201958 | US | TELECOMMUNICATIONS SYSTEM, MOBILE TERMINAL AND METHOD OF REGISTRATION OF A TERMINAL WITH A TELECOMMUNICATIONS NETWORK |
| 09/475,281 | 6211018 | US | METHOD FOR FABRICATING HIGH DENSITY TRENCH GATE TYPE POWER DEVICE |
| 09/096,698 | 6215488 | US | METHOD AND SYSTEM FOR DESIGNING A GRAPHICAL USER INTERFACE FOR AN ELECTRONIC CONSUMER PRODUCT |
| 09/197,315 | 6226636 | US | SYSTEM FOR RETRIEVING IMAGES USING A DATABASE |
| 09/139,203 | 6237072 | US | MEMORY MANAGEMENT WITH COMPACTION OF DATA BLOCKS |
| 09/123,019 | 6249515 | US | MULTIPLE ACCESS CONTROL METHOD FOR GUARANTEEING QOS REQUIREMENT |

Exhibit A-19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/030,344 | 6263091 | US | SYSTEM AND METHOD FOR IDENTIFYING FOREGROUND AND BACKGROUND PORTIONS OF DIGITIZED IMAGES |
| 09/070,322 | 6282318 | US | A METHOD AND SYSTEM FOR COMBINING PATTERN MATCHING AND OPTIMIZATION |
| 09/207,835 | 6282322 | US | SYSTEM AND METHOD FOR COMPRESSING AND DECOMPRESSING IMAGES |
| 09/428,403 | 6284605 | US | METHOD FOR FABRICATING SEMICONDUCTOR POWER INTEGRATED CIRCUIT |
| 09/236,688 | 6285805 | US | SYSTEM AND METHOD FOR FINDING THE DISTANCE FROM A MOVING QUERY POINT TO THE CLOSEST POINT ON ONE OR MORE CONVEX OR NON-CONVEX SHAPES |
| 09/198,708 | 6285892 | US | DATA TRANSMISSION SYSTEM FOR REDUCING TERMINAL POWER CONSUMPTION IN A WIRELESS NETWORK |
| 09/030,438 | 6289112 | US | SYSTEM AND METHOD FOR DETERMINING BLOCK DIRECTION IN FINGERPRINT IMAGES |
| 09/253,084 | 6295375 | US | METHOD AND DEVICE FOR CODING A SEQUENCE OF PICTURES |
| 09/710,821 | 6297820 | US | METHOD AND SYSTEM FOR DESIGNING A GRAPHICAL USER INTERFACE FOR AN ELECTRONIC CONSUMER PRODUCT |
| 09/316,985 | 6304612 | US | TRANSMISSION SYSTEM HAVING A SIMPLIFIED CHANNEL DECODER |
| 09/170,469 | 6314436 | US | SPACE-LIMITED MARKING STRUCTURE FOR TRACING GARBAGE COLLECTORS |
| 09/240,214 | 6317834 | US | BIOMETRIC AUTHENTICATION SYSTEM WITH ENCRYPTED MODELS |
| 09/039,347 | 6327272 | US | DATA TRANSFER SYSTEM, TRANSMITTER AND RECEIVER |
| 09/424,607 | 6329934 | US | MODIFYING DATA WHICH HAS BEEN CODED |
| 09/337,844 | 6338073 | US | FINALIZATION IN INCREMENTAL GARBAGE COLLECTORS |
| 09/338,150 | 6339779 | US | REFERENCE COUNTING MECHANISM FOR GARBAGE COLLECTORS |
| 08/397,292 | 6341276 | US | SYSTEM FOR SELECTING A COMPUTER SOLUTION FROM A PRE-DEFINED SET |
| 09/086,270 | 6347084 | US | METHOD OF TIMESTAMP SYNCHRONIZATION OF A RESERVATION-BASED TDMA PROTOCOL |
| 09/259,956 | 6349040 | US | ELECTRONIC DEVICE WITH A VARIABLE KEYBOARD |
| 09/276,876 | 6351561 | US | GENERATING DECISION-TREE CLASSIFIERS WITH OBLIQUE HYPERPLANES |
| 09/335,019 | 6360233 | US | DYNAMIC MEMORY SPACE ALLOCATION |

Exhibit A-20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/318,331 | 6363513 | US | TRANSMISSION SYSTEM WITH ADAPTIVE CHANNEL ENCODER AND DECODER |
| 09/160,003 | 6370117 | US | CHANNEL ALLOCATION METHODS IN A COMMUNICATION NETWORK AND CORRESPONDING SYSTEM |
| 09/280,107 | 6370595 | US | METHOD OF ADDRESSING A PLURALITY OF ADDRESSABLE UNITS BY A SINGLE ADDRESS WORD |
| 09/107,526 | 6377549 | US | CALL ADMISSION CONTROL SYSTEM FOR WIRELESS ATM NETWORKS |
| 09/343,910 | 6381471 | US | DUAL BAND RADIO TELEPHONE WITH DEDICATED RECEIVE AND TRANSMIT ANTENNAS |
| 09/287,428 | 6388715 | US | TELEVISION RECEIVER |
| 09/220,292 | 6389072 | US | MOTION ANALYSIS BASED BUFFER REGULATION SCHEME |
| 09/186,249 | 6393155 | US | ERROR REDUCTION IN TRANSFORMED DIGITAL DATA |
| 09/337,845 | 6393439 | US | STORED DATA OBJECT MARKING FOR GARBAGE COLLECTORS |
| 09/456,899 | 6405027 | US | GROUP CALL FOR A WIRELESS MOBILE COMMUNICATION DEVICE USING BLUETOOTH |
| 09/070,216 | 6407993 | US | FLEXIBLE TWO-WAY TELECOMMUNICATION SYSTEM |
| 09/328,968 | 6408293 | US | AN INTERACTIVE FRAMEWORK FOR UNDERSTANDING USER'S PERCEPTION OF MULTIMEDIA DATA |
| 09/177,962 | 6412013 | US | SYSTEM FOR CONTROLLING DATA OUTPUT TO A NETWORK |
| 09/819,285 | 6424323 | US | ELECTRONIC DEVICE HAVING A DISPLAY |
| 09/475,050 | 6424344 | US | APPARATUS FOR PROVIDING A VISUAL NAVIGATION INTERFACE |
| 09/474,090 | 6438361 | US | APPARATUS AND METHOD FOR AUTOMATIC SELECTION OF BROADBAND FREQUENCY CHANNEL USING DOUBLE FREQUENCY CONVERSION |
| 09/559,896 | 6442204 | US | VIDEO ENCODING METHOD AND SYSTEM |
| 09/417,660 | 6445387 | US | INTERFACE METHOD FOR SEARCHING VIRTUAL SPACE BASED ON BODY ICON |
| 09/467,591 | 6445921 | US | CALL RE-ESTABLISHMENT FOR A DUAL MODE TELEPHONE |
| 09/548,112 | 6452515 | US | VIDEO ENCODER AND DECODER |
| 08/994,873 | 6453416 | US | SECURE PROXY SIGNING DEVICE AND METHOD OF USE |
| 09/583,942 | 6458080 | US | MANAGING PARAMETERS EFFECTING THE COMPREHENSIVE HEALTH OF A USER |
| 09/404,716 | 6463174 | US | MACROBLOCK-BASED SEGMENTATION AND BACKGROUND MOSAICKING METHOD |

Exhibit A-21

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/003,988 | 6466686 | US | SYSTEM AND METHOD FOR TRANSFORMING FINGERPRINTS TO IMPROVE RECOGNITION |
| 09/343,607 | 6467088 | US | RECONFIGURATION MANAGER FOR CONTROLLING UPGRADES OF ELECTRONIC DEVICES |
| 09/833,848 | 6469665 | US | TIME OF ARRIVAL ESTIMATION POSITIONING SYSTEMS |
| 09/264,060 | 6470006 | US | TIMING CONTROL OF TRANSMISSION TIME SLOT |
| 09/477,771 | 6470345 | US | REPLACEMENT OF SUBSTRINGS IN FILE/DIRECTORY PATHNAMES WITH NUMERIC TOKENS |
| 09/203,786 | 6483881 | US | METHOD OF REDUCING COMPLEXITY USING STATISTICS OF PATH METRICS IN A TRELLIS DECODER |
| 09/030,595 | 6487306 | US | SYSTEM AND METHOD FOR DERIVING A STRING-BASED REPRESENTATION OF AN (FINGERPRINT) IMAGE |
| 09/533,485 | 6487563 | US | MEMORY RECLAMATION METHOD |
| 09/537,821 | 6502110 | US | MEMORY RECLAMATION METHOD AND APPARATUS |
| 09/318,324 | 6512929 | US | TELECOMMUNICATION ASSEMBLY |
| 08/826,616 | 6515688 | US | VIEWER INTERACTIVE THREE-DIMENSIONAL WORKSPACE WITH A TWO-DIMENSIONAL WORKPLANE CONTAINING INTERACTIVE TWO-DIMENSIONAL IMAGES |
| 09/303,316 | 6519005 | US | METHOD OF CONCURRENT MULTIPLE-MODE MOTION ESTIMATION FOR DIGITAL VIDEO |
| 09/537,822 | 6526421 | US | METHOD OF SCHEDULING GARBAGE COLLECTION |
| 09/533,487 | 6567469 | US | MOTION ESTIMATION ALGORITHM SUITABLE FOR H.261 VIDEOCONFERENCING APPLICATIONS |
| 09/527,198 | 6571260 | US | MEMORY RECLAMATION METHOD |
| 09/497,138 | 6584229 | US | MACROBLOCK-BASED OBJECT-ORIENTED CODING METHOD OF IMAGE SEQUENCE HAVING A STATIONARY BACKGROUND |
| 09/182,698 | 6584423 | US | METHOD OF COMMUNICATION BETWEEN REMOTE TERMINALS AND A CENTRAL STATION |
| 09/826,027 | 6590125 | US | BLUE LIGHT-EMITTING POLYMER PREPARED USING A FLUORINATED TETRAPHENYL MONOMER AND AN EL DEVICE MANUFACTURED USING THE POLYMER |
| 09/209,064 | 6590903 | US | METHOD FOR THE TRANSMISSION OF AN ASYNCHRONOUS DATA STREAM VIA A SYNCHRONOUS DATA BUS, AND CIRCUIT ARRANGEMENT FOR CARRYING OUT THE METHOD |

Exhibit A-22

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/394,556 | 6598020 | US | ADAPTIVE EMOTION AND INITIATIVE GENERATOR FOR CONVERSATIONAL SYSTEMS |
| 09/425,658 | 6600902 | US | MULTIPLE LINK DATA OBJECT CONVEYING METHOD FOR CONVEYING DATA OBJECTS TO WIRELESS STATIONS |
| 09/422,371 | 6603740 | US | LOCAL AREA NETWORK WITH A BRIDGE TERMINAL FOR TRANSMITTING DATA BETWEEN A PLURALITY OF SUB-NETWORKS AND FOR LOOP DETECTION |
| 09/786,292 | 6615335 | US | COMPRESSED STORAGE OF INFORMATION |
| 09/709,260 | 6618445 | US | SCALABLE MPEG-2 VIDEO DECODER |
| 09/712,678 | 6631163 | US | DYNAMIC ADAPTATION OF COMPLEXITY IN AN MPEG-2 SCALABLE DECODER |
| 09/422,736 | 6650648 | US | AUTOMATIC CONFIGURATION OF A BRIDGE TERMINAL FOR TRANSMITTING DATA BETWEEN A PLURALITY OF SUB-NETWORKS IN A LOCAL AREA NETWORK |
| 09/394,803 | 6658388 | US | PERSONALITY GENERATOR FOR CONVERSATIONAL SYSTEMS |
| 09/607,597 | 6678535 | US | PERVASIVE DOCK AND ROUTER WITH COMMUNICATION PROTOCOL CONVERTER |
| 09/960,188 | 6678613 | US | METHOD AND APPARATUS FOR NOTIFYING A USER OF AN APPOINTMENT |
| 09/377,361 | 6707858 | US | LOW IF RECEIVER |
| 09/282,638 | 6711294 | US | METHOD AND APPARATUS FOR REDUCING IMAGE DATA STORAGE AND PROCESSING BASED ON DEVICE SUPPORTED COMPRESSION TECHNIQUES |
| 09/616,229 | 6754373 | US | SYSTEM AND METHOD FOR MICROPHONE ACTIVATION USING VISUAL SPEECH CUES |
| 09/694,448 | 6766341 | US | FASTER TRANSFORMS USING SCALED TERMS |
| 10/226,963 | 6771193 | US | SYSTEM AND METHODS FOR EMBEDDING ADDITIONAL DATA IN COMPRESSED DATA STREAMS |
| 10/184,513 | 6774928 | US | MOBILE FOR VIDEO-CONFERENCING |
| 10/285,131 | 6798362 | US | POLYNOMIAL-TIME, SEQUENTIAL, ADAPTIVE SYSTEM AND METHOD FOR LOSSY DATA COMPRESSION |
| 10/077,061 | 6807604 | US | METHOD OF REFRESHING A DYNAMIC MEMORY |
| 10/234,888 | 6809662 | US | MODULATION CODE SYSTEM AND METHODS OF ENCODING AND DECODING A SIGNAL BY MULTIPLE INTEGRATION |
| 09/732,196 | 6809775 | US | TV RECEIVER APPARATUS AND RELATED METHOD |
| 09/996,003 | 6810083 | US | METHOD AND SYSTEM FOR ESTIMATING OBJECTIVE QUALITY OF COMPRESSED VIDEO DATA |

Exhibit A-23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 09/730,675 | 6810089 | US | BLOCK DETECTION METHOD FOR A CHANNEL SUBJECTED TO FADING |
| 10/186,646 | 6813692 | US | RECEIVER APPARATUS AND METHOD |
| 09/595,935 | 6836554 | US | SYSTEM AND METHOD FOR DISTORTING A BIOMETRIC FOR TRANSACTIONS WITH ENHANCED SECURITY AND PRIVACY |
| 10/011,880 | 6844878 | US | MEDIA PROCESSING REDUCTION IN HIDDEN AREAS |
| 09/699,609 | 6850948 | US | METHOD AND APPARATUS FOR COMPRESSING TEXTUAL DOCUMENTS |
| 09/773,422 | 6865387 | US | SOFTWARE RECONFIGURATION OF COMMUNICATIONS APPARATUS |
| 09/585,827 | 6876691 | US | METHOD OF AND RECEIVER FOR FREQUENCY ACQUISITION IN A FREQUENCY HOPPING SYSTEM |
| 10/082,872 | 6877068 | US | METHOD AND DEVICE FOR PREFETCHING A REFERENCED RESOURCE |
| 09/995,489 | 6882991 | US | SEARCH METHOD IN A HIERARCHICAL OBJECT STRUCTURE |
| 09/822,435 | 6891892 | US | MPEG-2 DECODER WITH AN EMBEDDED CONTRAST ENHANCEMENT FUNCTION AND METHODS THEREFOR |
| 10/086,741 | 6895118 | US | METHOD OF CODING DIGITAL IMAGES BASED ON ERROR CONCEALMENT |
| 10/057,670 | 6907074 | US | APPARATUS AND METHOD FOR PERFORMING MIXED MOTION ESTIMATION BASED ON HIERARCHICAL SEARCH |
| 09/823,486 | 6909746 | US | FAST ROBUST DATA COMPRESSION METHOD AND SYSTEM |
| 09/811,637 | 6910207 | US | METHOD OF EXECUTING A COMPUTER PROGRAM WITH AN INTERPRETER, COMPUTER SYSTEM AND COMPUTER PROGRAM PRODUCT |
| 09/734,782 | 6912579 | US | SYSTEM AND METHOD FOR CONTROLLING AN APPARATUS HAVING A DEDICATED USER INTERFACE FROM A BROWSER |
| 09/165,683 | 6918123 | US | CALLS IDENTIFY SCENARIO FOR CONTROL OF SOFTWARE OBJECTS VIA PROPERTY ROUTES |
| 09/837,036 | 6925126 | US | DYNAMIC COMPLEXITY PREDICTION AND REGULATION OF MPEG2 DECODING IN A MEDIA PROCESSOR |
| 10/029,811 | 6925197 | US | METHOD AND SYSTEM FOR NAME-FACE/VOICE-ROLE ASSOCIATION |
| 10/331,915 | 6926572 | US | FLAT PANEL DISPLAY DEVICE AND METHOD OF FORMING PASSIVATION FILM IN THE FLAT PANEL DISPLAY DEVICE |
| 08/901,338 | 6944221 | US | BUFFER MANAGEMENT IN VARIABLE BIT-RATE COMPRESSION SYSTEMS |

Exhibit A-24

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/119,852 | 6944229 | US | APPARATUS AND METHOD FOR MPEG DECODING USING DYNAMIC FREQUENCY AND VOLTAGE SCALING |
| 10/024,611 | 6944579 | US | SIGNAL SEPARATION METHOD, SIGNAL PROCESSING APPARATUS, IMAGE PROCESSING APPARATUS, MEDICAL IMAGE PROCESSING APPARATUS AND STORAGE MEDIUM FOR RESTORING MULTIDIMENSIONAL SIGNALS FROM OBSERVED DATA IN WHICH MULTIPLE SIGNALS ARE MIXED |
| 10/456,501 | 6945869 | US | APPARATUS AND METHOD FOR VIDEO BASED SHOOTING GAME |
| 10/637,843 | 6946995 | US | MICROSTRIP PATCH ANTENNA AND ARRAY ANTENNA USING SUPERTRATE |
| 10/077,059 | 6952450 | US | UNEQUAL ERROR PROTECTION OF VIDEO BASED ON MOTION VECTOR CHARACTERISTICS |
| 09/552,650 | 6954634 | US | RECONFIGURABLE COMMUNICATION NETWORK |
| 10/323,227 | 6961594 | US | MOBILE DEVICE POWER SAVING |
| 09/891,430 | 6963756 | US | ELECTRONIC EQUIPMENT COMPRISING A RETRACTABLE SCREEN |
| 09/481,771 | 6964048 | US | METHOD FOR DYNAMIC LOANING IN RATE MONOTONIC REAL-TIME SYSTEMS |
| 09/571,456 | 6965582 | US | CELLULAR RADIO COMMUNICATION SYSTEM |
| 10/121,583 | 6965699 | US | CAMERA INFORMATION CODING/DECODING METHOD FOR SYNTHESIZING STEREOSCOPIC REAL VIDEO AND A COMPUTER GRAPHIC IMAGE |
| 09/822,457 | 6967944 | US | INCREASING LINK CAPACITY VIA CONCURRENT TRANSMISSIONS IN CENTRALIZED WIRELESS LANS |
| 09/730,655 | 6967968 | US | COMMUNICATION NETWORK HAVING MINIMIZED ROUNDTRIP CONTENTION DELAY |
| 10/334,837 | 6970149 | US | ACTIVE MATRIX ORGANIC LIGHT EMITTING DIODE DISPLAY PANEL CIRCUIT |
| 10/041,937 | 6980112 | US | EMERGENCY CALL PATIENT LOCATING SYSTEM FOR IMPLANTED AUTOMATIC DEFIBRILLATORS |
| 10/334,409 | 6980351 | US | ELECTROPHORETIC DISPLAY |
| 09/797,085 | 6980522 | US | AD-HOC RADIO COMMUNICATION SYSTEM |
| 09/806,091 | 6983013 | US | METHOD AND DEVICE FOR ENCODING VIDEO SIGNAL |
| 09/914,240 | 6985526 | US | SNR SCALABLE VIDEO ENCODING METHOD AND CORRESPONDING DECODING METHOD |

Exhibit A-25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/127,528 | 6985635 | US | SYSTEM AND METHOD FOR PROVIDING A SINGLE-LAYER VIDEO ENCODED BITSTREAMS SUITABLE FOR REDUCED-COMPLEXITY DECODING |
| 10/033,649 | 6988067 | US | LSF QUANTIZER FOR WIDEBAND SPEECH CODER |
| 09/460,944 | 6988276 | US | IN-HOUSE TV TO TV CHANNEL PEEKING |
| 10/743,459 | 6992637 | US | SLOT ANTENNA HAVING SLOTS FORMED ON BOTH SIDES OF DIELECTRIC SUBSTRATE |
| 10/109,772 | 6993182 | US | METHOD AND APPARATUS FOR DETECTING SCENE CHANGES IN VIDEO USING A HISTOGRAM OF FRAME DIFFERENCES |
| 10/146,399 | 6999515 | US | ENCODING BLOCK-ORGANIZED DATA |
| 10/038,987 | 7003497 | US | SYSTEM AND METHOD FOR CONFIRMING ELECTRONIC TRANSACTIONS |
| 10/267,705 | 7006701 | US | SEQUENTIAL DIGITAL IMAGE COMPRESSION |
| 09/840,812 | 7010034 | US | VIDEO COMPRESSION |
| 10/082,860 | 7012960 | US | METHOD OF TRANSCODING AND TRANSCODING DEVICE WITH EMBEDDED FILTERS |
| 10/255,327 | 7016668 | US | METHOD AND APPARATUS FOR A RECONFIGURABLE MULTI-MEDIA SYSTEM |
| 10/089,959 | 7016676 | US | METHOD, NETWORK AND CONTROL STATION FOR THE TWO-WAY ALTERNATE CONTROL OF RADIO SYSTEMS OF DIFFERENT STANDARDS IN THE SAME FREQUENCY BAND |
| 10/014,190 | 7020336 | US | IDENTIFICATION AND EVALUATION OF AUDIENCE EXPOSURE TO LOGOS IN A BROADCAST EVENT |
| 09/718,246 | 7034866 | US | COMBINED DISPLAY-CAMERA FOR AN IMAGE PROCESSING SYSTEM |
| 09/962,659 | 7039585 | US | METHOD AND SYSTEM FOR SEARCHING RECORDED SPEECH AND RETRIEVING RELEVANT SEGMENTS |
| 11/024,568 | 7042401 | US | TRAPEZOID ULTRA WIDE BAND PATCH ANTENNA |
| 10/043,053 | 7047309 | US | LOAD BALANCING AND DYNAMIC CONTROL OF MULTIPLE DATA STREAMS IN A NETWORK |
| 09/944,306 | 7049954 | US | DATA TRANSMISSION SYSTEM |
| 10/033,806 | 7051120 | US | HEALTHCARE PERSONAL AREA IDENTIFICATION NETWORK METHOD AND SYSTEM |
| 10/653,804 | 7054470 | US | SYSTEM AND METHOD FOR DISTORTION CHARACTERIZATION IN FINGERPRINT AND PALM-PRINT IMAGE SEQUENCES AND USING THIS DISTORTION AS A BEHAVIORAL BIOMETRICS |

Exhibit A-26

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/172,416 | 7054497 | US | METHOD AND SYSTEM FOR OPTIMIZING IMAGE SHARPNESS DURING CODING AND IMAGE ENHANCEMENT |
| 09/961,995 | 7058083 | US | NETWORK INTERFACE DRIVER AND METHOD |
| 09/933,552 | 7058879 | US | DATA TRANSMISSION SYSTEM, EQUIPMENT SUITABLE FOR SUCH A SYSTEM AND DATA TRANSMISSION METHOD |
| 10/169,346 | 7058951 | US | METHOD AND A SYSTEM FOR ALLOCATION OF A BUDGET TO A TASK |
| 10/359,710 | 7072513 | US | METHOD OF SEGMENTING HANDWRITTEN TOUCHING NUMERAL STRINGS HAVING NON-VERTICAL SEGMENTATION LINE |
| 10/513,012 | 7072671 | US | RADIO SYSTEM, APPARATUS, AND METHOD OF OPERATING THE RADIO SYSTEM |
| 09/973,312 | 7075917 | US | WIRELESS NETWORK WITH A DATA EXCHANGE ACCORDING TO THE ARQ METHOD |
| 10/184,875 | 7079670 | US | APPARATUS AND METHOD FOR AUTHENTICATING A USER BY EMPLOYING FEATURE POINTS OF A FINGERPRINT IMAGE OF THE USER |
| 10/155,211 | 7092448 | US | METHOD AND SYSTEM FOR ESTIMATING NO-REFERENCE OBJECTIVE QUALITY OF VIDEO DATA |
| 09/838,010 | 7092549 | US | METHOD AND APPARATUS FOR REMOVING DEFECTS IN AN IMAGE SEQUENCE |
| 10/175,413 | 7092694 | US | WIRELESS COMMUNICATION SYSTEM HAVING A GUEST TRANSMITTER AND A HOST RECEIVER |
| 09/942,634 | 7093298 | US | APPARATUS AND METHOD FOR SECURITY OBJECT ENHANCEMENT AND MANAGEMENT |
| 09/810,015 | 7095328 | US | SYSTEM AND METHOD FOR NON INTRUSIVE MONITORING OF AT RISK INDIVIDUALS |
| 10/749,606 | 7099686 | US | MICROSTRIP PATCH ANTENNA HAVING HIGH GAIN AND WIDEBAND |
| 09/730,679 | 7103070 | US | TRANSMISSION SYSTEM COMPRISING A STATION OF A FIRST TYPE AND A STATION OF A SECOND TYPE AND SYNCHRONIZATION METHOD |
| 10/153,256 | 7103340 | US | ANTENNA DIVERSITY ARRANGEMENT |
| 10/650,406 | 7106264 | US | BROADBAND SLOT ANTENNA AND SLOT ARRAY ANTENNA USING THE SAME |
| 10/124,009 | 7107111 | US | TRICK PLAY FOR MP3 |
| 10/065,802 | 7107445 | US | METHOD AND APPARATUS FOR SECURE PROCESSING OF SENSITIVE DATA |

Exhibit A-27

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/298,968 | 7110047 | US | SIGNIFICANT SCENE DETECTION AND FRAME FILTERING FOR A VISUAL INDEXING SYSTEM USING DYNAMIC THRESHOLDS |
| 10/080,184 | 7110366 | US | APPARATUS AND METHOD FOR PEER-TO-PEER LINK MONITORING OF A WIRELESS NETWORK WITH CENTRALIZED CONTROL |
| 09/822,452 | 7113074 | US | METHOD AND SYSTEM FOR AUTOMATICALLY CONTROLLING A PERSONALIZED NETWORKED ENVIRONMENT |
| 10/202,660 | 7117258 | US | METHOD AND APPARATUS FOR ASSIGNING IP ADDRESS USING AGENT IN ZERO CONFIGURATION NETWORK |
| 10/078,936 | 7120209 | US | REDUCED COMPLEXITY INTERCARRIER INTERFERENCE CANCELLATION |
| 09/877,344 | 7123658 | US | SYSTEM AND METHOD FOR CREATING MULTI-PRIORITY STREAMS |
| 09/449,250 | 7123745 | US | METHOD AND APPARATUS FOR DETECTING MOVING OBJECTS IN VIDEO CONFERENCING AND OTHER APPLICATIONS |
| 09/806,565 | 7137126 | US | CONVERSATIONAL COMPUTING VIA CONVERSATIONAL VIRTUAL MACHINE |
| 10/059,441 | 7139017 | US | METHOD AND SYSTEM FOR OBTAINING THE BEST PICTURE QUALITY IN A SCARCE-POWER DEVICE |
| 10/124,061 | 7149159 | US | METHOD AND APPARATUS FOR EDITING DATA STREAMS |
| 10/024,779 | 7151767 | US | METHOD AND APPARATUS FOR SYNCHRONIZING FREQUENCY HOPPING TRANSCEIVERS |
| 10/082,858 | 7151916 | US | METHOD OF RECEIVING A SIGNAL AND A RECEIVER |
| 10/029,825 | 7164671 | US | OVERLAPPING NETWORK ALLOCATION VECTOR (ONAV) FOR AVOIDING COLLISION IN THE IEEE 802.11 WLAN OPERATING UNDER HCF |
| 09/773,418 | 7167454 | US | RADIO COMMUNICATION SYSTEM |
| 10/957,749 | 7170355 | US | VOLTAGE-CONTROLLED OSCILLATOR USING CURRENT FEEDBACK NETWORK |
| 10/028,378 | 7170566 | US | FAMILY HISTOGRAM BASED TECHNIQUES FOR DETECTION OF COMMERCIALS AND OTHER VIDEO CONTENT |
| 10/257,204 | 7171169 | US | NETWORK WITH ADAPTATION OF THE MODULATION METHOD |
| 09/929,118 | 7171206 | US | METHOD AND SYSTEM FOR TRANSFERRING A COMMUNICATION SESSION |
| 10/480,660 | 7174135 | US | WIDEBAND SIGNAL TRANSMISSION SYSTEM |

Exhibit A-28

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/147,974 | 7177345 | US | DEMODULATING DEVICE AND METHOD FOR W-CDMA BASE STATION |
| 11/180,726 | 7183149 | US | METHOD OF MANUFACTURING FIELD EFFECT TRANSISTOR |
| 10/477,871 | 7190408 | US | TV-RECEIVER, IMAGE DISPLAY APPARATUS, TV-SYSTEM AND METHOD FOR DISPLAYING AN IMAGE |
| 10/135,337 | 7193989 | US | RADIO COMMUNICATION ARRANGEMENTS |
| 10/135,353 | 7193991 | US | RADIO COMMUNICATION ARRANGEMENTS |
| 10/211,416 | 7194018 | US | APPARATUS FOR SEARCHING MULTIPATH IN SPREAD SPECTRUM COMMUNICATIONS SYSTEM AND METHOD THEREOF |
| 10/621,461 | 7197598 | US | APPARATUS AND METHOD FOR FILE-LEVEL STRIPING |
| 09/923,868 | 7206285 | US | METHOD FOR SUPPORTING NON-LINEAR, HIGHLY SCALABLE INCREASE-DECREASE CONGESTION CONTROL SCHEME |
| 10/330,800 | 7215635 | US | APPARATUS FOR TRANSMITTING AND RECEIVING SIGNAL USING ORTHOGONAL CODES AND NON-BINARY VALUES IN CDMA/OFDM SYSTEM AND METHOD THEREOF |
| 09/855,115 | 7215706 | US | VIDEO SIGNAL ENCODING AND BUFFER MANAGEMENT |
| 09/819,279 | 7227579 | US | LIGHT MODULATION REMOVER |
| 10/523,619 | 7230579 | US | DIRECTIONAL DUAL FREQUENCY ANTENNA ARRANGEMENT |
| 10/182,158 | 7242719 | US | A METHOD AND APPARATUS FOR SPACE-SAVING-VARIABLE LENGTH ENCODING AND DECODING |
| 10/119,577 | 7245592 | US | ALIGNING 802.11E HCF AND 802.11H TPC OPERATIONS |
| 10/547,585 | 7283832 | US | METHOD AND SYSTEM FOR ESTABLISHING WIRELESS PEER-TO-PEER COMMUNICATIONS |
| 10/547,586 | 7286841 | US | METHOD AND SYSTEM FOR MAINTAINING UPLINK SYNCHRONIZATION WITH PEER-TO-PEER COMMUNICATION IN WIRELESS COMMUNICATION SYSTEM |
| 10/551,312 | 7308266 | US | METHOD AND SYSTEM FOR PEER-TO-PEER COMMUNICATION MANAGEMENT IN WIRELESS COMMUNICATION NETWORKS |
| 10/264,904 | 7308466 | US | MEMORY RECLAMATION METHOD |
| 11/182,927 | 7502335 | US | METHOD FOR ALLOCATING IP ADDRESSES FOR PEER-TO-PEER WIRELESS INSTANT MESSAGING AND OTHER DATA COMMUNICATIONS |
| 11/091,242 | 7672255 | US | MOBILE INSTANT MESSAGING CONFERENCING METHOD AND SYSTEM |
| 10/544,773 | 7681227 | US | GENERATION OF ENCRYPTED VIDEO INFORMATION |

Exhibit A-29

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 10/562,538 | 7738778 | US | SYSTEM AND METHOD FOR GENERATING A MULTIMEDIA SUMMARY OF MULTIMEDIA STREAMS |
| 11/042,620 | 7773550 | US | PEER-TO-PEER MOBILE DATA TRANSFER METHOD AND DEVICE |
| 11/288,505 | 7817606 | US | METHOD FOR ESTABLISHING NETWORK CONNECTIONS BETWEEN STATIONARY TERMINALS AND REMOTE DEVICES THROUGH MOBILE DEVICES |
| 11/776,420 | 7853500 | US | SYSTEM AND METHOD FOR DETERMINING RIGHT OF ACCESS |
| 12/691,594 | 7940704 | US | MOBILE INSTANT MESSAGING CONFERENCING METHOD AND SYSTEM |
| 10/817,994 | 7961663 | US | PEER-TO-PEER MOBILE INSTANT MESSAGING METHOD AND DEVICE |
| 12/832,576 | 7969925 | US | PEER-TO-PEER MOBILE DATA TRANSFER METHOD AND DEVICE |
| 10/016,325 | 8001052 | US | SYSTEM & METHOD FOR UNIQUE DIGITAL ASSET IDENTIFICATION AND TRANSACTION MANAGEMENT |
| 12/966,673 | 8117113 | US | SYSTEM & METHOD FOR DETERMINING RIGHT OF ACCESS |
| 12/103,604 | 8200581 | US | DIGITAL MEDIA ASSET CONVERSION SYSTEM AND METHOD |
| 2012100461 | 2012100461 | AU | LOCAL AREA ADVERTISEMENT MANAGEMENT |
| 2012100463 | 2012100463 | AU | RENEWABLE RESOURCE DISTRIBUTION MANAGEMENT SYSTEM |
| 2011101297 | 2011101297 | AU | REMOTE RECOGNITION OF AN ASSOCIATION BETWEEN REMOTE DEVICES |
| 2013101034 | 2013101034 | AU | REGISTRATION AND AUTHENTICATION OF COMPUTING DEVICES USING A DIGITAL SKELETON KEY |
| 2011101296 | 2011101296 | AU | HARDWARE IDENTIFICATION THROUGH COOKIES |
| 2013100369 | 2013100369 | AU | UNIQUE DEVICE IDENTIFICATION AMONG LARGE POPULATIONS OF HOMOGENEOUS DEVICES |
| 2013100802 | 2013100802 | AU | DEVICE AUTHENTICATION USING INTER-PERSON MESSAGE METADATA |
| 2013100259 | 2013100259 | AU | MIGRATION OF USAGE SESSIONS BETWEEN DEVICES |
| 2012100459 | 2012100459 | AU | PERSONAL CONTROL OF PERSONAL INFORMATION |
| 2012100470 | 2012100470 | AU | ANONYMOUS WHISTLE BLOWER SYSTEM WITH REPUTATION REPORTING OF ANONYMOUS WHISTLE BLOWERS |
| 2012100464 | 2012100464 | AU | COMPUTER BASED COMPARISON OF HUMAN INDIVIDUALS |

Exhibit A-30

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 2013100243 | 2013100243 | AU | PEDESTRIAN TRAFFIC MONITORING AND ANALYSIS |
| 2013100804 | 2013100804 | AU | PREDICTIVE DELIVERY OF INFORMATION BASED ON DEVICE HISTORY |
| 2012100465 | 2012100465 | AU | HEALTH ASSESSMENT BY REMOTE PHYSICAL EXAMINATION |
| 2012100458 | 2012100458 | AU | LOCAL AREA SOCIAL NETWORKING |
| 2012100460 | 2012100460 | AU | METHOD AND SYSTEM FOR IMPLEMENTING ZONE-RESTRICTED BEHAVIOR OF A COMPUTING DEVICE |
| 2012100462 | 2012100462 | AU | NEAR-FIELD AUTHENTICATION THROUGH COMMUNICATION OF ENCLOSED CONTENT SOUND WAVES |
| 2013100883 | 2013100883 | AU | DETECTION OF DEVICE TAMPERING |
| 2013100355 | 2013100355 | AU | DEVICE-SPECIFIC CONTENT DELIVERY |
| 10165951.4 | 2273371 | DE | FAILOVER PROCEDURE FOR SERVER SYSTEM |
| 60 2008 039 553.7 | 2203815 | DE | INSTALLING PROTECTED SOFTWARE PRODUCT USING UNPROTECTED INSTALLATION |
| 60 2010 023 538.6 | 2273411 | DE | SYSTEMS AND METHODS FOR DETERMINING AUTHORIZATION TO OPERATE LICENSED SOFTWARE BASED ON A CLIENT DEVICE FINGERPRINT |
| 10168528.7 | 2282474 | DE | SYSTEM AND METHOD FOR SECURED MOBILE COMMUNICATION |
| 60 2010 031 589.4 | 2267966 | DE | SYSTEM AND METHOD FOR SECURING AN ELECTRONIC COMMUNICATION |
| EP 10166779.8 | 2270703 | EP | SYSTEMS AND METHODS FOR PROVIDING CONDITIONAL AUTHORIZATION TO OPERATE LICENSED SOFTWARE |
| EP 10165956.3 | 2264975 | EP | SYSTEM AND METHOD FOR REDUNDANCY IN A COMMUNICATION NETWORK |
| EP 10165951.4 | EP 2273371 | EP | FAILOVER PROCEDURE FOR SERVER SYSTEM |
| EP 10165196.6 | | EP | SECURING EXECUTABLE CODE INTEGRITY USING AUTO-DERIVATIVE KEY |
| EP 10165197.4 | 2264640 | EP | FEATURE-SPECIFIC KEYS FOR EXECUTABLE CODE |
| 8831302.8 | 2203815 | EP | INSTALLING PROTECTED SOFTWARE PRODUCT USING UNPROTECTED INSTALLATION |
| 10165175 | 2273411 | EP | SYSTEMS AND METHODS FOR DETERMINING AUTHORIZATION TO OPERATE LICENSED SOFTWARE BASED ON A CLIENT DEVICE FINGERPRINT |
| EP 10168528.7 | 2282474 | EP | SYSTEM AND METHOD FOR SECURED MOBILE COMMUNICATION |
| EP 10188068.0 | 2282474 | EP | SYSTEM AND METHOD FOR DEVICE AUTHENTICATION WITH BUILT-IN TOLERANCE |

Exhibit A-31

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| EP 10165171.9 | 2267966 | EP | SYSTEM AND METHOD FOR SECURING AN ELECTRONIC COMMUNICATION |
| 10166788.9 | EP2270704 | EP | SYSTEMS AND METHODS FOR AUDITING SOFTWARE USAGE USING A COVERT KEY |
| EP 10165179.2 | 2273438 | EP | USE OF A FINGERPRINT WITH AN ON-LINE OR NETWORKED AUCTION |
| 10165951.4 | 2273371 | GB | FAILOVER PROCEDURE FOR SERVER SYSTEM |
| EP08831302.8 | EP2203815 | GB | INSTALLING PROTECTED SOFTWARE PRODUCT USING UNPROTECTED INSTALLATION |
| 10165175 | 2273411 | GB | SYSTEMS AND METHODS FOR DETERMINING AUTHORIZATION TO OPERATE LICENSED SOFTWARE BASED ON A CLIENT DEVICE FINGERPRINT |
| 10168528.7 | 2282474 | GB | SYSTEM AND METHOD FOR SECURED MOBILE COMMUNICATION |
| 10165171.9 | 2267966 | GB | SYSTEM AND METHOD FOR SECURING AN ELECTRONIC COMMUNICATION |
| 12/819,046 | | US | SYSTEMS AND METHODS FOR PROVIDING CONDITIONAL AUTHORIZATION TO OPERATE LICENSED SOFTWARE |
| 12/818,906 | 8239852 | US | REMOTE UPDATE OF COMPUTERS BASED ON PHYSICAL DEVICE RECOGNITION |
| 14/867,976 | 9558636 | US | AUTOMATIC TELLER MACHINE INVENTORY AND DISTRIBUTION SYSTEM |
| 15/417,748 | | US | AUTOMATIC TELLER MACHINE INVENTORY AND DISTRIBUTION SYSTEM |
| 14/825,120 | | US | VERIFICATION THAT AN AUTHENTICATED USER IS IN PHYSICAL POSSESSION OF A CLIENT DEVICE |
| 12/468,288 | 8812701 | US | DEVICE AND METHOD FOR SECURED COMMUNICATION |
| 12/813,362 | 8452960 | US | SYSTEM AND METHOD FOR CONTENT DELIVERY |
| 12/813,378 | 8736462 | US | SYSTEM AND METHOD FOR TRAFFIC INFORMATION DELIVERY |
| 12/813,391 | 8903653 | US | SYSTEM AND METHOD FOR LOCATING NETWORK NODES |
| 12/813,420 | 9141489 | US | FAILOVER PROCEDURE FOR SERVER SYSTEM |
| 13/707,454 | | US | RENEWABLE RESOURCE DISTRIBUTION MANAGEMENT SYSTEM |
| 12/792,184 | | US | SECURING EXECUTABLE CODE INTEGRITY USING AUTO-DERIVATIVE KEY |
| 12/792,206 | | US | FEATURE-SPECIFIC KEYS FOR EXECUTABLE CODE |
| 12/903,980 | 8769296 | US | SOFTWARE SIGNATURE TRACKING |

Exhibit A-32

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 12/235,243 | 8160962 | US | INSTALLING PROTECTED SOFTWARE PRODUCT USING UNPROTECTED INSTALLATION IMAGE |
| 13/269,415 | 8671060 | US | POST-PRODUCTION PREPARATION OF AN UNPROTECTED INSTALLATION IMAGE FOR DOWNLOADING AS A PROTECTED SOFTWARE PRODUCT |
| 14/524,939 | | US | ELECTRONIC MAIL SENDER VERIFICATION |
| 12/828,473 | 8213907 | US | SYSTEM AND METHOD FOR SECURED MOBILE COMMUNICATION |
| 13/586,111 | 8693473 | US | REMOTE RECOGNITION OF AN ASSOCIATION BETWEEN REMOTE DEVICES |
| 13/692,843 | | US | DATA REPOSITORY AUTHENTICATION |
| 13/832,982 | 9286466 | US | REGISTRATION AND AUTHENTICATION OF COMPUTING DEVICES USING A DIGITAL SKELETON KEY |
| 13/914,584 | 9143496 | US | DEVICE AUTHENTICATION USING DEVICE ENVIRONMENT INFORMATION |
| 14/176,906 | | US | REMOTE RECOGNITION OF AN ASSOCIATION BETWEEN REMOTE DEVICES |
| 14/794,121 | | US | SECURE TWO-STAGE TRANSACTIONS |
| 15/048,466 | | US | REGISTRATION AND AUTHENTICATION OF COMPUTING DEVICES USING A DIGITAL SKELETON KEY |
| 12/903,948 | 8316421 | US | SYSTEM AND METHOD FOR DEVICE AUTHENTICATION WITH BUILT-IN TOLERANCE |
| 11/531,235 | 7934250 | US | METHOD AND APPARATUS FOR USING PERFORMANCE AND STRESS TESTING ON COMPUTING DEVICES FOR DEVICE AUTHENTICATION |
| 11/531,257 | 7987362 | US | METHOD AND APPARATUS FOR USING IMPERFECTIONS IN COMPUTING DEVICES FOR DEVICE AUTHENTICATION |
| 13/235,281 | | US | PSYCHOGRAPHIC DEVICE FINGERPRINTING |
| 13/621,809 | 9571492 | US | HARDWARE IDENTIFICATION THROUGH COOKIES |
| 13/911,574 | 8695068 | US | DEVICE AUTHENTICATION USING DISPLAY DEVICE IRREGULARITY |
| 14/196,083 | 9578502 | US | DEVICE AUTHENTICATION USING INTER-PERSON MESSAGE METADATA |
| 14/179,292 | 9444802 | US | DEVICE AUTHENTICATION USING DISPLAY DEVICE IRREGULARITY |
| 15/416,920 | | US | HARDWARE IDENTIFICATION THROUGH COOKIES |
| 14/050,213 | | US | MIGRATION OF USAGE SESSIONS BETWEEN DEVICES |

Exhibit A-33

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 14/176,928 | | US | DEVICE-SPECIFIC RESTRICTIVE CONTENT DELIVERY |
| 14/196,065 | | US | SHARED STATE AMONG MULTIPLE DEVICES |
| 11/532,080 | 8284929 | US | SYSTEM OF DEPENDENT KEYS ACROSS MULTIPLE PIECES OF RELATED SCRAMBLED INFORMATION |
| 12/703,470 | 8838976 | US | WEB CONTENT ACCESS USING A CLIENT DEVICE IDENTIFIER |
| 12/903,959 | 9082128 | US | SYSTEM AND METHOD FOR TRACKING AND SCORING USER ACTIVITIES |
| 13/586,057 | 9338152 | US | PERSONAL CONTROL OF PERSONAL INFORMATION |
| 13/692,857 | 8881273 | US | DEVICE REPUTATION MANAGEMENT |
| 13/742,972 | | US | ANONYMOUS WHISTLE BLOWER SYSTEM WITH REPUTATION REPORTING OF ANONYMOUS WHISTLE BLOWER |
| 13/743,162 | 8521874 | US | COMPUTER-BASED COMPARISON OF HUMAN INDIVIDUALS |
| 13/944,622 | | US | EMPLOYEE PERFORMANCE EVALUATION |
| 13/944,618 | | US | INCLUDING USAGE DATA TO IMPROVE COMPUTER-BASED TESTING OF APTITUDE |
| 13/916,945 | 8892642 | US | COMPUTER-BASED COMPARISON OF HUMAN INDIVIDUALS |
| 14/510,965 | 9311485 | US | DEVICE REPUTATION MANAGEMENT |
| 14/049,841 | 9571981 | US | PEDESTRIAN TRAFFIC MONITORING AND ANALYSIS USING LOCATION AND AUTHENTICATION OF MOBILE COMPUTING DEVICES |
| 14/188,063 | 9414199 | US | PREDICTIVE DELIVERY OF INFORMATION BASED ON DEVICE HISTORY |
| 15/415,726 | | US | PEDESTRIAN TRAFFIC MONITORING AND ANALYSIS |
| 13/743,198 | 9449151 | US | HEALTH ASSESSMENT BY REMOTE PHYSICAL EXAMINATION |
| 15/268,845 | | US | HEALTH ASSESSMENT BY REMOTE PHYSICAL EXAMINATION |
| 11/470,246 | 7804079 | US | METHOD AND APPARATUS FOR USING IMPERFECTIONS AND IRREGULARITIES IN OPTICAL MEDIA FOR IDENTIFICATION PURPOSES |
| 13/657,859 | | US | LOCAL AREA SOCIAL NETWORKING |
| 14/983,281 | | US | MOBILE DEVICE MONITORING AND ANALYSIS |
| 12/818,981 | | US | SYSTEM AND METHOD FOR MONITORING EFFICACY OF ONLINE ADVERTISING |
| 12/272,570 | 8566960 | US | SYSTEM AND METHOD FOR ADJUSTABLE LICENSING OF DIGITAL PRODUCTS |
| 12/784,380 | 9633183 | US | MODULAR SOFTWARE PROTECTION |

Exhibit A-34

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Application Number | Patent Number | Country | Title |
|---|---|---|---|
| 12/784,262 | 8423473 | US | SYSTEMS AND METHODS FOR GAME ACTIVATION |
| 12/784,447 | | US | SYSTEM AND METHOD FOR MEDIA DISTRIBUTION |
| 12/140,917 | 7908662 | US | SYSTEM AND METHOD FOR AUDITING SOFTWARE USAGE |
| 15/483,392 | | US | MODULAR SOFTWARE PROTECTION |
| 12/792,249 | 8495359 | US | SYSTEM AND METHOD FOR SECURING AN ELECTRONIC COMMUNICATION |
| 13/707,886 | 8949954 | US | CUSTOMER NOTIFICATION PROGRAM ALERTING CUSTOMER-SPECIFIED NETWORK ADDRESS OF UNAUTHORIZED ACCESS ATTEMPTS TO CUSTOMER ACCOUNT |
| 13/734,175 | | US | METHOD AND SYSTEM FOR IMPLEMENTING ZONE-RESTRICTED BEHAVIOR OF A COMPUTING DEVICE |
| 13/734,178 | 9564952 | US | NEAR FIELD AUTHENTICATION THROUGH COMMUNICATION OF ENCLOSED CONTENT SOUND WAVES |
| 14/074,153 | 8881280 | US | DEVICE-SPECIFIC CONTENT DELIVERY |
| 14/530,529 | 9294491 | US | DEVICE-SPECIFIC CONTENT DELIVERY |
| 15/424,298 | | US | NEAR FIELD AUTHENTICATION THROUGH COMMUNICATION OF ENCLOSED CONTENT SOUND WAVES |
| 12/390,273 | 8374968 | US | LICENSE AUDITING FOR DISTRIBUTED APPLICATIONS |
| 12/819,012 | | US | SYSTEM AND METHOD FOR PIRACY REDUCTION IN SOFTWARE ACTIVATION |
| 12/818,934 | 9129097 | US | SYSTEMS AND METHODS FOR AUDITING SOFTWARE USAGE USING A COVERT KEY |
| 13/239,260 | | US | LICENSE AUDITING OF SOFTWARE USAGE BY ASSOCIATING SOFTWARE ACTIVATIONS WITH DEVICE IDENTIFIERS |
| 12/792,442 | | US | SYSTEM AND METHOD FOR PREVENTING MULTIPLE ONLINE PURCHASES |
| 12/792,375 | 9075958 | US | USE OF FINGERPRINT WITH AN ON-LINE OR NETWORKED AUCTION |
| 13/961,774 | | US | SYSTEM AND METHOD FOR PREVENTING MULTIPLE ONLINE PURCHASES |

Exhibit A-35

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT P

1               UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF TEXAS

3                 MARSHALL DIVISION

4

5   UNILOC 2017 LLC,     )

6   UNILOC USA, INC.,    )

7           Plaintiffs,) Civil Case No. 2:18-cv-491

8     vs.           ) -492, -493, -494, -495, -496

9   GOOGLE LLC,         ) -497, -499, -500, -501, -502

10         Defendant. ) -503, -504, -548, -550, -551

     _____) -552, -553

11

12       CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14     VIDEOTAPED DEPOSITION OF CRAIG ETCHEGOYEN

15            as a 30(b)(6) witness

16           Newport Beach, California

17           Friday, October 4, 2019

18

19

20   REPORTED BY:

21   Michelle Milan Fulmer

22   CSR No. 6942, RPR, CRR, CRC

23   JOB No. 3568152

24

25   PAGES 1 - 185

1     Q    Do you know whether Uniloc Lux and

2  Uniloc USA were ever late on a payment to Fortress?

3     A    I -- I don't think they were ever late on

4  anything.

5     Q    If you look back at Article VI of the RSA,    02:51:54

6  which is 001286.

7     A    286.  Sorry.  They're sticking here.  286.

8  Okay.  I am here.

9          What section?  Sorry.  6.2?

10    Q    Yeah.  6.2.2.                     02:52:39

11    A    It's, "From the closing date through"?

12  That one?

13    Q    Yeah.

14    A    Got it.

15    Q    It says, "From the closing date through    02:52:48

16  December 31st, 2016, the company shall have received

17  at least $20,000,000 in actual monetization

18  revenues.  As of March 31st, 2017, and the last day

19  of each fiscal quarter thereafter, the company

20  shall have received at least 20,000,000 in actual    02:53:08

21  monetization revenues during the first four fiscal

22  quarter period ending on such date."

23          Were --

24    A    You said four fiscal four.  "Each fiscal

25  quarter thereafter."                       02:53:26

1     Q    Okay.  I apologize.

2        Did -- were these revenue numbers met?

3     A    Oh, I have no idea.  I would assume this

4  was all satisfied or approved, if not satisfied,

5  because there was never a -- there was never a    02:53:55

6  breach of the covenant or any default of any kind

7  with Fortress.

8     Q    Okay.  But sitting here today, you don't

9  know whether the revenue numbers in 6.2.2 of the RSA

10  were ever met?    02:54:11

11     A    Sitting here today, I know there was never

12  a breach of any covenant.  So my assumption --

13  again, not from memory.  My assumption would be that

14  there was either an understanding or the covenant

15  was hit.    02:54:28

16     Q    Yeah.  My question is a little bit

17  different.

18     A    Okay.

19     Q    I'm not asking whether there may have been

20  something else that may have happened to excuse if    02:54:36

21  the numbers weren't met.

22        I'm just asking if you know, sitting here

23  today, whether the revenue numbers in 6.2.2 of the

24  RSA were, in fact, met.

25     A    I don't know that.  What I'm telling you is    02:54:53

Veritext Legal Solutions
866 299-5127

1    by process of elimination.

2        Q    Okay.  Look at -- and if you look at

3    6.5.1.2.

4        A    Yeah.  I was just reading that.  "Promptly

5    upon acquiring knowledge thereof, the existence of          02:55:23

6    any default or event of default."  That one?

7        Q    Right.

8        A    Yeah.

9        Q    And so I think I know the answer to this,

10   but is it the case that Uniloc had not given any           02:55:33

11   notice of any such brief --

12       A    It's okay.

13       Q    Let me start over again.

14       A    It would have been Fortress giving the

15   notice.  Not Uniloc.                                       02:55:49

16       Q    I'm not sure that that's right, but the --

17   let me just -- now I can't find what I was just

18   pointing to.  Okay.  Here we go.

19       A    6.5.1.2, "Promptly upon acquiring knowledge

20   thereof, the existence of any default or event of          02:56:30

21   any default, specifying the nature thereof and what

22   action the company has taken, is taking or proposes

23   to take with respect thereto."

24            That's what you were pointing to.

25       Q    Yeah.  And are you aware of any such             02:56:45

Page 141

1  notices ever being provided in connection with the

2  RSA?

3      A    Oh, I don't -- I don't remember or know.  I

4  know there was never -- there was never a default of

5  any kind.                                          02:56:59

6      Q    Are you aware of any writing in which

7  Fortress waived any default by Uniloc of the RSA?

8          MR. LOVELESS:  Objection.  Form.

9          THE WITNESS:  Again, I'm not aware of any

10  default or -- it's possible if there was some sort   02:57:30

11  of foot fault default in the agreement that Fortress

12  would have waived that.  That would have -- that

13  wouldn't shock me.

14          As I sit here today, I'm not aware of any

15  sort of notice.  There has been zillions of pages of  02:57:50

16  documents over the years.

17  BY MR. PERLSON:

18      Q    Okay.  But you're not aware of any written

19  waiver from Fortress of any default in the RSA?

20          MR. LOVELESS:  Objection.  Form.            02:58:06

21  BY MR. PERLSON:

22      Q    I'm not suggesting that you're agreeing

23  that there was a default.  I'm just asking whether

24  you're aware of any such waiver.

25      A    Again, I don't think there was any default.  02:58:14

Page 142

1      I don't know if there was a waiver, but, no pun

2      intended, by default, the note being completely

3      paid off would cure any default that would exist at

4      the time anyway.  So that wouldn't matter.  But, I

5      mean, that might be a question for someone other          02:58:36

6      than me.

7          Q    Who do you think would be -- who would be

8      able to answer that?

9          A    Oh, I don't know.  Good luck.  I don't know

10     who would be able to answer that.                         02:58:48

11         Q    All right.  Do you know whether Uniloc

12     Australia had any subsidiaries besides Uniloc USA?

13         A    I don't -- I don't think Uniloc --

14     definitely doesn't currently.  I don't --

15         Q    Yeah.  That was a bad question.  Let me put     02:59:39

16     timing on it.

17         A    Okay.

18         Q    At the time of the RSA in 2014, did Uniloc

19     Australia have any subsidiaries?

20         A    I don't know.  I mean, I don't know and         02:59:58

21     I -- I don't know and I don't think so, but, again,

22     a long time ago.

23         Q    Did it have any subsidiaries from

24     Singapore?

25         A    You're really, really testing the brain         03:00:14

                                                            Page 143

1             CERTIFICATION OF COURT REPORTER

2                  FEDERAL JURAT

3

4         I, the undersigned, a Certified Shorthand

5  Reporter of the State of California do hereby

6  certify:

7         That the foregoing proceedings were taken

8  before me at the time and place herein set forth;

9  that any witnesses in the foregoing proceedings,

10  prior to testifying, were placed under oath; that a

11  verbatim record of the proceedings was made by me

12  using machine shorthand which was thereafter

13  transcribed under my direction; further, that the

14  foregoing is an accurate transcription thereof; that

15  before completion of the deposition, a review of the

16  transcript [ ] was [X] was not requested.

17         I further certify that I am neither

18  financially interested in the action nor a relative

19  or employee of any attorney of any of the parties.

20         IN WITNESS WHEREOF, I have this date

21  subscribed my name:  Date:  October 7, 2019.

22

23

24         Michelle Milan Fulmer

25         CSR 6942, RPR, CRR, CRC

Page 185

EXHIBIT Q

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    James J. Foster
     Aaron S. Jacobs (CA No. 214953)
2    PRINCE LOBEL TYE LLP
     One International Place, Suite 3700
3    Boston, MA 02110
     617-456-8000
4    jfoster@princelobel.com
     ajacobs@princelobel.com
5

6    Matthew D. Vella (CA No. 314548)
     mvella@princelobel.com
     PRINCE LOBEL TYE LLP
7    410 Broadway Avenue, Suite 180
     Laguna Beach, CA 92651
8

9    Attorneys for Plaintiffs

10                UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

| | |
|---|---|
| 13   UNILOC USA, INC., and<br>     UNILOC LUXEMBOURG, S.A., | Case No.: 3:18-cv-00360-WHA<br>Case No.: 3:18-cv-00363-WHA<br>Case No.: 3:18-cv-00365-WHA<br>Case No.: 3:18-cv-00572-WHA |
| 14 | |
| 15            Plaintiffs, | |
| 16   v. | **PLAINTIFFS' OPPOSITION TO<br>DEFENDANT'S MOTION TO DISMISS,<br>AND REPLY IN SUPPORT OF RULE 25** |
| 17   APPLE INC., | **MOTION TO ADD UNILOC 2017 AS A<br>PARTY** |
| 18          Defendant. | |
| 19 | **Date: Thursday, December 20, 2018<br>Time: 8:00 a.m.** |
| 20 | **Courtroom: 12, 19th Floor<br>Judge: Hon. William Alsup** |

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| PLAINTIFFS' OPPOSITION TO DEFENDANT'S<br>MOTION TO DISMISS FOR LACK OF<br>SUBJECT-MATTER JURISDICTION | | CASE NOS. 3:18-CV-00360-WHA;<br>-00363-WHA; -00365-WHA; -00572-WHA |

with the standing of a particular plaintiff, a dismissal should always be *without* prejudice if the problem is capable of correction. *Mentor H/S*, 244 F.3d at 1373.

The legal and factual merits of Plaintiffs' position on standing are amply stated in this Opposition. Plaintiffs reject Apple's allegations of "conceal[ment]," "false represent[ations]" or "false allegations," a "licensing scheme," "discovery misconduct," "plan[ning] to induce the Court," and similar invective. Mot. at 22-24. Plaintiffs will address this form of advocacy at the hearing of this motion.

Apple's jurisdictional argument is based on a factual premise – that Uniloc Luxembourg had defaulted and Fortress had a right to sublicense – that no one would have agreed with at the time, or since. *See* Palmer Decl. Nor is there evidence that such thought had even crossed the mind of anyone at Fortress or Uniloc Luxembourg. Equally important is that under the law (discussed thoroughly above) a right to sublicense would not have affected Uniloc Luxembourg's standing; nor is there any evidence anyone at Uniloc Luxembourg would have harbored that belief. Until Apple filed its motion on October 25, no one at Plaintiffs (or representing Plaintiffs) would have seen any plausible argument that Uniloc Luxembourg lacked standing at the time it filed these actions.

Thus, Apple's histrionic reference to Plaintiffs' having a "licensing scheme" that divested the court of jurisdiction is wrong, for the various reasons elaborated above.

The transfer of ownership of the patents from Uniloc Luxembourg to Uniloc 2017 could not have affected the Court's jurisdiction, for the reasons described above. Nor was it concealed: the transfer was publicly recorded in the Patent Office shortly after it occurred. Further, the transfer was reported to Apple, and defendants in all of the other Uniloc Luxembourg patent litigations. But no motion was filed in these (or other) actions immediately, because Rule 25(c) provides: "If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or join with the original party." It

| PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION | 11 | CASE NOS. 3:18-CV-00360-WHA; -00363-WHA; -00365-WHA; -00572-WHA |
|---|---|---|

CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google000817

seems that where the action is continued by the original party, the result is binding on the transferee. In any event, although perhaps not necessary to do so, Plaintiffs decided to file a motion to add Uniloc 2017, which they did.

Apple alleges Plaintiffs "misrepresented" the rights and interests in the patents, when they moved for leave to file a red-lined Second Amended Complaint on May 16 in the -359 action, without changing the named plaintiffs. Mot. at 24. In truth, the attorney that drafted that Second Amended Complaint had simply been unaware of the May 5 transactions. After litigation counsel became aware of the transactions, newly filed cases identified Uniloc 2017 as a plaintiff.

Date: November 12, 2018

Respectfully submitted,

/s/ Aaron S. Jacobs
James J. Foster
Aaron S. Jacobs (CA No. 214953)
**PRINCE LOBEL TYE LLP**
One International Place, Suite 3700
Boston, MA 02110
Tel: (617) 456-8000
jfoster@princelobel.com
ajacobs@princelobel.com

Matthew D. Vella (CA No. 314548)
mvella@princelobel.com
PRINCE LOBEL TYE LLP
410 Broadway Avenue, Suite 180
Laguna Beach, CA 92651

CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google000818

# EXHIBIT R

# Declaration of James Palmer
## November 9, 2018

James J. Foster
Aaron S. Jacobs (CA No. 214953)
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
617-456-8000
jfoster@princelobel.com
ajacobs@princelobel.com

Matthew D. Vella (CA No. 314548)
mvella@princelobel.com
PRINCE LOBEL TYE LLP
410 Broadway Avenue, Suite 180
Laguna Beach, CA 92651

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNILOC USA, INC., and<br>UNILOC LUXEMBOURG, S.A.,<br><br>   Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 3:18-cv-00360-WHA<br>Case No.: 3:18-cv-00363-WHA<br>Case No.: 3:18-cv-00365-WHA<br>Case No.: 3:18-cv-00572-WHA<br><br>**DECLARATION OF JAMES PALMER**<br><br>DATE: Thursday, December 20, 2018<br>TIME: 8:00 a.m.<br>COURTROOM: 12, 19th Floor<br>JUDGE: Hon. William Alsup |

1.  I am a Managing Director in the Intellectual Property Finance Group ("IP Group") of the credit business at Fortress Investment Group, an affiliate of Fortress Credit Co. LLC ("Fortress"). I submit this declaration under penalty of perjury in support of Uniloc's Opposition to Apple's Motion to Dismiss.

2.  I understand Apple has alleged Fortress had the right, during May 26-August 2, 2017, to sublicense (to Apple or others) the patents involved in these actions. As explained below, that was not the case.

3.     The IP Group facilitates investments, such as loans, that are secured by the borrowers' patents.  On December 30, 2014, Fortress, on behalf of various affiliates provided a loan to, among others, Uniloc USA, Inc. and Uniloc Luxembourg S. A. (collectively, the borrowers, "Uniloc"). The documentation for the loan included, among other documents, a Revenue Sharing and Note and Warrant Purchase Agreement ("the Agreement"), Dkt. No. 135-2, as well as a Patent License Agreement ("the License"), Dkt. No. 135-3.

4.     As is standard for this type of loan, the documentation gave Fortress various rights intended to secure the loan, to be enforced only if Uniloc defaulted and such default led to an Event of Default under the Agreement. This included the License, which gave rights to Fortress to sublicense the patents in the portfolio, but only "following an Event of Default," as defined by the Agreement. The Agreement, in turn, specified, under "Annulment of Defaults" (¶ 7.3), that an Event of Default would end after Fortress (on behalf of the Majority Purchasers) either was reasonably satisfied Uniloc had effected a cure, or had waived the Event of Default.

5.     The sole purpose of providing for contingent sublicensing authority is to secure the Fortress loan in case of an Event of Default, not to allow Fortress to license patents in competition with the patent owner. Although the remedies language of this Agreement is typically broad, to give Fortress flexibility in protecting its investment in a default scenario, Fortress does not believe it can in good faith declare an "event of default" has occurred under the Agreement and then pursue foreclosure or other remedies unless such action is warranted under the terms of the Agreement.

6.     The purpose of the loan was to finance Uniloc's litigation of the 71 United States patents then in Uniloc's portfolio (which did not include the patents involved in these actions). See Ex. A. As is standard for this type of loan, the Agreement imposed certain covenants on Uniloc and required Uniloc to make certain representations and warranties. As Fortress had not previously done business with Uniloc, the Agreement included a covenant as to expected Actual Monetization Revenues (¶ 6.2.2). The Agreement also included a standard representation that, as of the December 30, 2014 Closing, none of the 71 United States patents listed in an Appendix to the

Agreement had been adjudged invalid, in whole or in part, or were at that time subject to any challenge to their validity (¶ 4.5).

Apple's allegations

7.     I understand Apple alleges an "Event of Default," as that term was defined in ¶ 7.1 of the Agreement, existed as of May 26, 2017. I disagree, for the reasons stated below.

Actual Monetization Revenues

8.     Paragraph 6.2 of the Agreement required Uniloc to diligently pursue monetization of the patents in the 2014 portfolio, to provide regular updates to Fortress, and to consult with Fortress as to Uniloc's activities if requested to do so – which Uniloc did faithfully. At all times prior to August 2, 2017, Fortress was satisfied with Uniloc's efforts in that regard.

9.     As a result of its satisfaction with Uniloc's performance, Fortress invested additional funds in the monetization effort by increasing the amount of the loan in May 2016, and entered into discussions for another substantial investment in May 2017. The parties revised the Agreement with each investment, each revision reconfiguring the relationship.

10.     Apple points to the monetization revenue for the four quarters ending March 31, 2017, as falling short of the figure in the December 2014 Agreement, labeling that difference an "Event of Default." But Uniloc had not defaulted on the loan. To the contrary, the situation had changed markedly, and positively, since December 2014, rendering the earlier minimums no longer of significance to Fortress, to the point Fortress made a substantial additional investment, finalized by the Third Amendment to the Agreement, as of May 15, 2017 (the "May 15, 2017 Agreement"). Dkt. No. 135-4.

11.     Although Fortress did not regard Uniloc as in default, I understand Apple argues ¶ 7.1.2 of the Agreement defines an Event of Default as *any* failure "to perform or observe any of the covenants or agreements contained in Article VI [which] failure continues for 30 days after... knowledge of [Uniloc] of such failure," however unimportant it would have seemed at the time. But at that time there had been no increase in financial risk and therefore this was not what Fortress would have regarded as a "default," and Fortress did not consider it or treat it as a default.

12.     In the weeks following March 31, 2017, Uniloc and Fortress finalized the May 15, 2017 Agreement, with Fortress completely aware of the Actual Monetization Revenues numbers. To the extent Apple argues the shortfall created an "Event of Default" before May 15, 2017, even though Fortress did not view it that way, there is no dispute Fortress's signature to the May 15 Agreement establishes Uniloc had cured that ostensible "Event of Default" to Fortress's satisfaction. And, to the extent there had been minimum monetization revenue requirements for the period prior to May 15, 2017, Fortress viewed the May 15, 2017 Agreement as wiping the slate clean.

13.     To summarize, at no time, either before or after May 15, 2017, did Fortress consider Uniloc as being in default, or believe Fortress had a right to license Uniloc's patents subject to the May 15, 2017 Agreement.

Validity challenges

14.     I understand Apple also alleges, Dkt. No. 135 at 5, Uniloc made a "false" representation on December 30, 2014, namely, none of the patents listed in the Appendix to the Agreement had been adjudged invalid, in whole or in part, or had been subject to any challenge to its validity.

15.     The allegation appears overblown. The list attached to the 2014 Agreement included 71 United States patents. As I understand Apple's accusation: i) the Patent Office, in an Inter Partes Review of one of those 71 patents had found some claims of that patent unpatentable, but others patentable; and ii) the validity of another two (of the 71) patents had been challenged in a motion filed in Texas district court. Both these events had occurred shortly before the Agreement. But this oversight, by whoever reviewed the draft for the closing, appears to Fortress as being of no apparent materiality.

16.     As described above, the purpose of the loan was to fund patent litigation, in which it was expected that the validity of virtually all asserted patents would be contested. That two or three of the 71 patents had already been challenged would not have been considered material.

17.     As for Apple's charge Uniloc had made "false" representations, Fortress has seen no evidence that the oversights were intentional, or even discovered before Apple filed its Motion.

If Fortress had learned of these oversights during the life of the Agreement, Fortress could not, in good faith, and would not, have claimed an Event of Default had occurred.

18.     I understand Apple claims the mistaken representation -- that no patent had yet been challenged as to its validity -- was "later re-affirmed" by the signing of the May 15, 2017 Amendment. Apple appears to suggest Uniloc had effectively represented that by May 15, 2017, there had been no validity challenges.

19.     That is certainly not what the May 15, 2017 Agreement means, at least to me. To review, the December 30, 2014 (and subsequent) loans were to support Uniloc's assertion of patents against infringers, primarily through litigation. Fortress well understood defendants in such litigation almost universally assert invalidity. As of May 15, 2017, Fortress was aware that Uniloc had filed a number of actions on the listed patents, and understood in all, or virtually all, of them invalidity had been, or would shortly be, asserted.

20.     Fortress thus did not regard the statement in the May 15, 2017 amendment describing the "representation or warranties" of the 2014 Agreement as "being true and correct in all material respects" as of May 15, 2017 as meaning no allegations of invalidity had been raised since 2014.

Executed:  November 9, 2018                                    _____
                                                                                        James Palmer

# Declaration of James Palmer
# March 13, 2019

1   James J. Foster
    Aaron S. Jacobs (CA No. 214953)
2   PRINCE LOBEL TYE LLP
    One International Place, Suite 3700
3   Boston, MA 02110
    617-456-8000
4   jfoster@princelobel.com
    ajacobs@princelobel.com
5
    Matthew D. Vella (CA No. 314548)
6   mvella@princelobel.com
    PRINCE LOBEL TYE LLP
7   410 Broadway Avenue, Suite 180
    Laguna Beach, CA 92651
8
    Attorneys for Plaintiffs
9

10                  UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13   UNILOC USA, INC.,                )   **Case No.: 3:18-cv-00360-WHA**
     UNILOC LUXEMBOURG, S.A. and       )   **Case No.: 3:18-cv-00363-WHA**
14   UNILOC 2017 LLC,                  )   **Case No.: 3:18-cv-00365-WHA**
                                       )   **Case No.: 3:18-cv-00572-WHA**
15              Plaintiffs,            )
                                       )
16          v.                         )   **SUPPLEMENTAL DECLARATION OF**
                                       )   **JAMES PALMER**
17   APPLE INC.,                       )
                                       )
18              Defendant.             )
     _____  )

19

20          1.      I had previously submitted a Declaration of November 9, 2018, Dkt. No. 142-1, in

21   support of Uniloc's Opposition to Apple's Motion to Dismiss.  I am submitting this Supplemental

22   Declaration under penalty of perjury.

23          2.      The November 9 Declaration (¶ 10-13) averred Fortress did not consider Uniloc as

24   having been in default.  I stated there that if, contrary to Fortress's view, an "Event of Default" had

25   occurred, Uniloc had "cured that 'ostensible 'Event of Default" to Fortress's satisfaction."  But I

26   understand Apple is now arguing my November 9 declaration was "conspicuously silent" as to the

27   period after May 1, 2017.  Dkt. No. 173, p. 8.

28

1    3.    For the same reasons as I described in my November 9 declaration, at all times

2   between May 1, 2017 and August 2, 2017, Fortress was satisfied with Uniloc's monetization

3   revenues, and did not regard Uniloc as being in default.  To the extent Apple argues, contrary to

4   Fortress's view, a shortfall in monetization revenues numbers created an "Event of Default" after

5   May 1, 2017, Uniloc had cured that ostensible "Event of Default" to Fortress's satisfaction.

6

7   Dated:  March 13, 2019                          */s/ James Palmer*
8                                                   James Palmer

# EXHIBIT S

## LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** (this "**Agreement**"), dated as of May 3, 2018, is entered into by and between Uniloc 2017 LLC, a Delaware limited liability company ("**Uniloc 2017**") and Uniloc Licensing USA LLC, a Delaware limited liability company ("**Uniloc Licensing USA**").

**WHEREAS**, Uniloc Licensing USA is engaged in the business of monetizing Patents (as hereinafter defined) through licensing and enforcement actions;

**WHEREAS**, Uniloc 2017 desires to monetize its Patents and, in connection therewith, wishes to procure the Services (as hereinafter defined) from Uniloc Licensing USA;

**WHEREAS**, Uniloc Licensing USA desires to provide to Uniloc 2017, and Uniloc 2017 desires to accept from Uniloc Licensing USA, the Services, upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, Uniloc 2017 and Uniloc Licensing USA intend the terms of this Agreement to be consistent with those between uncontrolled parties in similar circumstances, and as defined in the Organization for Economic Co-operation and Development's Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations and the U.S. Internal Revenue Code Section 482.

**NOW THEREFORE**, in consideration of the mutual covenants, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**Section 1.** **DEFINITIONS**. For purposes of this Agreement, the following definitions will apply:

1.1 The term "**Centurion Platform**" means Uniloc 2017's software platform (in object code and source code form) for searching patent databases and filtering search results according to semantic criteria.

1.2 The term "**Effective Date**" means the date hereof.

1.3 The term "**Licensed Patents**" means all of the Patents owned or controlled by Uniloc 2017 as of the date hereof.

1.4 The term "**Patents**" means patents, utility models and any similar or equivalent statutory rights with respect to the protection of inventions, and all applications for any of the foregoing.

1.5 The term "**Privileged Information**" means any information that has been communicated in any manner for the purpose of giving or receiving legal advice from an attorney or patent agent.

1.6     The term "**Services**" means (i) licensing and enforcement services and (ii) services pertaining to the planning and management of litigation, in each case, with respect to the Licensed Patents, as set forth in further detail in <u>Section 3</u>, and such other services reasonably requested by Uniloc 2017 and agreed to by Uniloc Licensing USA in writing from time to time.

1.7     The term "**Taxes**" means any and all present and future levies, imposts, duties, deductions, charges, or withholdings and all liabilities with respect thereto imposed on either party by applicable tax authorities.

1.8     The term "**Territory**" means all locations other than the countries comprising the European Union.

### Section 2.     GRANT OF LICENSE; SERVICES.

2.1     Effective as of the Effective Date, Uniloc 2017, without any further action by any party hereto, hereby grants to Uniloc Licensing USA during the term of this Agreement a non-assignable exclusive license within the Territory under the Licensed Patents solely to enforce through litigation, as set forth in further detail in <u>Section 3</u>, such Licensed Patents solely in the Territory.

2.2     Effective as of the Effective Date, Uniloc Licensing USA shall, without any further action by any party hereto, provide the Services to Uniloc 2017, and in exchange therefor, Uniloc 2017 hereby grants to Uniloc Licensing USA during the term of this Agreement a non-assignable royalty-free, limited license under the Licensed Patents solely for use in providing the Services.

2.3     Uniloc 2017 hereby grants to Uniloc Licensing USA during the term of this Agreement a non-exclusive license to use, copy and prepare derivative works based on the Centurion Platform solely in connection with providing the Services. No right is granted by Uniloc 2017 to Uniloc Licensing USA hereunder to distribute or otherwise make available the Centurion Platform to any third party. All improvements, enhancements and other modifications made by Uniloc Licensing USA to the Centurion Platform, including all derivative works based thereon, will be owned exclusively by Uniloc 2017, and Uniloc Licensing USA hereby assigns to the Uniloc 2017 all of its right, title and interest in such modifications and derivative works and all copyrights and other intellectual property rights therein or thereto. Uniloc Licensing USA agrees to provide to Uniloc 2017 no less frequently than on a quarterly basis during the term of this Agreement complete copies of the source code of all such modifications and derivative works made by Uniloc Licensing USA. Uniloc Licensing USA agrees and acknowledges that the Centurion Platform is licensed to it by Uniloc 2017 hereunder on an "as is" basis without any implied or express warranty of any kind (including any implied warranty of non-infringement) or any obligation to provide maintenance and support and that Uniloc Licensing USA is solely responsible, at its cost, to support and maintain the Centurion Platform licensed hereunder.

2.4     Uniloc Licensing USA shall not have any right to, and Uniloc Licensing USA shall not, grant any sublicenses under any of the licenses granted to it in Section 2.1, Section 2.2 or Section 2.3 to any third parties without the prior written consent of Uniloc 2017.

2

                                        Uniloc Common Production to Google002678

2.5    Unless otherwise specifically expressed in this Agreement, no license to, or right of Uniloc 2017 under, any patents, copyrights or other intellectual property of Uniloc 2017 is either granted or implied to Uniloc Licensing USA and all rights not expressly granted in this Agreement are expressly reserved by Uniloc 2017.

## Section 3.    ENFORCEMENT; NULLITY PROCEEDINGS.

3.1    Effective as of the Effective Date, Uniloc 2017 shall, without any further action by any party hereto, grant to Uniloc Licensing USA, and Uniloc Licensing USA shall accept from Uniloc 2017, the exclusive right to: (a) bring suit in the name of Uniloc Licensing USA, or, if required by applicable law, jointly with Uniloc 2017, for infringement of the Licensed Patents, and manage and oversee any such suit, including by defending any counterclaims brought by any party as part of any such suit; (b) defend any nullity proceeding or similar legal proceeding in the name of Uniloc Licensing USA, or, if required by applicable law, jointly with Uniloc 2017, with respect to any of the Licensed Patents, and manage and oversee any such proceeding, including by defending any counterclaims brought by any party as part of any such proceeding; (c) recover damages, profits and awards of whatever nature for past and present infringement of the Licensed Patents; and (d) settle (with the prior written consent of Uniloc 2017) any claim or suit for infringement of, or any nullity proceeding or similar proceeding with respect to, the Licensed Patents.

3.2    To the extent Uniloc Licensing USA receives any damages, profits, awards or other proceeds in respect of the Licensed Patents by way of award, settlement or otherwise, Uniloc Licensing USA shall promptly pay to Uniloc 2017, 100% of such proceeds. In addition, Uniloc Licensing USA will invoice to Uniloc 2017 100% of all direct costs related thereto, plus the service fee described below.

## Section 4.    FEES AND PAYMENTS.

4.1    Uniloc 2017 shall reimburse Uniloc Licensing USA for all reasonable and documented out-of-pocket expenses incurred by Uniloc Licensing USA and its officers, directors, employees, agents and representatives in rendering the Services. Such reimbursement shall also include a reasonable and proportionate allocable share of overhead expenses incurred in providing the Services. The costs incurred by Uniloc Licensing USA in providing the Services under this Agreement shall be calculated using a generally accepted cost accounting system and will be based on actual direct and indirect costs incurred by Uniloc Licensing USA.

4.2    Uniloc Licensing USA shall charge an arm's-length service fee agreed upon in writing by both parties hereto, adhering to transfer pricing regulations in the respective tax jurisdictions. All such fees shall be in United States dollars and shall be paid in the United States of America by wire transfer to a bank to be designated by Uniloc Licensing USA.

4.3    On a quarterly basis, Uniloc Licensing USA will furnish to Uniloc 2017 a written report in the English language that has been approved by the board of directors of Uniloc Licensing USA and that describes in reasonable detail the Services provided by Uniloc Licensing USA during the preceding fiscal quarter. Such report will be provided within sixty (60) days after the end of the prior fiscal quarter and will separately describe the different types and amounts of

3

the Services rendered. Within thirty (30) days of receipt of such report, Uniloc 2017 shall pay all fees for the Services and provide all reimbursements for reasonable and documented out-of-pocket expenses incurred in connection with the Services described in such report in a manner consistent with the terms of this Agreement; provided, that Uniloc 2017 may, in its sole and reasonable discretion and by written notice to Uniloc Licensing USA, object to and not reimburse any expenses provided in such report, whereupon the parties shall in good faith negotiate the proper amount of reimbursement (if any) to be provided by Uniloc 2017 to Uniloc Licensing USA with respect to such expense.

4.4     If Uniloc 2017 fails to timely make any payment required under this Agreement, interest at an annual rate equal to five percent (5%) of the unpaid amount shall accrue from the date the payment became due until the date it is paid in full. The interest rate will be adjusted from time to time as may be required to accommodate relevant transfer pricing requirements.

4.5     In no event shall Uniloc Licensing USA be liable to Uniloc 2017 for any financial loss incurred in connection with the provision of the Services under this Agreement.

**Section 5.     TERM OF AGREEMENT; TERMINATION**.

5.1     The term of this Agreement will commence on the date hereof and will continue thereafter in force for successive annual periods from the first day of the next calendar year until terminated.

5.2     This Agreement may be terminated (a) by either party upon thirty (30) days' written notice to the other party, (b) by mutual agreement in writing by both parties hereto or (c) upon breach of any provision of this Agreement by any party and delivery of written notice in respect of such breach to the breaching party by the non-breaching party.

5.3     Upon the termination of this Agreement in accordance with Section 5.2, Uniloc Licensing USA shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions as may be reasonably requested by Uniloc 2017, to facilitate an orderly transition of the Services (including any actions necessary to change the parties to any litigation matter in which any of the parties hereto is a party). Uniloc 2017 shall reimburse all documented out-of-pocket expenses reasonably incurred by Uniloc Licensing USA in connection with the actions described in the immediately preceding sentence. The covenants set forth in this Section 5.3 shall survive any termination of this Agreement.

**Section 6.     TAXES**.

6.1     If the paying party is required by applicable law to deduct any Taxes from or in respect of any sum payable under or in respect of this Agreement to the other party, the paying party shall (x) make such deductions and (y) pay the full amount deducted to the relevant taxing authorities in accordance with the requirements of applicable law. To the extent any such amounts are so deducted, such amounts shall be treated for all purposes under this Agreement as having been paid to the party to whom such amounts would otherwise have been paid.

CONFIDENTIAL - ATTORNEYS EYES ONLY                Uniloc Common Production to Google002680

6.2　In addition, the paying party agrees to pay any present or future stamp, recording, documentary, excise, property, VAT, sales and use, or similar tax, charge or levy that arise from any payments made under or in respect of this Agreement; provided, however, that any such amounts shall be limited to the net amount of any such tax, charge or levy payable by the recipient after taking into account any deductions or credits to which the recipient is entitled under applicable law.

**Section 7.　CONFIDENTIALITY; PRIVILEGED INFORMATION.**

7.1　Each of the parties shall keep confidential, disclose only to its affiliates, officers, directors, principals, employees, agents, auditors, advisors and other representatives and use only in connection with the transactions contemplated by this Agreement all information and data obtained by them from or on behalf of the other party relating to such other party, the Licensed Patents, the Centurion Platform, the terms of this Agreement or the transactions contemplated hereby (other than information or data that is or becomes available to the public other than as a result of a breach of this Section 7), unless disclosure of such information or data is required by applicable law. Notwithstanding the foregoing, Uniloc 2017 may, upon the agreement of Uniloc Licensing USA, disclose any information subject to the confidentiality provisions of the immediately preceding sentence to any third party as may be necessary or helpful to further the goals of this Agreement.

7.2　Without limiting any of the obligations set forth in Section 7.1, the parties agree that any Privileged Information exchanged between the parties, their respective employees, counsel, indemnitors, advisors, consultants, agents and representatives (collectively, "**Representatives**"), as may be necessary or helpful to further the goals of this Agreement, is subject to this Agreement. In the absence of any written agreement between the parties to the contrary, Privileged Information exchanged under this Agreement shall only be shown, or the contents disclosed, to the parties' respective Representative on a need-to-know basis for purposes of furthering the one or more of the parties' cooperation with respect to the transactions contemplated by this Agreement and to ensure the confidentiality of the exchanged Privileged Information.

7.3　The parties fully intend by this Agreement to ensure that any exchange and/or disclosure of Privileged Information under this Agreement (a) does not in any way diminish or compromise the confidentiality of the same and (b) does not constitute to any extent a waiver of any privilege or immunity that otherwise would encompass such Privileged Information, in whole or in part, in the absence of exchange under this Agreement.

7.4　The parties hereby agree to keep confidential as among themselves and not to disclose to any third party (with the exception of the party's respective Representatives on a need-to-know basis) any Privileged Information that either party could claim is subject to the protections of attorney-client, joint defense, or common interest privileges (including as set forth in Section 8) or the attorney work-product doctrine. The parties further agree to take all steps necessary to preserve any applicable privilege or doctrine in connection with any such Privileged Information.

5

CONFIDENTIAL - ATTORNEYS EYES ONLY

7.5    All Privileged Information exchanged under this Agreement shall be returned to the providing party or destroyed at the request of the providing Party upon the expiration or termination of this Agreement.

7.6    Privileged Information exchanged between the parties is to be provided solely for the use of the parties in connection with the transactions contemplated by this Agreement.

**Section 8.    COMMON INTEREST**. Without assuming, increasing or incurring additional obligations or liabilities on behalf of any party hereto or limiting any provision of Section 7, the parties acknowledge and agree that (a) the parties have a common, joint, and mutual legal interest to maintain the privileged status of the information exchanged between the parties in connection with the license provisions of Section 2 and the enforcement provisions of Section 3, (b) the parties and their counsel may exchange privileged and work product information, orally and in writing, including, without limitation, analyses, mental impressions, legal memoranda, draft legal documents, claims charts and other related work products (collectively, "**Common Interest Materials**"), (c) the exchange of Common Interest Materials may best enable the parties to pursue their separate but common interests with respect to the Licensed Patents, the Services, the license provisions of Section 2 and the enforcement provisions of Section 3 and (d) any Common Interest Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection.

**Section 9.    MISCELLANEOUS**.

9.1    Amendment and Modification. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each party.

9.2    Waiver. No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies which they would otherwise have hereunder. Any agreement on the part of either party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such party.

9.3    Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e mail or otherwise or (b) on the first business day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier.

9.4    Interpretation. When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. The headings contained in this Agreement are for convenience of reference purposes only and shall not affect in

6

any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement. The term "or" is not exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall." References to days mean calendar days unless otherwise specified.

9.5    Entire Agreement. This Agreement constitutes the entire agreement, and supersedes all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the parties with respect to the subject matter hereof. Notwithstanding any oral agreement or course of conduct of the parties to the contrary, no party to this Agreement shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the parties.

9.6    No Third-Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to or shall confer upon any person or entity other than the parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

9.7    Governing Law. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

9.8    Assignment; Successors. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by either party without the prior written consent of the other party, and any such assignment without such prior written consent shall be null and void; provided, however, that Uniloc 2017 may assign this Agreement to any affiliate without the prior consent of Uniloc Licensing USA; provided, further, that no assignment shall limit the assignor's obligations hereunder. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

9.9    Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

CONFIDENTIAL - ATTORNEYS EYES ONLY    Uniloc Common Production to Google002683

9.10    <u>Counterparts; Facsimile or .pdf Signature</u>. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. This Agreement may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

9.11    <u>No Presumption Against Drafting Party</u>. Each party acknowledges that each party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

9.12    <u>Independent Contractor</u>. It is understood and agreed that Uniloc Licensing USA shall for all purposes hereof be deemed to be an independent contractor and shall not, unless otherwise expressly authorized by Uniloc 2017, have any authority to act for or represent Uniloc 2017 in any way, execute any transaction on behalf of Uniloc 2017 or otherwise be deemed an agent or employee of Uniloc 2017, except to the extent that any member or professional employee of Uniloc Licensing USA may be serving as a director or an officer of Uniloc 2017.

9.13    <u>Indemnification</u>. Uniloc Licensing USA shall indemnify, defend and hold harmless Uniloc 2017 and its affiliates and its and their respective directors, officers, employees and agents (the "**Indemnitees**"), from and against any and all claims, losses, damages, suits, fees, judgments, costs and expenses (including reasonable attorneys' fees) that the Indemnitees may suffer or incur arising out of or in connection with Uniloc Licensing USA's gross negligence, willful misconduct, bad faith or fraud.

*Remainder of page left intentionally blank; signature pages follow.*

8

CONFIDENTIAL - ATTORNEYS EYES ONLY                                     Uniloc Common Production to Google002684

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized officers.

<u>**UNILOC 2017:**</u>

**UNILOC 2017 LLC**

By: _____

Name:

Title:     CONSTANTINE M. DAKOLIAS
            PRESIDENT

*[Signature Page to License Agreement]*

UNILOC LICENSING USA LLC

By: _____

Name: Craig Etchegoyen

Title: CEO

*[Signature Page to License Agreement]*

# EXHIBIT T

## AMENDMENT NO. 1 TO LICENSE AGREEMENT

This Amendment No. 1 to License Agreement, dated as of August 28, 2018 (this "Amendment") and effective as of May 3, 2018 (the "Effective Date"), amends that certain License Agreement, dated as of May 3, 2018 (the "Agreement"), by and between Uniloc 2017 LLC, a Delaware limited liability company ("Uniloc 2017") and Uniloc Licensing USA LLC, a Delaware limited liability company ("Uniloc Licensing USA"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

WHEREAS, the parties hereto desire to clarify their original intentions under the Agreement with respect to the (x) scope of the license granted to Uniloc Licensing USA with respect to the right to enforce through litigation the Licensed Patents in the Territory and (y) circumstances under which Uniloc Licensing USA may retain outside counsel, consultants, experts, advisors and other service providers in connection with the license granted to Uniloc Licensing USA under the Agreement;

WHEREAS, pursuant to Section 9.1 of the Agreement, the Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment thereto, signed on behalf of each party thereto; and

WHEREAS, the parties hereto desire to amend the Agreement in accordance with the provisions and terms set forth in this Amendment.

NOW, THEREFORE, in consideration of the premises set forth above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Amendments.

(a)    Effective as of the Effective Date, Section 2.1 of the Agreement is deleted and amended and restated in its entirety to provide the following: "Effective as of the Effective Date, Uniloc 2017, without any further action by any party hereto, hereby grants to Uniloc Licensing USA during the term of this Agreement a non-assignable exclusive license within the Territory under the Licensed Patents solely to enforce through litigation, as set forth in further detail in Section 3, such Licensed Patents solely in the Territory, except for those litigation matters set forth on Schedule A appended hereto (the "Uniloc USA Litigation Matters"), as the right to enforce through litigation such Uniloc USA Litigation Matters has been assigned solely to Uniloc USA, Inc. pursuant to that certain License Agreement, dated as of the date hereof, by and between Uniloc 2017 and Uniloc USA, Inc., as amended. In connection with, and in furtherance of, the license granted by Uniloc 2017 to Uniloc Licensing USA pursuant to the immediately preceding sentence, Uniloc 2017 acknowledges and agrees that Uniloc Licensing USA may, without the prior written consent of Uniloc 2017, retain such outside counsel, consultants, experts, advisors and other service providers as are deemed reasonably necessary by Uniloc Licensing USA on customary arm's-length terms and conditions."

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    

(b)     Effective as of the Effective Date, the Agreement is amended to include <u>Schedule A</u> in the form of such Schedule appended to this Amendment.

(c)     Effective as of the Effective Date, Section 3.1 of the Agreement is amended such that the following phrase is inserted between the words "exclusive right" and "to": "(except with respect to the Uniloc USA Litigation Matters)".

2.     <u>Effect of Amendment</u>. This Amendment shall not constitute an amendment or waiver of any provision of the Agreement not expressly amended or waived herein and shall not be construed as an amendment, waiver or consent to any action that would require an amendment, waiver or consent except as expressly stated herein. The provisions and agreements set forth herein shall not establish a custom or course of dealing or conduct between the parties hereto. The Agreement, as amended by this Amendment, is and shall continue to be in full force and effect and is in all respects ratified and confirmed hereby.

3.     <u>Reference to the Agreement</u>. After giving effect to this Amendment, unless the context otherwise requires, each reference in the Agreement to "this Agreement", "hereof", "hereunder", "herein" or words of like import referring to the Agreement shall refer to the Agreement as amended by this Amendment; <u>provided,</u> that references in the Agreement to "as of the date hereof" or "as of the date of this Agreement" or words of like import shall continue to refer to May 3, 2018.

4.     <u>Miscellaneous</u>. This Amendment may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each party hereto. This Amendment and all disputes or controversies arising out of or related to this Amendment shall be governed by and construed in accordance with the internal laws of the State of Delaware, without reference to its conflicts of law principles. The provisions of Article 9 (other than Section 9.1 and Section 9.7) of the Agreement shall apply to this Amendment *mutatis mutandis* as if set forth herein.

*Remainder of page left intentionally blank; signature pages follow.*

Schedule A-2

Uniloc Common Production to Google 0009318

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first written above.

**UNILOC 2017:**

**UNILOC 2017 LLC,**
a Delaware limited liability company

By: _____
    Name: CONSTANTINE M. DAKOLIAS
    Title: PRESIDENT

**UNILOC LICENSING USA:**

**UNILOC LICENSING USA LLC,**
a Delaware limited liability company

By: _____
    Name:
    Title:

*[Signature Page to Amendment No. 1 to License Agreement]*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first written above.

**UNILOC 2017:**

**UNILOC 2017 LLC**,
a Delaware limited liability company

By: _____
     Name:
     Title:

**UNILOC LICENSING USA:**

**UNILOC LICENSING USA LLC**,
a Delaware limited liability company

By: _____
     Name:
     Title:

*[Signature Page to Amendment No. 1 to License Agreement]*

## Schedule A

## Uniloc USA Litigation Matters

| Name | Number | District | Filed |
|------|--------|----------|-------|
| Uniloc USA, Inc. et al v. AVG Technologies USA, Inc. | 6-13-cv-00626 | TXED | 6-Sep-13 |
| Uniloc USA, Inc. et al v. Kaspersky Lab, Inc. | 6-13-cv-00795 | TXED | 18-Oct-13 |
| Uniloc USA, Inc. v. E-MDS, Inc. | 6-14-cv-00625 | TXED | 18-Jul-14 |
| Uniloc USA, Inc. et al v. Avaya Inc. | 6-15-cv-01168 | TXED | 28-Dec-15 |
| Uniloc USA, Inc. et al v. Facebook, Inc. | 6-16-cv-00223 | TXED | 18-Mar-16 |
| Uniloc USA, Inc. et al v. WhatsApp Inc. | 6-16-cv-00225 | TXED | 18-Mar-16 |
| Uniloc USA, Inc. et al v. AVG Technologies USA, Inc. et al | 2-16-cv-00393 | TXED | 12-Apr-16 |
| Uniloc USA, Inc. et al v. Picis, Inc. | 6-16-cv-00465 | TXED | 27-May-16 |
| Uniloc USA, Inc. et al v. QuadraMed Corporation | 6-16-cv-00466 | TXED | 27-May-16 |
| Uniloc USA, Inc. et al v. N Harris Computer Corporation | 6-16-cv-00467 | TXED | 27-May-16 |
| Uniloc USA, Inc. et al v. OptumInsight, Inc. et al | 6-16-cv-00468 | TXED | 27-May-16 |
| Uniloc USA, Inc. et al v. Netsmart Technologies, Inc. | 6-16-cv-00470 | TXED | 27-May-16 |
| Uniloc USA, Inc. et al v. Medical Information Technology, Inc. d/b/a Meditech | 6-16-cv-00463 | TXED | 27-May-16 |
| Uniloc USA, Inc. et al v. Google LLC | 2-16-cv-00566 | TXED | 28-May-16 |
| Uniloc USA, Inc. et al v. Apple Inc. | 2-16-cv-00638 | TXED | 14-Jun-16 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. | 2-16-cv-00642 | TXED | 14-Jun-16 |
| Uniloc USA, Inc. et al v. WhatsApp, Inc. | 2-16-cv-00645 | TXED | 14-Jun-16 |
| Uniloc USA, Inc. et al v. Snap Inc. | 2-16-cv-00696 | TXED | 30-Jun-16 |
| Uniloc USA, Inc. et al v. Facebook, Inc. | 2-16-cv-00728 | TXED | 5-Jul-16 |

| Name | Number | District | Filed |
|---|---|---|---|
| Uniloc USA, Inc. et al v. Green Tomato Limited | 2-16-cv-00731 | TXED | 5-Jul-16 |
| Uniloc USA, Inc. et al v. Sony Interactive Entertainment LLC | 2-16-cv-00732 | TXED | 5-Jul-16 |
| Uniloc USA, Inc. et al v. Avaya Inc. | 2-16-cv-00777 | TXED | 15-Jul-16 |
| Uniloc USA, Inc. et al v. Telegram Messenger, LLP | 2-16-cv-00892 | TXED | 11-Aug-16 |
| Uniloc USA, Inc. et al v. HTC America, Inc. | 2-16-cv-00989 | TXED | 6-Sep-16 |
| Uniloc USA, Inc. et al v. LG Electronics USA, Inc. | 2-16-cv-00991 | TXED | 6-Sep-16 |
| Uniloc USA, Inc. et al v. Motorola Mobility LLC | 2-16-cv-00992 | TXED | 6-Sep-16 |
| Uniloc USA, Inc. et al v. ZTE (USA) Inc. et al | 2-16-cv-00993 | TXED | 6-Sep-16 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-16-cv-00994 | TXED | 6-Sep-16 |
| Uniloc USA, Inc. et al v. Google, LLC | 2-17-cv-00214 | TXED | 20-Mar-17 |
| Uniloc USA, Inc. et al v. Google Inc. | 2-17-cv-00224 | TXED | 22-Mar-17 |
| Uniloc USA, Inc. et al v. Amazon.com, Inc. et al | 2-17-cv-00228 | TXED | 24-Mar-17 |
| Uniloc USA, Inc. et al v. Google, LLC | 2-17-cv-00231 | TXED | 26-Mar-17 |
| Uniloc USA, Inc. et al v. Cisco Systems, Inc. | 2-17-cv-00527 | WAWD | 4-Apr-17 |
| Uniloc USA, Inc. et al v. Riot Games, Inc. | 2-17-cv-00275 | TXED | 6-Apr-17 |
| Uniloc USA, Inc. et al v. Nexon America, Inc. | 2-17-cv-00276 | TXED | 6-Apr-17 |
| Uniloc USA, Inc. et al v. Square Enix, Inc. | 2-17-cv-00302 | TXED | 12-Apr-17 |
| Uniloc USA, Inc. et al v. Kik Interactive, Inc. | 2-17-cv-00346 | TXED | 21-Apr-17 |
| Uniloc USA, Inc. et al v. Kik Interactive, Inc. | 2-17-cv-00347 | TXED | 21-Apr-17 |
| Uniloc USA, Inc. et al v. Hike Ltd. | 2-17-cv-00348 | TXED | 21-Apr-17 |
| Uniloc USA, Inc. et al v. Hike Ltd. | 2-17-cv-00349 | TXED | 21-Apr-17 |
| Uniloc USA, Inc. et al v. RingCentral, Inc. | 2-17-cv-00354 | TXED | 25-Apr-17 |

Schedule A-2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Name | Number | District | Filed |
|---|---|---|---|
| Uniloc USA, Inc. et al v. RingCentral, Inc. | 2-17-cv-00355 | TXED | 25-Apr-17 |
| Uniloc USA, Inc. v. Picis, Inc. (original case no. before consolidation, 6-16-cv-00465) | 6-16-cv-00463 | TXED | 15-May-17 |
| Uniloc USA, Inc. et al v. Google Inc. | 2-17-cv-00465 | TXED | 1-Jun-17 |
| Uniloc USA, Inc. et al v. Google Inc. | 2-17-cv-00466 | TXED | 1-Jun-17 |
| Uniloc USA, Inc. et al v. Google Inc. | 2-17-cv-00467 | TXED | 1-Jun-17 |
| Nutanix, Inc. v. Uniloc USA, Inc. et al | 4-17-cv-03181 | CAND | 2-Jun-17 |
| Uniloc USA, Inc. et al v. Hike Ltd. | 2-17-cv-00475 | TXED | 6-Jun-17 |
| Uniloc USA, Inc. et al v. Hike Ltd. | 2-17-cv-00476 | TXED | 6-Jun-17 |
| Uniloc USA, Inc. et al v. Kik Interactive, Inc. | 2-17-cv-00481 | TXED | 7-Jun-17 |
| Uniloc USA, Inc. et al v. Kik Interactive, Inc. | 2-17-cv-00483 | TXED | 7-Jun-17 |
| Riot Games, Inc. v. Uniloc USA, Inc. et al | 8-17-cv-01050 | CACD | 15-Jun-17 |
| Uniloc USA, Inc. v. Picis, Inc. (appealed from TXED 6-16-cv-00463, filed on 5/15/17) | 17-2171 | CAFC | 16-Jun-17 |
| Uniloc USA, Inc. et al v. Blackboard, Inc. | 1-17-cv-00753 | TXWD | 11-Aug-17 |
| Uniloc USA, Inc. et al v. Infor, Inc. | 3-17-cv-02119 | TXND | 11-Aug-17 |
| Amazon.com, Inc. et al v. Uniloc USA, Inc. et al | 2-17-cv-01307 | WAWD | 29-Aug-17 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. et al | 2-17-cv-00650 | TXED | 15-Sep-17 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. et al | 2-17-cv-00651 | TXED | 15-Sep-17 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. et al | 2-17-cv-00652 | TXED | 15-Sep-17 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-17-cv-00707 | TXED | 20-Oct-17 |
| Uniloc USA, Inc. et al v. Apple Inc. | 2-17-cv-00708 | TXED | 20-Oct-17 |

Schedule A-3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Name | Number | District | Filed |
|------|--------|----------|-------|
| Uniloc USA, Inc. et al v. HTC America, Inc. | 2-17-cv-01558 | WAWD | 20-Oct-17 |
| Uniloc USA, Inc. et al v. Exclusive Group LLC d/b/a Binatone North America | 1-17-cv-03962 | INSD | 27-Oct-17 |
| Uniloc USA, Inc. v. ADP, LLC et al (appealed from TXED 2-16-cv-00393, filed on 4/12/16) (appeal consolidated with Appeal No. 18-1448) | 18-1132 | CAFC | 1-Nov-17 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-17-cv-00736 | TXED | 9-Nov-17 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-17-cv-00737 | TXED | 9-Nov-17 |
| Uniloc USA, Inc. et al v. Motorola Mobility, LLC | 1-17-cv-01658 | DED | 15-Nov-17 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-17-cv-00746 | TXED | 16-Nov-17 |
| Uniloc USA, Inc. et al v. Apple Inc. | 3-18-cv-00360 | CAND | 17-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 3-18-cv-00365 | CAND | 17-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 4-18-cv-00361 | CAND | 17-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 4-18-cv-00362 | CAND | 17-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 4-18-cv-00364 | CAND | 17-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. (previously filed in TXED as case no. 2-17-cv-00258) | 5-18-cv-00357 | CAND | 17-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 3-18-cv-00358 | CAND | 17-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 3-18-cv-00363 | CAND | 18-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 3-18-cv-00572 | CAND | 26-Jan-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 1-18-cv-00158 | TXWD | 22-Feb-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 1-18-cv-00159 | TXWD | 22-Feb-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 1-18-cv-00161 | TXWD | 22-Feb-18 |

Schedule A-4

| Name | Number | District | Filed |
|---|---|---|---|
| Uniloc USA, Inc. et al v. Apple Inc. | 1-18-cv-00163 | TXWD | 22-Feb-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 1-18-cv-00164 | TXWD | 22-Feb-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 1-18-cv-00166 | TXWD | 22-Feb-18 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. et al | 2-18-cv-00040 | TXED | 23-Feb-18 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. et al | 2-18-cv-00041 | TXED | 23-Feb-18 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. et al | 2-18-cv-00042 | TXED | 23-Feb-18 |
| Uniloc USA, Inc. et al v. Samsung Electronics America, Inc. et al | 2-18-cv-00044 | TXED | 23-Feb-18 |
| Uniloc USA, Inc. et al v. Logitech Inc. et al | 5-18-cv-01304 | CAND | 28-Feb-18 |
| Uniloc USA, Inc. et al v. LG Electronics USA, Inc. et al | 3-18-cv-00557 | TXND | 9-Mar-18 |
| Uniloc USA, Inc. et al v. LG Electronics USA, Inc. et al | 3-18-cv-00559 | TXND | 9-Mar-18 |
| Uniloc USA, Inc. et al v. LG Electronics USA, Inc. et al | 3-18-cv-00560 | TXND | 9-Mar-18 |
| Uniloc USA, Inc. et al v. LG Electronics USA, Inc. et al | 3-18-cv-00561 | TXND | 9-Mar-18 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-18-cv-00072 | TXED | 13-Mar-18 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-18-cv-00073 | TXED | 13-Mar-18 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-18-cv-00074 | TXED | 13-Mar-18 |
| Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al | 2-18-cv-00075 | TXED | 13-Mar-18 |
| Uniloc USA, Inc. et al v. Amazon.com, Inc. | 2-18-cv-00080 | TXED | 15-Mar-18 |

Schedule A-5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Name | Number | District | Filed |
|---|---|---|---|
| Uniloc USA, Inc. et al v. Amazon.com, Inc. | 2-18-cv-00081 | TXED | 16-Mar-18 |
| Uniloc Luxembourg SA et al v. Amazon.com, Inc. | 2-18-cv-00091 | TXED | 22-Mar-18 |
| Uniloc Luxembourg SA et al v. Amazon.com, Inc. | 2-18-cv-00092 | TXED | 22-Mar-18 |
| Uniloc USA, Inc. et al v. Amazon.com, Inc. | 2-18-cv-00123 | TXED | 31-Mar-18 |
| Uniloc USA, Inc. et al v. Apple Inc. | 1-18-cv-00293 | TXWD | 9-Apr-18 |
| Uniloc USA, Inc. et al v. Ubisoft, Inc. | 3-18-cv-02375 | CAND | 19-Apr-18 |
| Uniloc USA, Inc. v. E-MDS, Inc. (appealed from TXED 6-14-cv-00625, filed on 7/18/14) | 18-1893 | CAFC | 27-Apr-18 |
| Uniloc USA, Inc. et al v. Apple Inc. (appealed from CAND 3-18-cv-00358, filed on 1/17/18) | 18-2094 | CAFC | 20-Jun-18 |

Schedule A-6

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT U

## AMENDED AND RESTATED NOTE PURCHASE AND SECURITY AGREEMENT

This Amended and Restated Note Purchase and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of November 16, 2018 (the "Effective Date") by and between Uniloc 2017 LLC, a Delaware limited liability company ("Company"), and CF Uniloc Holdings LLC, a Delaware limited liability company, as the purchaser ("Purchaser") and as the collateral agent (in such capacity, "Collateral Agent"). The parties hereto are sometimes referred to herein as a "Party" or, collectively, as the "Parties".

### RECITALS

WHEREAS, the Parties are party to that certain Note Purchase and Security Agreement, dated as of May 3, 2018 (the "Original Note Purchase Agreement"), pursuant to which Purchaser purchased (the "Note Purchase") from Company promissory notes in the form attached as Exhibit A (each as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Notes") in an aggregate principal amount of $54,241,109 (the "Note Purchase Amount"); and

WHEREAS, the Parties have agreed to amend and restate the Original Note Purchase Agreement in its entirety as set forth herein.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### AGREEMENT

**1.     DEFINITIONS.**

1.1     Certain Defined Terms. As used in this Agreement, the following terms shall have the following respective meanings:

"Affiliate" means with respect to any Person, a Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members; provided, however, that (i) none of Parties or their parent companies or Affiliates shall be deemed to be an Affiliate of any Party or its parent company or Affiliates and (ii) none of Parties or their parent companies or Affiliates shall be deemed to be an Affiliate of Company or any of its Affiliates.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in The City of New York.

"Change of Control" means at any time, any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act of 1934, as amended) shall have acquired beneficial ownership of more than 50% on a fully diluted basis of the voting and/or economic interest in the equity interests of Company or shall have obtained the power (whether or not

Collateral Agent, and Company will pay the costs of filing the same in all public offices within the United States where Collateral Agent deems necessary or desirable.

4.4    Impairment of Collateral. No impairment of, injury to, or loss or destruction of any of the Collateral shall relieve Company of any of the Secured Obligations, except as may be specifically provided otherwise herein.

4.5    Return of Collateral. Upon payment in full of the Notes and any other amounts due hereunder, Collateral Agent shall release its security interest in, and return to Company, all Collateral hereunder.

4.6    Further Assurances. Company agrees that at any time and from time to time, at its expense, Company will promptly execute and deliver all further instruments and documents, and take all further action that Collateral Agent may request, in order to perfect and protect the security interests granted or purported to be granted hereby and to enable Collateral Agent or Purchaser to exercise and enforce its rights and remedies hereunder with respect to any Collateral within the United States, which instruments and documents shall include, without limitation, any and all necessary or appropriate filings with the U.S. Patent and Trademark Office.

4.7    Collateral Agent Appointed Attorney-in-Fact. Subject to Section 4.8, Company hereby irrevocably appoints Collateral Agent as Company's attorney-in-fact, with full authority in the place and stead of Company and in its name or otherwise, from time to time in Collateral Agent's discretion and without notice to Company, to take any action and to execute any instrument which Collateral Agent may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including without limitation, to receive, endorse and collect all instruments made payable to Company representing any interest payment, principal payment or other payment in respect of the Collateral or any part thereof and to give full discharge for the same, when and to the extent permitted by this Agreement. Collateral Agent may not exercise the power of attorney granted to it this Section 4.7, except as expressly permitted in Section 4.8.

4.8    Collateral Agent May Perform. Upon the occurrence and during the continuance of an Event of Default and only after Collateral Agent provides written notice to Company of such Event of Default, Collateral Agent may exercise the power of attorney granted to it in Section 4.7 to (but shall not be obligated and shall have no liability to any Person for failure to) itself perform, or cause performance of, this Agreement, and the expenses of Collateral Agent incurred in connection therewith shall be payable by Company.

4.9    Intellectual Property. As to Collateral in the form of intellectual property ("Intellectual Property Collateral"):

(a)    Subject to Section 4.9(e), with respect to each item of the Intellectual Property Collateral, Company agrees to take, at its expense, all necessary steps, including, without limitation, in the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authority within the United States, to (i) maintain the validity and enforceability of such Intellectual Property Collateral and maintain such Intellectual Property Collateral in full force and effect and (ii) pursue the registration and maintenance of each trademark or copyright registration or application, now or hereafter included in

8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    Uniloc Common Production to Google 0011450

such Intellectual Property Collateral. Subject to Section 4.9(e), Company shall not, without the written consent of Collateral Agent, discontinue use of or otherwise abandon or fail to pursue the registration or maintenance of any Intellectual Property Collateral.

(b)     [Reserved]

(c)     Company has executed and delivered an agreement, in substantially the form set forth in Exhibit C hereto (an "Intellectual Property Security Agreement"), for recording the security interest granted hereunder to Collateral Agent, for the benefit of Purchaser, in such Intellectual Property Collateral with the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authorities within the United States necessary to perfect the security interest hereunder in such Intellectual Property Collateral.

(d)     Company agrees that should it obtain an ownership interest in any items that would constitute Intellectual Property Collateral that is not on the date hereof a part of the Intellectual Property Collateral ("After-Acquired Intellectual Property"), (i) the provisions of this Agreement shall automatically apply thereto and (ii) any such After-Acquired Intellectual Property and, in the case of trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual Property Collateral subject to the terms and conditions of this Agreement with respect thereto. Company shall give prompt written notice to Collateral Agent identifying the After-Acquired Intellectual Property, and Company shall execute and deliver to Collateral Agent an Intellectual Property Security Agreement covering such After-Acquired Intellectual Property, which Intellectual Property Security Agreement shall be recorded with the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authorities within the United States necessary to perfect the security interest hereunder in such After-Acquired Intellectual Property.

(e)     Subject to Sections 4.7-4.8 and 8, but notwithstanding anything else to the contrary herein, Company has and retains all rights in all Patents owned, controlled, or exclusively licensed by Company, and has sole authority and discretion regarding the exercise of all rights under such Patents, including the prosecution, maintenance, use, right to exclude, disposition, licensing, and enforcement (including the settlement of any litigation) of such Patents, and nothing in this Agreement is intended to or shall be construed as limiting or providing Collateral Agent or any other Person with the right to control or limit Company's exercise of its rights under such patents and patent applications.

**5.     REPRESENTATIONS AND WARRANTIES OF COMPANY.** Company hereby represents and warrants to Purchaser as follows:

5.1     Organization, Good Standing and Qualification. Company is a limited liability company duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware and has all requisite power and authority to own its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted. Company is qualified to do business in each jurisdiction where failure to be so qualified would have a material adverse effect on its financial condition, business or operations.

9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY        Uniloc Common Production to Google 0011451

6.2 <u>Purchase for Own Account</u>. Each Note issued to Purchaser has been or will be acquired by Purchaser for its own account, not as a nominee or agent, and not with a view to or in connection with the sale or distribution of any part thereof.

6.3 <u>Exempt from Registration; Restricted Securities</u>. Purchaser understands that the sale of the Notes will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), on the grounds that the sale provided for in this Agreement is exempt from registration under the Securities Act, and that the reliance of Company on such exemption is predicated in part on Purchaser's representations set forth in this Agreement. Purchaser understands that the Notes are restricted securities within the meaning of Rule 144 under the Securities Act, and must be held indefinitely unless they are subsequently registered or an exemption from such registration is available.

6.4 <u>Accredited Investor</u>. Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission.

7. **COVENANTS**. The following covenants shall apply so long as any Notes remain outstanding:

7.1 <u>Negative Covenants</u>. Subject to Section 4.9(e), Company shall not, without the prior written consent of Purchaser, take any of the following actions:

(a) create, incur, assume or suffer to exist any Lien on or with respect to any of its assets constituting Collateral, whether now owned or hereafter acquired, except Liens created hereunder in favor of Collateral Agent, for the benefit of Purchaser (collectively, "Permitted Liens");

(b) create, incur, assume or suffer to exist any debt for borrowed money, except the Notes issued hereunder;

(c) merge into or consolidate with any Person or permit any Person to merge into it, or enter into transaction which would constitute a liquidation, Change of Control or sale of all or substantially all of the assets of Company;

(d) sell, lease, transfer or otherwise dispose of all or substantially all of its assets or, without the written consent of Collateral Agent, any of its assets constituting Collateral;

(e) enter into any transactions with Affiliates, except for (x) transactions entered into on arm's-length terms and (y) the transactions contemplated by the Transaction Documents and any amendments to the Transaction Documents agreed to by the parties thereto;

(f) amend its certificate of formation or its Operating Agreement; or

(g) change its name, type of organization, jurisdiction of organization, organizational identification number or location from those as of the Effective Date without first giving at least ten (10) days' prior written notice to Collateral Agent and taking all

11

Uniloc Common Production to Google 0011453

action required by Collateral Agent for the purpose of perfecting or protecting the security interest granted by this Agreement.

7.2 <u>Affirmative Covenant</u>. Subject to the provisions set forth in the Operating Agreement, Company shall use its best efforts to pursue any *bona fide* claim (including any claim for indemnification) under the Purchase Agreement in accordance with its terms. Company shall, in accordance with <u>Section 3.9</u>, apply any Net Proceeds obtained in connection with such claims towards the repayment of the Outstanding Balance.

7.3 <u>Use of Proceeds</u>. Company shall use the proceeds of the Note Purchase to fund working capital requirements of Company and for other general corporate purposes. No proceeds will be used to repay any existing indebtedness for borrowed money without the prior written consent of Purchaser.

7.4 <u>Certain Acknowledgements</u>.

(a) The relationship between Purchaser, on the one hand, and Company, on the other hand, is solely that of creditor and debtor. No party hereto has any fiduciary relationship or duty to any other party hereto arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the parties hereto by virtue of, any Note Document or any transaction contemplated therein.

(b) The Parties hereby expressly acknowledge that certain affiliates of Collateral Agent and Purchaser (collectively, "<u>Investor Parties</u>") are indirect equity owners of Company. Notwithstanding any common ownership and/or control between Investor Parties, on the one hand, and Company, on the other hand, (i) the parties hereto acknowledge and agree that: (x) Collateral Agent and Purchaser, on the one hand, and Company, on the other hand, are separate and distinct legal entities and (y) Collateral Agent and Purchaser may exercise all the rights, privileges and benefits of the holder of the Notes and enforce all remedies and other provisions under the Note Documents without regard to the fact that any of Investor Parties is an indirect equity owner of Company; (ii) to the maximum extent permitted by applicable law, (x) Company hereby waives and releases any and all defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind of nature that Company or any member or beneficial interest owner of Company may have against Collateral Agent and/or Purchaser relating to the Notes or to the Note Documents, or the enforcement by Collateral Agent and/or Purchaser of its rights and remedies thereunder, arising by reason of the fact that any of Investor Parties is an indirect equity owner of Company and (y) Company waives any and all defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind of nature that Company may have against Investor Parties arising by reason of the fact that Collateral Agent and/or Purchaser is acting in its capacity as the administrative agent and as lender under the Notes; and (iii) Company covenants and agrees never to institute or cause to be instituted or continue prosecution of any suit or cause of action or proceeding of any kind or nature whatsoever against Collateral Agent and/or Purchaser in contravention of the foregoing.

12

 Uniloc Common Production to Google 0011454

**IN WITNESS WHEREOF**, the Parties have executed this Amended and Restated Note Purchase and Security Agreement to be effective as of the date first above written.

**UNILOC 2017 LLC**

By: _____

Name: _____
Title: CONSTANTINE M. DAKOLIAS
        PRESIDENT

*[Signature Page to Amended and Restated Note Purchase and Security Agreement]*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Uniloc Common Production to Google 0011460

**CF UNILOC HOLDINGS LLC,**
as Purchaser and as Collateral Agent

By: _____

Name:    CONSTANTINE M. DAKOLIAS
Title:        PRESIDENT

*[Signature Page to Amended and Restated Note Purchase and Security Agreement]*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT V

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **UNILOC 2017 LLC,** | § | |
| **UNILOC USA, INC.** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | Civil Case No. 2:18-cv-491, -492, -493, |
| v. | § | -494, -495, -496, -497, -499, -500, |
| | § | -501, -502, -503, -504, -548, -550, -551, - |
| **GOOGLE LLC,** | § | 552, -553 |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendants Google LLC ("Google"), by its attorneys, will take the deposition of Plaintiff Uniloc 2017 LLC ("Uniloc 2017") by oral examination using videotape, audiotape, and/or stenographic means, before a Notary Public or other office authorized by law to administer oaths. The deposition will begin on September 5, 2019 at 9 a.m. at the offices of Jones Day, 1755 Embarcadero Road, Palo Alto, CA 94303, or at a mutually agreed upon time and location, and will continue from day to day (excluding weekends and holidays) until completed, or may be continued until competed at a future date or dates.

The deposition will be taken by or through one or more of Uniloc 2017's officers, directors, managing agents or other persons who are able to testify on Uniloc 2017's behalf about the matters set forth in Schedule A pursuant to Rule 30(b)(6). At least two weeks prior to the deposition, Uniloc 2017 is requested to designate in writing to Google the names(s) of the person(s) who will testify on its behalf concerning the subject matters set forth in Schedule A, and for each such written designation, the matter(s) as to which that person will testify. Also, at least two weeks prior to the

deposition, Uniloc 2017 shall produce all relevant documents in that designee's possession or custody.

DATED: July 19, 2019

/s/ Michael E. Jones
Michael E. Jones
State Bar No. 10929400

**POTTER MINTON, P.C.**
110 N. College Ave., Suite 500
mikejones@potterminton.com
Tel: (903) 597-8311
Fax: (903) 593-0846

*Attorney for Defendant Google LLC in all above-captioned cases*

Michael C. Hendershot
California State Bar No. 211830

**JONES DAY**
1755 Embarcadero Road
Palo Alto, CA 94303
mhendershot@jonesday.com
Tel: (650) 739-3940
Fax: (650) 739-3900

*Attorney for Defendant Google LLC in Civil Case Nos. 2:18-CV-00497, 2:18-CV-00499, 2:18-CV-00501, 2:18-CV-00552*

# TOPICS

**TOPIC NO. 1:**

The relationships between any Uniloc Entities, between any Fortress Entities, and/or between any combination of Uniloc Entities and Fortress Entities.

**TOPIC NO. 2:**

Any agreements between Fortress Entities, including any amendment, modification, supplementation, abrogation, or termination of any such agreements.

**TOPIC NO. 3:**

Any agreements between Uniloc Entities, including any amendment, modification, supplementation, abrogation, or termination of any such agreements.

**TOPIC NO. 4:**

Any agreements between any combination of Fortress Entities and Uniloc Entities, including any amendment, modification, supplementation, abrogation, or termination of any such agreements.

**TOPIC NO. 5:**

Each person or entity having an ownership interest in Uniloc 2017 or Uniloc USA, or any other non-public parent companies, direct or indirect, of Uniloc 2017 or Uniloc USA, including the amount or percentage of each person's or entity's interest since the formation of Uniloc 2017 or Uniloc USA to the present.

**TOPIC NO. 6:**

The formation of Uniloc 2017 LLC and Uniloc USA.

**TOPIC NO. 7:**

Uniloc USA's and Uniloc 2017's officers, directors, and executives from their formation to the present.

**TOPIC NO. 8:**

Uniloc USA's and Uniloc 2017's corporate structure, including any relationship to Uniloc Corporation PTY Limited, Uniloc Lux, CF Uniloc, Fortress Investment, Fortress, Uniloc USA, Uniloc 2017, Uniloc Management LLC, and Fortress Credit Corp.

**TOPIC NO. 9:**

Communications between any Uniloc Entity and any other party relating to the possibility of patent litigation, including any actual or potential patent litigation against Google and the Uniloc 2017-Google litigations.

**TOPIC NO. 10:**

All licensees, assignees, or other rightsholders of any of the Asserted Patents or Related Patents and the specific rights held by each such person or entity from September 15, 2018 to the present.

**TOPIC NO. 11:**

CF Uniloc's rights in any Asserted Patent or Related Patents from September 15, 2018 to the present.

**TOPIC NO. 12:**

All facts supporting Uniloc USA's or Uniloc 2017's claim that it has standing to bring the Uniloc 2017-Google litigations.

**TOPIC NO. 13:**

Any royalty obligations or milestones in any agreement between any Uniloc Entity and any Fortress Entity, including any communications about such obligations or milestones.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **UNILOC 2017 LLC,** | § | |
| | § | |
| *Plaintiff,* | § | Civil Case No. 2:18-cv-491, -492, -493, |
| | § | -494, -495, -496, -497, -499, -500, |
| v. | § | -501, -502, -503, -504, -548, -550, -551, |
| | § | -552, -553 |
| **GOOGLE LLC,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## ORDER GRANTING DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FOR LACK OF STANDING AND IMPROPER VENUE

Before the Court is Defendant Google LLC's Motion to Dismiss for Lack of Standing and Improper Venue ("Motion"). Having reviewed and considered the Motion and all related briefings, the Court finds that it should be GRANTED.

IT IS THEREFORE ORDERED that Google LLC's Motion to Dismiss for Lack of Standing and Improper Venue is GRANTED.