# EXHIBIT 1

1  UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF CALIFORNIA
3  SAN JOSE DIVISION
4  ------------------------------------------x
5  UNILOC USA, INC.,
   UNILOC LUXEMBOURG S.A.
6  and UNILOC 2017 LLC,
7        Plaintiff,
8  vs.               Case No.
                       5:19-cv-01692-EJD (VKD)
9
   APPLE INC.,
10
11       Defendant.
12 ------------------------------------------x
13 *** ADDITIONAL CAPTION ON PAGE 75 ***
14
15 CONFIDENTIAL - ATTORNEYS' EYES ONLY
16
17 REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
18 JAMES PALMER
19 September 9, 2020
20
21 Reported By: Lynne Ledanois, CSR 6811
22 Job No. 4226269(B)
23
24
25 Pages 74-237

Page 183

1   A   Based on -- I'm not a legal expert,
2   I'm not a lawyer, and so I can't legally --
3   legally -- I don't think I should comment on
4   that.
5   Q   Do you have an understanding
6   separately from the agreement in terms of when
7   there is an event of default, whether Fortress
8   has options at its disposal in terms of the
9   remedies it would have?
10  A   I mean, that would be -- normally I
11  think we would have to put them in default in
12  order to have those rights.  That's the way I
13  think it works on most of the stuff.
14  Q   Do you understand that Fortress would
15  need to make an election in order to invoke
16  remedies following an event of default?
17      MR. FOSTER:  So let me just stop you
18  there.  You've been asking him about 7.2.1.
19  Are you limiting your question to that or
20  are you broadening it to other sections?
21      MR. WINNARD:  I'm broadening it.
22      MR. FOSTER:  Okay.  Thank you.
23      THE WITNESS:  So please ask the
24  question again.
25  BY MR. WINNARD:

Page 184

1   Q   I'll state it this way:  Under the
2   revenue sharing agreement, do you have an
3   understanding as to whether Fortress's remedies
4   automatically come into play or whether it must
5   evoke them affirmatively in the event of a
6   default?
7   A   You know, legally how this is written,
8   I do not -- I'm not sure exactly, although based
9   on everything else that we do, I would suspect
10  that we would have to put them in default.
11  Q   Is there language in the agreement of
12  which you're aware that would require Fortress
13  to put Uniloc into default in order to invoke
14  its remedies?
15  A   Based on my review of it today, I
16  can't see it, but I would have to review the
17  entire document again.
18  Q   If you would turn to Section 7.3.
19  This is "Annulment of Defaults."
20      Do you see that?
21  A   Yes.
22  Q   Is Section 7.3 standard language in
23  Fortress's revenue sharing agreements?
24  A   I wouldn't know.
25  Q   As the managing director of IP at

Page 185

1   Fortress, do you have an understanding of this
2   provision?
3   A   So that's a different question.
4   Please -- specifically you're asking me about
5   this section in this instance or what?
6   Q   Do you have an understanding of this
7   language as the managing director of IP
8   transactions at Fortress?
9   A   On this specific language in this
10  specific section?  Again, I'm not a lawyer, you
11  know, legalese here, I'm not sure, so...
12  Q   You don't profess to be an expert in
13  the meaning of Section 7.3; right?
14  A   That's what I'm saying.
15  Q   Do you know why Fortress includes
16  Section 7.3 in the agreements with patent
17  assertion entities?
18  A   I didn't say that they put this in all
19  agreements with patent assertion entities.  In
20  this particular case, I don't know why it's
21  here.
22  Q   Let me ask that question.
23      Do you know why Section 7.3 was
24  included in the revenue sharing agreement
25  between Uniloc and Fortress?

Page 186

1   A   I do not.
2   Q   Did Fortress ever waive any event of
3   default in writing under this revenue sharing
4   agreement?
5   A   I don't believe Fortress ever
6   considered this company to be in event of
7   default.  So therefore, we would not have waived
8   it, I don't think.  But we never thought they
9   were in default.
10  Q   Are you aware of any instance where
11  Fortress waived an event default in a revenue
12  sharing agreement between Fortress and --
13  A   I don't recall.
14  Q   To the best of your understanding,
15  there was never an instance where Fortress
16  waived in writing any event of default under the
17  revenue sharing agreement between Fortress and
18  Uniloc; right?
19  A   To the best of my knowledge.
20  Q   To the best of your knowledge, that's
21  correct?
22  A   Yes, although I would say the fact
23  that we gave them more money and were very happy
24  with them, I mean, I can't imagine we considered
25  them in default.

Page 187

1  Q   Did Fortress ever enter any amendment
2  to the revenue sharing agreement that waived any
3  event of default?
4  A   I don't have them in front of me, so I
5  don't recall.
6  Q   Are you aware of any amendment to the
7  revenue sharing agreement that operated as a
8  waiver of any event of default?
9      MR. FOSTER: Objection to the form.
10     THE WITNESS: You keep asking me if we
11  waived the event of default. I don't
12  believe we considered them in default to
13  then waive them and waive the default.
14 BY MR. WINNARD:
15  Q   So is the answer to my question that
16  there was no waiver because you believed there
17  never to be an event of default?
18  A   I'm not aware of any waiver, specific
19  waiver.
20  Q   Are you aware of any general waiver?
21  A   I believe the fact that we continued
22  to give them money and were happy with the
23  investment, you know. I mean, I don't think
24  there was any waiver because we never thought
25  they were in default. I don't know how many

Page 188

1  times I can say it.
2  Q   So for the same reason, was there
3  never a cure of any event of default because you
4  never believed Uniloc to trigger an event of
5  default?
6      MR. FOSTER: Objection to form.
7      THE WITNESS: Again, I would defer to
8   my previous answers.
9 BY MR. WINNARD:
10  Q   This question is slightly different.
11 I'm asking about cure. You've testified that
12 you don't believe there had been an event of
13 default.
14     My question is: Given your belief
15 that you don't believe there was an event of
16 default, is it also the case you believe there
17 was never a cure of any event of default?
18     MR. FOSTER: Same objection.
19     THE WITNESS: I'll state again I don't
20  believe that there was an event of default.
21 BY MR. WINNARD:
22  Q   Can you answer my question?
23  A   Can you say it again? I'm sorry.
24 Please go ahead.
25  Q   Given your belief that there was never

Page 189

1  an event of default, is it your testimony that
2  there was never a cure of any event of default
3  under the revenue sharing agreement?
4  A   I mean, I guess that would be the
5  case, yes.
6  Q   Is that a yes, that it's your
7  testimony that given your belief that there was
8  no event of default, you also believe there was
9  no cure of any event of default under the
10 revenue sharing agreement; correct?
11  A   I mean, it just seems like a strange
12 question that I'm not sure, you know, like the
13 answer you're fishing for on that.
14     I don't believe that there was an
15 event of default and, therefore, you know, you
16 could derive from that what you will.
17  Q   Right. I'm asking you to help me
18 confirm my understanding.
19     So given your understanding there was
20 never an event of default, is it also your
21 understanding in your testimony today that there
22 was no cure of any event of default under the
23 revenue sharing agreement?
24     MR. FOSTER: Same objection.
25     THE WITNESS: If there was no default,

Page 190

1  there can be no cure.
2 BY MR. WINNARD:
3  Q   What is your understanding of the word
4  "cure" as it's used in Section 7.3 of the
5  revenue sharing agreement?
6  A   Let's see. Down at the "Y"?
7  Q   Correct.
8  A   The company shall have cured -- I
9 guess the majority -- I'm talking to myself out
10 loud, I apologize.
11     I'm not a lawyer. I don't want to
12 comment on what this legalese actually means.
13  Q   Do you have any understanding of the
14 word "cure" as it's used in the revenue sharing
15 agreement?
16  A   I believe that would mean satisfy.
17  Q   So in order to cure a revenue
18 shortfall of $20 million, you would need to
19 generate $20 million; right?
20     MR. FOSTER: Objection.
21     THE WITNESS: I don't think so.
22 BY MR. WINNARD:
23  Q   What do you mean by the word "satisfy"
24 as a definition for the word "cure"?
25  A   We could have amended the strategy,

Page 191

1  changed the strategy, decided to, you know, take
2  a different direction. Many things could have
3  affected this.
4      Q    Just so I understand how you're
5  understanding of the word "cure," if Uniloc
6  breached the agreement but Fortress didn't care
7  about the breach and was still satisfied, would
8  you consider that a cure under the revenue
9  sharing agreement?
10     A    I'm not going to comment on that. I'm
11 not a lawyer.
12     Q    Is your answer that you don't have any
13 information or belief as to whether that would
14 constitute a cure?
15         MR. FOSTER: Objection.
16         THE WITNESS: Yes.
17 BY MR. WINNARD:
18     Q    So in the circumstance where Uniloc
19 breached the agreement but Fortress was
20 satisfied nevertheless with Uniloc's
21 performance, you can't testify one way or the
22 other if that is a cure of the revenue sharing
23 agreement?
24         MR. FOSTER: Objection.
25         THE WITNESS: I'm sorry, say that

Page 192

1  again, please.
2  BY MR. WINNARD:
3      Q    In the circumstance where Uniloc has
4  breached a covenant in Article VI of the revenue
5  sharing agreement but Fortress is nevertheless
6  satisfied with Uniloc overall, can you testify
7  one way or the other as to whether you consider
8  that a cure?
9          MR. FOSTER: Objection.
10         THE WITNESS: I mean, I guess it would
11 be a cure, but I never felt that they were
12 in default, so I just don't -- other
13 things -- you know, we could have changed
14 the strategy, we could have done a number of
15 things.
16 BY MR. WINNARD:
17     Q    What do you mean by "change the
18 strategy"?
19     A    You know, we could have said, I don't
20 need you to generate 20 million in revenues,
21 focus on finding other opportunities.
22     Q    And if that was the language you used,
23 would you consider that a cure under the
24 agreement?
25     A    If I had conversations with that --

Page 193

1  with Craig and the team about that, I would say
2  it's not a cure, it's more of a change of
3  strategy and I don't care about 6.2 anymore.
4      Q    Can you turn to Section 9.4.2 of the
5  agreement? It's on Page 30 of Exhibit 3 and it
6  ends in Bates Number 18312.
7      A    9.2 you said?
8      Q    9.4.2. It's at the bottom of Page 30
9  ending of 18312, the Bates number at the bottom.
10         Do you see that?
11     A    Yes.
12         I'm just going to say I have a hard
13 stop in one hour. I'm happy to come back, I'm
14 happy to do anything you want to address
15 additional questions. But I really -- I'm
16 sorry, but I do have a hard stop in one hour.
17         MR. FOSTER: Doug, you can get it done
18 in an hour; right?
19         MR. WINNARD: I don't think so, Jim.
20 I think we're going to have to come back.
21 I'll do what I can. I've skipped a number
22 of stuff I got here, but I don't think I'm
23 going to get done in an hour.
24         MR. FOSTER: It's your deposition,
25 but, you know, you keep going over and over

Page 194

1  the same thing because the witness doesn't
2  give you an answer you want. He's not going
3  to do it just to get out of here by 4:00,
4  but keep going.
5          MR. WINNARD: Sure thing, Jim.
6          (Discussion off the record.)
7  BY MR. WINNARD:
8      Q    So you see Section 9.4.2 and the first
9  sentence of that reads, "No course of dealing
10 between the purchasers and company shall operate
11 as a waiver of any purchaser's right under this
12 agreement or with respect to the obligations."
13         Do you see that?
14     A    Yep.
15     Q    As a managing director of IP
16 transactions at Fortress, do you have an
17 understanding of what that language means?
18     A    I'm not a lawyer. But, you know --
19 I'm not a lawyer.
20     Q    Do you have an understanding as a
21 layman as to what that language means and as
22 someone who was involved in transactions like
23 this at Fortress?
24     A    You know, I've learned not to step my
25 shoes into legalese and language, or I

Page 207
1   A   I believe I understand what an event
2   of default is.
3   Q   Is that understanding the same or
4   different from how it's defined in the revenue
5   sharing agreement between Uniloc and Fortress?
6       MR. FOSTER: Objection.
7       THE WITNESS: Say that again, please.
8   BY MR. WINNARD:
9   Q   Is your understanding of an event of
10  default different from what -- how it's defined
11  in the revenue sharing agreement?
12      MR. FOSTER: Same objection.
13      THE WITNESS: I believe I understand
14  what an event of default is.
15  BY MR. WINNARD:
16  Q   Right. I'm just asking to make sure I
17  understand your understanding.
18      Is your understanding the same or
19  different from how an event of default is
20  defined in the revenue sharing agreement?
21      MR. FOSTER: Same objection.
22      THE WITNESS: Is my understanding of
23  an event of default the same as it is in the
24  revenue sharing agreement?
25      Well, I think you're reading it saying

Page 208
1   they are in default and I'm reading it
2   saying I don't believe they are in default.
3   So...
4   BY MR. WINNARD:
5   Q   Do you agree with the express terms of
6   the revenue sharing agreement defining what an
7   event of default is under the terms of that
8   agreement?
9   A   I believe that's the purpose of that
10  section to define events of default.
11  Q   Do you have any basis to disagree that
12  that is the definition of event of default for
13  purposes of the revenue sharing agreement?
14  A   No.
15  Q   Do you agree that the parties didn't
16  modify the definition of event of default at any
17  time after December 2014; right?
18  A   In writing?
19  Q   In any way.
20  A   Well, if an event of default was -- I
21  think we probably did redefine it.
22  Q   What was the new definition of event
23  of default?
24  A   I don't think we considered the
25  revenue monetization milestones events of

Page 209
1   default or not achieving them.
2   Q   Did Fortress ever consider amending
3   Section 6.2.2 of the revenue sharing agreement
4   after December 2014?
5   A   I don't know, but I would refer to the
6   amendments.
7   Q   Setting aside the amendments, you're
8   not aware of any discussions at Fortress about
9   amending --
10  A   I think you asked me this question at
11  least five times already today. You really did.
12  Five times. I've answered the same every single
13  time.
14  Q   I'm sorry, I'm not sure if I'm gotten
15  the same answer and I'm not trying to get a
16  different answer. I just want to --
17  A   I think you are trying to get a
18  different answer. I really do.
19      Doug, I've tried to be patient.
20  You've asked this ten different times, five
21  different ways. I'm going to give you the same
22  answer. And that's it. You have it on record
23  five times. Take it or leave it.
24  Q   Can you, sitting here today, tell
25  me --

Page 210
1   A   I will not address this anymore unless
2   the -- I'm sorry, you've asked me ten different
3   ways.
4   Q   Let's turn to your declaration. If we
5   go to Paragraph -- I want to go to Paragraph 12.
6   Are you there?
7   A   Yes.
8   Q   And in the second sentence you say,
9   "To the extent Apple argues the shortfall
10  created an event of default before May 15, 2017,
11  even though Fortress did not view it that way,
12  there is no dispute Fortress's signature to the
13  May 15 agreement establishes Uniloc had cured
14  that ostensible event of default to Fortress's
15  satisfaction."
16      REPORTER: Can you read after "cured"?
17  BY MR. WINNARD:
18  Q   "Establishes Uniloc had cured That
19  ostensible event of default to Fortress's
20  satisfaction."
21      Do you see that?
22  A   Are you asking me?
23  Q   Yes.
24  A   Yeah, I see that, yes.
25  Q   How did Uniloc cure the event of

Page 211

1  default?
2  MR. FOSTER: Cure to Fortress's
3  reasonable satisfaction.
4  MR. WINNARD: We don't need speaking
5  objections, Jim.
6  THE WITNESS: Ask me the question
7  again, please.
8  BY MR. WINNARD:
9  Q  How did Uniloc cure the event of
10 default that you're referencing in Paragraph 12
11 of your declaration?
12 A  Okay. So I think what I'm trying to
13 say here is I never believed them to be in
14 default. And if for some reason somebody says
15 they are in default, the simple fact that we
16 executed that May 15 agreement, you know, states
17 that these guys are not in default.
18 Q  Do you consider the execution of that
19 amendment to the agreement as the cure of any
20 event of default?
21 A  I would put it this way. Okay. I
22 don't believe they were in default and if, in
23 fact, somebody says they are in default, the
24 fact that we move forward, you know, establishes
25 the fact that we don't believe that there is a

Page 212

1  default at that juncture.
2  Q  What specific actions did Uniloc take
3  to cure any event of default that may have
4  existed as of March 31st, 2017?
5  A  I think they would have had to thought
6  they were in default to take action to cure a
7  default. Since neither they nor us considered
8  them in default, I'm not sure they would have --
9  I don't know what actions you reference.
10 As I stated before, this is what I'll
11 say again. As I said ten different times, Craig
12 and I would have ongoing conversations about
13 strategy direction, et cetera, and you
14 constantly want to have discussions and make
15 sure you're on track and you make changes here
16 and decisions here.
17 So we never considered them in default
18 because we made a decision on not to go by the
19 monetization milestone.
20 Q  Who made the decision?
21 A  Myself. There were maybe others
22 involved in the discussion, certainly
23 discussions with Craig. We made the decision
24 that that's not the appropriate direction and
25 we're happy with it and we'll provide additional

Page 213

1  investment.
2  Q  Are there any documents that you're
3  referring to where you commit to writing a
4  decision not to enforce the revenue minimum?
5  A  I believe that the simple fact that we
6  executed amendments and didn't put them in
7  default is, you know, evidence enough.
8  Q  Did Uniloc propose to take any actions
9  after March 31st, 2017 to cure any potential
10 events of default caused by its revenue
11 shortfall?
12 A  As I just stated, neither Uniloc nor
13 Fortress considered them in default. So I don't
14 think they would have had to specifically
15 address taking action against that or on that.
16 Q  So Uniloc didn't propose any actions
17 to cure; right?
18 MR. FOSTER: Objection.
19 BY MR. WINNARD:
20 Q  Because there was nothing to cure?
21 A  Correct.
22 Q  Because it's your understanding there
23 was nothing to cure, Uniloc proposed no actions
24 to cure?
25 A  Correct.

Page 214

1  MR. FOSTER: You have another
2  26 minutes left. The last 20 minutes shows
3  exactly why I'm telling you to proceed at
4  your peril if you just keep repeating the
5  same questions over and over again.
6  BY MR. WINNARD:
7  Q  On what date did Uniloc cure any event
8  of default that may have been triggered by --
9  A  I'm not going to answer that.
10 Q  You can't identify a date for me?
11 A  I think you're asking the same
12 question that you've been asking for 30 minutes.
13 Q  I haven't asked you a date yet. I
14 want --
15 A  Yeah, but you know, this is like, no
16 offense, lawyer trickery right now. I'm sorry,
17 but I'll sit -- like what you just did was the
18 exact reason why this is -- really, come on.
19 Q  I just want to --
20 A  Cut to the chase. You asked me if
21 they are in default. I said no.
22 Q  Right. What I want to understand is
23 your declaration claims that it had been cured.
24 What I want to understand --
25 A  No, what I said is -- okay, let's be

Page 215

1  clear -- I never believed them to be in default.
2  But if for some crazy reason somebody thinks
3  they were in default, by simple fact of us
4  actually executing an additional amendment and
5  giving them additional capital means in my mind
6  that it's satisfied. That's what I say there.
7  There is a date right there in the declaration.
8  Q   Right. So you're not pointing to any
9  cure that may have occurred between May 31st and
10 May 15th; right?
11 A   I'm -- what I'm saying again is I do
12 not believe there was a default, so, therefore,
13 there was not a cure. But if for some crazy
14 reason somebody thinks there was a default, in
15 my mind there never was. And the simple fact
16 that we executed this and gave them additional
17 capital, you know, to me it's satisfied.
18 Q   You understand that any default would
19 need to be cured to Fortress's reasonable
20 satisfaction. That's the terms of the
21 agreement; right?
22 A   I believe that's what it says.
23     MR. FOSTER: All right. Doug, I've
24 been very patient, haven't said anything
25 else. At this point I'm going to put the

Page 216

1  hammer down. I'm going to point out to the
2  witness the judge has already ruled in the
3  '358 case, the '360 case exactly as this
4  witness has testified.
5      MR. WINNARD: I'm exploring the
6  veracity of the declaration to make sure I
7  understand what the witness means by "cured"
8  because we think that that's actually a
9  material dispute that's part of the
10 discovery and the dispute as to what
11 standing was at that time these actions were
12 filed.
13     I understand your position, but we're
14 entitled to discovery on this.
15 BY MR. WINNARD:
16 Q   I'm not trying to talk in circles.
17 Let me make sure I understand what you're
18 saying.
19     It's your testimony there was never an
20 event of default; right?
21 A   Correct.
22 Q   And that's true for all periods of
23 time from December 2014 until Uniloc 2017
24 acquired assets in, I think, May 2018?
25 A   That has been my belief.

Page 217

1  Q   Given that it's your belief that there
2  was no event of default, it is your
3  understanding that Uniloc didn't take any
4  specific action to cure any event of default at
5  any time; right?
6      MR. FOSTER: Objection.
7      THE WITNESS: We would have to put
8  them in default. They would have had to
9  realize or believe they were in default to
10 take action.
11     Now, we did things and we amended the
12 strategy and had discussions about that and
13 so forth, you know. So there's things
14 around that, but we never did it
15 specifically because there was an event of
16 default or to cure an event of default.
17 BY MR. WINNARD:
18 Q   So I understand, the execution of the
19 third amendment in May 2017, is it your view
20 that that amendment itself was a cure or is it
21 evidence that at some point leading up to that
22 amendment, there would have been a cure?
23 A   The way I -- what I'm saying is I
24 never would have done that if these guys were in
25 default. So, therefore, I guess I would say

Page 218

1  that they were in default at that time and there
2  wasn't the cure.
3      I'm saying I never would have done
4  that if I felt they were in default.
5  Q   At the time that Fortress lent money
6  in May 2017 to Uniloc, it was lending another
7  10 million; right?
8  A   Again, it's been a long -- I have to
9  go back and look. Is that what it says?
10 Because I think it was 10.6 and 10, was it, or
11 something, I think, so --
12 Q   It was an additional 10 million on top
13 of --
14 A   Okay.
15 Q   And if that's --
16 A   I wasn't trying to be difficult on
17 that. I just -- again, a lot of documents. I'm
18 not a lawyer. So I just wanted to recall.
19 Q   And from the investment memorandum, we
20 saw that Fortress had valued the patents that
21 Uniloc would acquire with that 10 million at
22 around 60 million; right?
23 A   Is that what it says?
24 Q   We can refer back.
25 A   If that's what it says, I'm not going